UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

ANTHONY THOMAS GRIMES, )
Petitioner, )
v. ) Civil Action No. 4:20-CV-56-JHM
)
KEVIN MAZZA, Warden, )
Green River Correctional Complex, and, )
)
DANIEL CAMERON, Kentucky Attorney General )

**PETITIONER GRIMES' MEMORANDUM
IN SUPPORT OF HIS
PETITION FOR A WRIT OF HABEAS CORPUS**

Comes now the Petitioner, Anthony Thomas Grimes, by counsel, and submits the following memorandum in support of his petition for writ of habeas corpus.

**PROCEDURAL STATEMENT OF THE CASE**

On February 4, 2003, Tony Grimes, Petitioner, was indicted on two counts of first degree rape (KRS 510.040), six counts of first degree sodomy (KRS 510.070), nine counts of first degree sexual abuse (KRS 510.110), and one count of second degree sexual abuse (KRS 510.120). [TR 1-4.] Petitioner would later learn that thirteen (13) of the counts were allegedly committed against Ashley Erin M., his older stepdaughter, while the remaining five (5) counts were allegedly against Jordan Lee M., his younger stepdaughter. The eighteen count indictment covered a period from June 6, 1997 through October 31, 2002. [TR 1-4.]

The jury on September 26, 2003 convicted Petitioner of two (2) counts of first degree rape, six (6) counts of first degree sodomy, eight (8) counts of first degree sexual abuse, and one (1) count of second degree sexual abuse. [TR 63-79.] Following a sentencing hearing, the jury recommended

that Petitioner be sentenced to confinement in the penitentiary for fifty-nine (59) years. [TR 84-100.]

On October 3, 2003, defense counsel filed a motion for a new trial on three grounds:

(1) "[t]he court failed to give the requested instruction on lesser-included offenses on indictments 1-14"; (2) "[i]n its closing argument, the Commonwealth argued facts that were not in evidence or reasonably inferable therefrom"; and (3) "[t]he Court failed to give the requested instruction permitting the jury to determine the age of the alleged victim at the time of the alleged offenses." [TR 112.]

On November 25, 2003, pursuant to the jury's recommendation, the judge sentenced Petitioner to be confined in the penitentiary for a total of fifty-nine (59) years. [TR 133.]   The final "Judgment and Sentence" was entered on November 25, 2003. [TR 128-134.]

Petitioner was represented at trial, in all the relevant pretrial matters and at sentencing by Hon. Joseph R. Flaherty, Flaherty Law Office, Owensboro, Kentucky.  Mr. Flaherty did not represent Petitioner on his direct appeal to the Kentucky Supreme Court.  J. Vincent Aprile II represented Petitioner on both his direct appeal to the Kentucky Supreme Court, all post-conviction proceedings in the Daviess Circuit Court and the appeals of those post-conviction proceedings.

Petitioner's timely notice of appeal to the Kentucky Supreme Court was filed on December 19, 2003. [TR 147-48.] After full briefing, the Kentucky Supreme Court on May 19, 2005 in an unpublished memorandum opinion affirmed the conviction and sentence. *Grimes v. Commonwealth*, Kentucky Supreme Court, No. 2003-SC-1062-MR (May 19, 2005) [hereinafter *Grimes*, KSC, 2005]; *Grimes v. Com.*, 2005 WL 1185609 (May 19, 2005).  Petitioner' direct appeal became final on July

22, 2005.  Petitioner filed no petition for a writ of certiorari in the United States Supreme Court.[1]

On August 17, 2006, Petitioner filed in the Daviess Circuit Court an RCr 11.42 motion, alleging some fifteen (15) specific claims of ineffective assistance of counsel.  [TR2, 14-32] That motion was denied, without an evidentiary hearing, on November 20, 2006. [TR2, 85-87.]

On August 14, 2007, Petitioner filed in the Daviess Circuit Court a motion, pursuant to CR 60.02, seeking alternative relief that would allow him to file a timely notice of appeal from the November 20, 2006 order denying his RCr 11.42 motion, on the grounds that neither Petitioner nor his counsel had ever received a copy of that order or notice of its entry from the Clerk of the Daviess Circuit Court at any time in 2006 or at any time in January or February 2007. [TR2, 88-116.] On February 1, 2008, the Daviess Circuit Court granted Petitioner's CR 60.02 motion and permitted Petitioner to file a timely notice of appeal from the November 20, 2006 order denying his RCr 11.42 motion. [TR2, 137-140.] Petitioner filed a timely notice of appeal on February 25, 2008. [TR2, 141-142.]

On July 24, 2009, the Kentucky Court of Appeals issued an opinion and order affirming in part, vacating in part and remanding to the Daviess Circuit Court to hold an evidentiary hearing on only whether Petitioner's trial attorney had failed to inform Petitioner of the prosecution's plea offer until after his sentencing was completed.  The opinion and order also denied the Commonwealth's

---

[1]  For purposes of calculating the one-year period for filing Petitioner' federal habeas corpus petition, the starting period is October 20, 2005, the expiration of the time for filing his certiorari petition, even though no cert petition was filed.  *Clay v. United States*, 537 U.S. 522, 524-25, 527 (2003) ("For the purpose of starting the clock on § 2255's one-year limitation period, we hold, a judgment of conviction becomes final when the time expires for filing a petition for certiorari contesting the appellate court's affirmation of the conviction"); *Gonzalez v. Thaler*, 132 S. Ct. 641 (2012) (applying that same principle to state court prisoners seeking federal habeas corpus review).

motion to dismiss the appeal because the Daviess Circuit Court had improperly extended Petitioner's time to appeal. After the Kentucky Court of Appeals denied the Commonwealth's motion for reconsideration, the Commonwealth filed a motion for discretionary review.

The Kentucky Supreme Court on August 18, 2010 granted the discretionary review motion, vacated the Court of Appeals' opinion, remanded the case for further consideration of the Commonwealth's motion to dismiss in light of the Kentucky Supreme Court's then recent opinion in *James v. James*, 313 S.W.3d 17 (Ky. 2010).

The Court of Appeals on December 9, 2011, in an unpublished opinion and order again denied the Commonwealth's motion to dismiss, affirmed in part, vacated in part, and remanded the case to the Daviess Circuit Court to conduct an evidentiary hearing on whether Petitioner's trial attorney had conveyed the prosecution's plea offer to Petitioner before his jury trial and sentencing were completed. *Grimes v. Commonwealth*, Kentucky Court of Appeals, No. 2008-CA-000518-MR (December 9, 2011) [hereinafter *Grimes*, KCA, 2011]; *Grimes v. Com*., unpublished, 2011 WL 6108510 (December 9, 2011). Discretionary review of that opinion and order was denied by the Kentucky Supreme Court on August 15, 2012.

An evidentiary hearing was held in Daviess Circuit Court on May 6, 2013 and, following post-evidentiary hearing briefing, the circuit court on March 7, 2014 denied Petitioner's RCr 11.42 claim regarding his trial defense counsel's failure to communicate the prosecution's plea offer to him as well as Petitioner's CR 52.05 motion for findings of fact. Petitioner filed a timely notice of appeal on March 24, 2014. After full briefing and oral argument, the Court of Appeals on July 22, 2016 in an unpublished opinion affirmed the order of the Daviess Circuit Court denying Petitioner RCr 11.42 relief. *Grimes v. Commonwealth*, Kentucky Court of Appeals, No. 2014-CA-000547-MR (July 22,

2016) [hereinafter *Grimes*, KCA, 2016]; *Grimes v. Com*., unpublished, 2016 WL 3962309 (July 22, 2016). Petitioner filed a timely motion for discretionary review in the Kentucky Supreme Court that was denied on February 9, 2017.

On February 17, 2017, Petitioner filed in the Daviess Circuit Court a motion, pursuant to CR 60.02, alleging that his trial counsel's explanation of the offer and its risks and advantages constituted ineffective assistance of counsel. On May 8, 2017, the Daviess Circuit Court, without conducting an evidentiary hearing, entered an order denying Petitioner's CR 60.02 motion. [NTR2, 366-373.] Petitioner filed a timely notice of appeal to the Kentucky Court of Appeals. After full briefing and oral argument, the Court of Appeals on April 26, 2019 in an unpublished opinion ruled that Petitioner's claim was not procedurally barred, but affirmed the circuit court's denial of the merits of his claim. *Grimes v. Commonwealth*, Kentucky Court of Appeals, No. 2017-CA-000988-MR, April 26, 2019 [hereinafter *Grimes*, KCA, 2019]; *Grimes v. Com*., unpublished, 2019 WL 1868919 (April 26, 2019).

After Petitioner's timely rehearing petition was denied, Petitioner filed a timely motion for discretionary review in the Kentucky Supreme Court, which was denied on February 12, 2020.

Petitioner's claims in this petition arise out of these various state court proceedings.

Petitioner is presently serving his sentence of imprisonment for fifty-nine (59) years at Green River Correctional Complex in Central City, Kentucky.[2]

## STATEMENT OF THE CASE

When Petitioner, was sixteen years old, he met Tina Grimes, a twenty-three year old co-worker. When Petitioner was almost eighteen, he and Tina began a romantic relationship. When

---

[2] Green River Correctional Complex, 1200 River Rd, Central City, KY 42330.

Petitioner was eighteen and Tina twenty-five, they began living together.  Tina was at that time the single parent of two girls, Ashley Erin M., then seven years old, and Jordan Lee M., then two years old, and a five-year old son, Andrew (Drew) Richard M.. [TAPE 2; 9/25/03; 03:15:25-17:14; TAPE 1; 09/24/03; 03:59:08-25.]

Petitioner and Tina lived together for three years prior to marrying on March 13, 1996. [TAPE 1; 09/24/03; 03:59:29-50.] From the moment Petitioner and Tina moved in together, all three of Tina's children were present and part of the family.

Petitioner never treated his children as if they were his stepchildren, but instead he treated them as if were his own biological children.  By their own choice, the three children called Petitioner "Dad."  [TAPE 2; 9/25/03; 03:15:35; TAPE 1; 09/24/03; 04:02:15.]

Petitioner, who was twenty-eight at trial, had been for ten years a sales representative for K & W Equipment Company, selling John Deere equipment in nine Kentucky counties and three and one-half counties in Indiana.  [TAPE 2; 9/25/03; 03:14:29-59.] Petitioner was usually able to be home in the evenings.

That was fortunate because Tina Grimes was a full-time emergency room nurse for Owensboro Emergency Health Systems who routinely worked the late shift from 6:00 p.m. until 6:00 a.m. [TAPE 1; 09/24/03; 04:00:25-39; 04:36:45.] Normally Tina Grimes would come home from work at 7:00 a.m. and go to bed until 3:30 or 4:00 p.m. to prepare to return to work at 6:00 p.m. [TAPE 1; 09/24/03; 04:00:39-01:14.]

As a result of these work schedules, Petitioner was "basically ...  the mom and the dad" to all three children.  [TAPE 2; 9/25/03; 03:16:29-59.] He took the kids to school in the morning and picked them up in the afternoon, took them to practices, and took them out to eat because he didn't

cook evening meals and Tina was at work on the late shift. [03:38:41.]

Petitioner's relationship with his stepchildren was loving. However, sometime in the summer of 2002 when Ashley was seventeen, as a typical teenager, she would become rebellious, hardheaded and stubborn at times. [03:19:49-20:56.] Petitioner had not experienced any such problems with his younger stepchildren, Jordan and Drew.

On the night of Sunday, December 8, 2002, Petitioner and Ashley had a problem. Petitioner asked Ashley if she had run her miles on the treadmill at the house for her daily exercise as she was supposed to do. When Ashley said no and told Petitioner that she was going to shower and go to bed, the situation "escalated into a big argument." [03:22:40.] Ashley wrote in her journal that: "Dad [Petitioner] makes me so angry. I hate him. Well not really but I'm just so mad at him. He made me run 5 miles on the treadmill today. He's such a jerk sometimes." [Defense Exhibit 1, 4; TAPE 2; 9/25/03; 03:28:50.] But the next morning everything seemed to be okay.

The next afternoon, Monday, December 9, 2002, Tina and Petitioner received a phone call from Mary Ann Yewell from social services. [TAPE 2; 9/25/03;03:31:17; TAPE 1; 09/24/03; 04:02:54-03:38.] Petitioner feared that Ashley had caused a problem because the Sunday before he had grabbed her and told her he was tired of this crap and that she was going to mind, "do what she's told." He worried that perhaps there were bruises on her arm that he had not noticed, but a teacher had. Petitioner knew that a co-worker of his had gone to jail when a baby-sitter saw bruises on his child's butt and reported it. [TAPE 2; 9/25/03;03:31:17-34:40.]

After the phone call from the social worker, Tina and Petitioner waited for Ashley to come home from school in her car but when she did not arrive, they drove around and found her driving her car. After a brief discussion with Ashley, they all returned to the house. When Ashley refused

to talk about her discussion with Ms. Yewell in front of Petitioner, she and Tina went into the bedroom to talk privately.

Petitioner was starting to get upset because he was worrying that he would be accused of physically abusing Ashley by grabbing her too roughly. Petitioner went out to the garage to get in his truck. Tina approached him, saying that Ashley says you have been touching her and asking if he had touched her. Petitioner, crying and upset, says, "yeah, I did, I grabbed her last night," referring to the incident with the treadmill. Petitioner told Tina he had to go, but went back into the house to tell Ashley and Jordan he loved them and to give them both a hug. Petitioner left because he was afraid he would be put in jail for grabbing Ashley just as his co-worker was.   [TAPE 2; 9/25/03; 03:31:17-34:40.]

That same afternoon Tina took Ashley and Jordan to meet with the social worker and they were told to go to the police department. [TAPE 1; 09/24/03; 04:07:15-32.] Sergeant Duvall of the Owensboro Police Department interviewed Ashley, Jordan, Andrew and Tina and took statements from each of them. His interviews of the two alleged victims, Jordan and Ashley, each lasted about thirty (30) minutes. [01:22:24.]

The next day Ashley telephoned Sergeant Duvall and told him "that everything that she told [him] the first day was a lie." [TAPE 2; 09/25/03; 01:07:52.] Ashley said "she'd done a really terrible thing and that everything she told me was a lie." [01:37:55-38:25.]   Sergeant Duvall told Ashley that her recantation was "going to throw a monkey wrench into this thing." [01:41:20-45.] When Duvall told Ashley she would have to tell her mother about recanting her original story, Ashley told him that "she couldn't bear to face her mother."  [01:37:55-38:25.]

After the recantation, Duvall talked to Tina Grimes on December 11 about the recantation,

but he did not speak to Ashley again until January 3, 2003. [TAPE 2; 09/25/03; 01:08:05; 01:42:01-43:00.]

On December 11, 2002, Duvall interviewed Petitioner at the police station. [01:08:05-30.] At the interview Petitioner "denied touching his daughters sexually." [01:09:36-45.] During Duvall's questioning, "each time" Petitioner "was told what the girls had alleged, he would say 'Sergeant Duvall, I never touched my girls in a sexual way.'" [TAPE 2; 09/25/03; 01:11:30.] Petitioner told Sergeant Duvall, "I've never sexually touched anybody, except my wife for the past ten (10) years, my daughters, another woman, I've never done this." [TAPE 2; 9/25/03; 03:35:14-30.]

Although Sergeant Duvall had attempted to videotape the interview with Petitioner, he failed to engage the record button properly and no recording of the interview was made. After the interview concluded, Duvall realized he had no recording of the interrogation. Duvall had no choice but to type up his notes of the interview "from memory" right after the conversation. [01:11:57-16:23.]

On December 11, Tina Grimes contacted Officer Duvall by telephone and they talked for about ten minutes. In that conversation Tina told Duvall that Petitioner had admitted to her over the phone that he had done these things, but she did not provide Duvall with any details of the conversation with Petitioner. [01:31:59-32:45.] In fact, Tina did not provide the details of the alleged telephone confession to the police or prosecution until January 2, 2003, more than three weeks after the call itself.

On February 4, 2003, Petitioner was indicted on two counts of first degree rape, six counts of first degree sodomy, nine counts of first degree sexual abuse, and one count of second degree

sexual abuse. [TR 1-4.] Petitioner would later learn that thirteen (13) of the counts were allegedly committed against Ashley, while the remaining five (5) counts were allegedly against Jordan. The eighteen count indictment covered a period from June 6, 1997 through October 31, 2002. [TR 1-4.]

At trial Ashley, then eighteen years old, testified about a number of different incidents:

(1) an incident in her brother Drew's room at their Brookhill residence between October 1-31, 2002, that involved the offenses (first degree rape, sodomy, and sexual abuse) alleged in counts one through three [TAPE 1: 9/24/03; 02:04:01-07:57];

(2) an incident between September 1, 2000 and December 31, 2001 in the bathroom at the Brookhill residence when Ashley wanted a friend to come over, that involved the offenses (first degree sodomy and sexual abuse) in counts four and five [02:08:09-10:18];

(3) an incident between September 1, 2000 and December 31, 2001, in her bedroom at the Brookhill residence, that involved the offenses (first degree sodomy and sexual abuse) in counts six and seven [02:11:52];

(4) an incident between September 1, 2000 and December 31, 2001, in the master bedroom at the Brookhill residence, that involved the offenses (first degree rape and sodomy) in counts eight and nine [02:13:43-16:30];

(5) an incident between June 6, 1998 and September 30, 2000, in the living room at the Circle Drive residence in Masonville, that involved the offense (first degree sodomy) in count ten [02:16:32-18:50];

(6) an incident between June 6, 1997 and September 30, 2000, at the Circle Drive residence in Masonville, that involved the offenses (first degree sodomy and sexual abuse) in counts eleven and twelve [02:16:32-18:50]; and

(7) an incident between June 6, 1997 and June 5, 1999, at the Circle Drive residence in Masonville, that involved the offense (first degree sexual abuse) in count thirteen [02:19:02-20:06].

Throughout Ashley's testimony, the prosecutor asked leading questions, even though Ashley was eighteen years of age at the time of trial.[3] Ashley frequently did not testify to her age at the time of the offense [02:08:09-10:18; 02:14:43-16:30; 02:16:32-18:50].

Ashley testified that the first adult that she told about this situation with her stepfather was Ms. Ashby, a parenting and fashion design teacher at Daviess County High School. [02:20:50-21:15.] Ashley said that she told Ms. Ashby in December 2002. [02:21:35.] According to Ashley, after she had written in her journal that she hated Petitioner, her brother Drew read the journal and threatened to tell Petitioner about it. As a result of her worry about Drew making this disclosure to Petitioner, Ashley was crying in her first period class when Ms Ashby asked what was wrong. In response, Ashley told her story to her teacher. [02:21:30-22:12.] She then was required to talk with Ms. Rodney, the guidance counselor. [02:22:30.]

Ashley said that she and her sister, Jordan, "had talked about it before." [02: 21:07.] However, Ashley could not "remember when it was," not even the year, indicating they had spoken only once about the situation with Petitioner. [03:11:43.]

Ashley claimed that she did not tell her mother about these alleged attacks because she was afraid her mother would not believe her and because she was "scared." [02:21:16-30.]

---

[3] Examples of the prosecutor's leading questions: "Later on that day did you get a pair of jeans?" [TAPE 1: 09/24/03; 02:07:24-29.] "Were you scared?" [02:08:58-09:04.] "Did he put his mouth on your vagina?" [02:17:40-48.] "Was it ever a time at the house on Circle Drive where you were forced to perform oral sex upon him?" [02:17:52-58.] "Did you speak with, do you remember this fellow [Sergeant Duvall] here?" [02:22:33-42.] "Now the next day, did you tell somebody it didn't happen?" [02:24:42-47.] "Did you tell him [Sergeant Duvall] you lied to him?" [02:25:10-16.]

Ashley acknowledged that the day after she made these allegations against Petitioner to her teachers and the police, she telephoned Sergeant Duvall and told him that it did not happen and that she had "made it all up." [TAPE 1; 02:24:42-25:10.]

The other daughter, Jordan, who was born October 27, 1990, was twelve (12) years old and a seventh grader at the time of trial. [TAPE 1; 09/24/03; 03:14:31-40.]

Jordan testified that when she was "about nine" years old and in the third grade Petitioner, while rubbing her back, rubbed her buttocks with his hands on the outside of her clothes for "probably a minute or more." [03:16:27-17:35.]

Jordan also said that when she was in the fourth grade a similar back rubbing situation occurred, but this time Petitioner rubbed her butt, his hand to her skin, for a minute or so. [03:18:00-19:29.] The prosecutor was unsatisfied with this account and asked, "He just rubbed your butt?" When Jordan indicated that was all, the prosecutor asked Jordan if she had told Sergeant Powell and Steve White that Petitioner had "rubbed your vagina"?  Jordan responded that she "might have said that" and "it would have been true," but she added "like since all of it happened it sometimes goes to a blur." [03:19:00-29.]

Jordan also recounted another time when she was in the fourth grade when during a back rubbing Petitioner supposedly rubbed her butt and "tried to rub" her vagina, but when she said no, Petitioner stopped. [03:19:40-21:00.]

Jordan recalled a time when she was in the fifth or sixth grade and had a loose tooth.  She had fallen asleep in the sun room where the television was and Petitioner  brought her into the living room.  After a brief recess, Jordan testified that he had taken her into his bedroom, instead of the living room.  She was either eleven or twelve years old.  Jordan testified that Petitioner wiggled her

loose tooth and after putting the pillow over head so she could not see took his finger out of her mouth. She said "it felt like something else besides his finger was in her mouth" and "it was his private part" she thought. However, she did not "know for sure," but did know he had not touch her in any other way at that time. [03:32:34-34:38.]

Unsatisfied with that answer, the prosecutor asked Jordan if she remembered telling Steve White that Petitioner "put his mouth on [her] breast." Jordan responded, "oh, yes, he did." She then said that Petitioner had lifted up her shirt and put his mouth on her breast. Jordan added that this happened after the tooth wiggling had taken place. [03:34:38-35:20.]

Jordan also recounted an incident when she was in either the fifth or sixth grade and eleven years old when she was out of school for a snow day. However, after prodding by the prosecutor, she decided that she was actually in the fourth grade when this supposedly happened. At that time two of Jordan's dogs lived outside in a heated shed. Jordan said that Petitioner called her into the shed and told her to come over to him. When Jordan went over to Petitioner, he supposedly grabbed her hands as she heard a zipper. She testified that he wrapped her hands against his exposed "private part" for a few minutes until Ashley walked in and he pretended he was warming Jordan's hands. [03:36:53-39:17.] On cross-examination, Jordan changed her testimony, stating that Ashley did not come into the shed until "probably two minutes after" Petitioner had stopped. [03:55:52-56:47.]

The prosecutor also asked if Jordan remembered another incident when, after she fell asleep watching television, Petitioner picked her up, took her to the bedroom, put her on the bed and touched her. Jordan answered that she did not remember that. [03:39:17-53.]

Contrary to Ashley's testimony, Jordan said that she and Ashley talked about these incidents with Petitioner "a lot." [03:41:56.] But Mary Ann Yewell was the first adult that she told about

Petitioner touching her. [03:41:21-39.]

Jordan acknowledged that before initially talking to Officer Duvall, she and this social worker, Mary Ann Yewell, went over her statement, trying to get her to recall more things. [03:53:39-54:47.]

Tina Grimes, Petitioner's wife and the mother of the two alleged victims, testified that neither of her daughters at anytime in the last five years had ever said anything to her about Petitioner mistreating them sexually in any way.   [TAPE 1: 09/24/03; 04:28:23-41.]   However, Tina did explain that Petitioner was "very strict on them, often stood them in the corner, made them go up and down on their toes," and "Ashley occasionally would have bruises on her forearms which she didn't know how she got." [04:29:00.] Ashley was required to use the treadmill every day.  Tina also noted that she and Petitioner "had many arguments concerning the way he treated the kids and disciplined the kids." [04:30:05.]

Tina said that on the date that Ashley had told her mother about these incidents, Petitioner had admitted to her that "he had touched them" and that he was "a sick son of a bitch." [04:05:09-49.]

Tina testified that, after these allegations were made, Petitioner, who immediately moved out of the house,  continued to call her constantly.  However, on December 11, 2002, Tina phoned Petitioner because she "was concerned about Ashley possibly being pregnant" and "confronted him on certain aspects, certain things that the kids had told" her that "he had done to them." [04:08:19-09:13.]

Tina then launched into a long list of what Petitioner had supposedly confessed to her, including Petitioner telling her that "he never touched them with his penis ... the only thing he did

is he used his fingers on them and never put them in them no deeper than fingernail depth." [04:10:47-11:01.] According to Tina, when she told Petitioner the girls were saying that he performed oral sex on them, he said, "No, I tried to do that to them but they don't keep themselves clean down there like you do, I couldn't do it." [04:10:47-11:27.]

When the prosecutor asked if Petitioner had said anything else on the phone to her, Tina replied, "Um, I'm sure, he said many things, I can't think of them right now." She then added some additional admissions supposedly made by Petitioner during that call. [04:11:25-12:16.] Tina testified that Petitioner told her "Jordan never touched his penis."

Tina briefly discussed Ashley's recantation of her original allegations of Petitioner's sexual misconduct, explaining that she had talked to Ashley about the recantation . [Tape 1: 09/24/03; 04:07:32-08:19.]

According to Tina, she had been telling her girls about "good touch bad touch" since they were babies. [04:31:13-30.] Tina told her girls that "[n]o one was to touch their private areas and if anyone touched them they needed to tell someone." [04:32:07.] Tina estimated that she had given her girls fifteen (15) of these "good touch bad touch" talks over their lives. [04:32:32-40.]

Detective Sergeant Robert Duvall, Owensboro Police Department, testified on re-direct examination, that during his January 2, 2003 interview with Ashley, she claimed that "she recanted her story because she didn't want to see" Petitioner "go to jail and because she knew the effect it would have on her mother's relationship," adding that "[s]he just wanted everything to go away." [TAPE 2; 09/25/03; 01:58:55-59:15.]

At the conclusion of the prosecution's case-in-chief, the defense moved for a directed verdict on all counts involving forcible compulsion. The trial judge denied that motion. However, the

prosecution and defense jointly moved to dismiss count sixteen because Jordan had testified that she did not remember the incident.  The court granted the motion and count sixteen was dismissed. [TAPE 2; 09/25/03; 02:19:45-32:00.]

During the defense case, Drew McArthy, the brother of the two alleged victims, testified that his relationship with his stepfather, Petitioner, was close and that they did things together.  Drew also testified that his mother Tina had told him about good touches and bad touches.  [TAPE 2; 09/25/03; 03:11:05-13:20.]

Petitioner testified on his own behalf, asserting his innocence of these charges just as he had when Sergeant Duvall interviewed him on December 11, 2003.  [TAPE 2; 09/25/03; 03:44:40-50.] When asked on direct examination if he had confessed to his wife on the phone that he "had done these acts" he is charged with, Petitioner said "no." [TAPE 2; 09/25/03; 03:36:04.] Petitioner during cross-examination told the jury that he had "never sexually touched [his] kids" and "never molested them." [03:54:43-53.]

Petitioner described himself as a "strict disciplinarian." [03:56:22-27.]  He acknowledged that he punished his stepchildren by "mak[ing] them stand in the corner, go[ing] up and down on their tiptoes." [03:50:35-42.] He liked short punishments; he did not like to ground his stepchildren. [03:51:15-19.] Petitioner emphatically stated that he had "never physically abused" his children and never had slapped Ashley.  Petitioner readily admitted that he did not like his children to disobey him. [03:53:17-22.]

At the close of all the evidence, defense counsel renewed his motion to dismiss all the counts of the indictment pertaining to Ashley on the basis of the definition of "forcible compulsion."  The trial judge denied the directed verdict motion.  [TAPE 2; 09/25/03; 04:24:28-29:30.]

The jury on September 26, 2003 convicted Petitioner of two (2) counts of first degree rape (KRS 510.040), six (6) counts of first degree sodomy (KRS 510.070), eight (8) counts of first degree sexual abuse (KRS 510.110), and one (1) count of second degree sexual abuse (KRS 510.120). [TR 63-79.]

Following a sentencing hearing, the jury recommended that Petitioner be sentenced to confinement in the penitentiary for fifty-nine (59) years. [TR 84-100.]

On October 3, 2003, defense counsel filed a motion for a new trial on three grounds: (1) "[t]he court failed to give the requested instruction on lesser-included offenses on indictments 1-14"; (2) "[i]n its closing argument, the Commonwealth argued facts that were not in evidence or reasonably inferable therefrom"; and (3) "[t]he Court failed to give the requested instruction permitting the jury to determine the age of the alleged victim at the time of the alleged offenses." [TR 112.] The motion was apparently never ruled on by the trial judge.

On November 25, 2003, pursuant to the jury's recommendation, the judge sentenced Petitioner to be confined in the penitentiary for a total of fifty-nine (59) years. [TR 133.]   The final "Judgment and Sentence" was entered on November 25, 2003. [TR 128-134.]  Petitioner's timely notice of appeal was filed on December 19, 2003. [TR 147-48.]

The Kentucky Supreme Court affirmed Petitioner's judgment of conviction in an unpublished memorandum opinion on May 19, 2005. *Grimes, KSC, 2005.* [TR2, 3-12.]  Petitioner's judgment was final on July 22, 2005.

On August 17, 2006, Petitioner filed in the Daviess Circuit Court an RCr 11.42 motion, alleging some fifteen (15) specific claims of ineffective assistance of counsel.  [TR2, 14-32] That motion was denied, without an evidentiary hearing, on November 20, 2006. [TR2, 85-87.]

In its order denying Petitioner RCr 11.42 relief, the circuit court initially noted:

> Nearly all of the Defendant's arguments and allegations have been or could have been presented on direct appeal of the judgment in this case. The Court will briefly address the Defendant's other arguments in this order. [TR2, 85.]

The circuit court then *specifically addressed only three of Petitioner's claims*: (1) counsel's failure to communicate a pretrial guilty plea offer; (2) counsel's failure both to investigate potential mitigation witnesses and evidence and to present available mitigation witnesses and evidence to the jury; and (3) counsel's failure to move the court to order a physical examination of the genitalia of both the alleged victims. [TR2, 85-86.] The remaining 11.42 claims were not specifically discussed in any way in the order.

In the penultimate paragraph of that order, the circuit court stated: "All other matters presented by the Defendant could have been presented under direct appeal and are not matters for the Court to consider collaterally." [TR2, 86.]

As a result of this erroneous ruling, the Daviess Circuit Court denied Petitioner *any review* of the remaining specific claims of ineffective assistance of counsel raised in the RCr 11.42 motion. Petitioner had alleged in his 11.42 motion that his trial counsel failed to render effective assistance of counsel: (1) by failing to investigate Petitioner's then wife and the mother of the two alleged victims, and her past propensity to accuse individuals, although not necessarily to the person's face, of abusing their children, even though there was no real evidence to support the accusations; (2) by conceding Petitioner's guilt to the offenses where the older sister was the alleged victim; (3) by failing to investigate potential guilt phase witnesses and evidence, such as family members and friends who would testify about the alleged victims' conduct toward Petitioner in public as well as about the disagreements that the two stepdaughters had with Petitioner's disciplinary measures and

by failing to present available guilt phase witnesses and evidence on these points; (4) by failing to request lesser included offense instructions on those charges involving the older girl that allegedly occurred when she was at least twelve years old but not yet sixteen years old on the basis that the victim's own testimony raised a factual issue of whether there was forcible compulsion or she consented to obtain favors from Petitioner; (5) by failing to request as to counts one (first degree rape), two (first degree sodomy) and three (first degree sexual abuse) an instruction, pursuant to KRS 510.020, that informed the jury that a person is deemed capable of consenting to any sexual act, including sexual intercourse, when sixteen years of age or older; (6) by failing to object on numerous occasions to the prosecutor's leading questions during his direct examination of both the alleged victims, who were eighteen (18) years old and twelve (12) years old at the time of the trial; (7) by failing to request an instruction on the separate nature of each count of the seventeen count indictment; (8) by failing to object when, during the prosecution's guilt phase closing argument, while discussing Petitioner's wife's account of Petitioner's telephone confession to her, the prosecutor, speaking as if he were Petitioner talking to his wife on the phone, said, the older girl "is like you, she said no, she told me no, I'd leave her alone," even though no evidence of this statement was introduced into evidence by either the Commonwealth or the defense; (9) by failing to object when the prosecutor during his guilt phase closing argument used Petitioner's occupation as a professional salesman, that had been introduced by the defense only as legitimate background evidence, to advise the jury that it was Petitioner's "job as a salesman to try to sell to you that he is not guilty," an impermissible and unreasonable inference from the evidence; (10) by failing to object to the prosecutor's questions that specifically required Petitioner to characterize the testimony of his wife as "not true" and to state whether there was anything in her testimony that she was "telling the

truth about"; and (11) by failing to object when Petitioner's wife on cross-examination volunteered an unresponsive, inadmissible lay opinion that falsely informed the jury that "early" breast development in girls is a physical indicator that the girls were sexually abused and that her younger daughter had developed breasts "early." [11.42 Motion, 6-16; TR2, 14-32.]

On August 14, 2007, Petitioner filed in the Daviess Circuit Court a motion, pursuant to CR 60.02, seeking alternative relief that would allow him to file a timely notice of appeal from the November 20, 2006 order denying his RCr 11.42 motion, on the grounds that neither Petitioner nor his counsel had ever received a copy of that order or notice of its entry from the Clerk of the Daviess Circuit Court at any time in 2006 or at any time in January or February 2007. [TR2, 88-116.] On February 1, 2008, the circuit court granted Petitioner's CR 60.02 motion and permitted Petitioner to file a timely notice of appeal from the November 20, 2006 order denying his RCr 11.42 motion. [TR2, 137-140.] Petitioner filed a timely notice of appeal to the Kentucky Court of Appeals on February 25, 2008. [TR2, 141-142.]

Two business days before oral argument, the Commonwealth filed a motion to dismiss the appeal for lack of jurisdiction, arguing the circuit court improperly extended Petitioner's time to appeal.  The Kentucky Court of Appeals on July 24, 2009 issued an unpublished opinion that denied the Commonwealth's motion to dismiss, but affirmed in part, vacated in part and remanded the case to the circuit court for an evidentiary hearing on only the claim that trial defense counsel had failed to communicate the plea offer to Petitioner. *Grimes v. Commonwealth*, Kentucky Court of Appeals, No. 2008-CA-000518-MR, July 24, 2009, unpublished and vacated. [Hereinafter *Grimes*, KCA, 2009.]

The Commonwealth moved for discretionary review, which the Kentucky Supreme Court

granted on August 18, 2010, vacated the Court of Appeals' July 24, 2009 opinion and remanded the matter to the Court of Appeals for consideration in light of then recent opinion in *James v. James*, 313 S.W.3d 17 (Ky. 2010).

In its December 9, 2011 opinion, the Court of Appeals noted that "Grimes contends that his trial counsel failed to inform him of a plea offer from the Commonwealth." *Grimes*, KCA, 2011, *Opinion and Order*, 22. "According to Grimes, but for trial counsel's failure to communicate this alleged offer, he would have entered a guilty plea and received a significantly lighter sentence." *Id*., 22. The Court of Appeals held "that Grimes is entitled to a hearing on this aspect of his RCr 11.42 motion" and "vacate[d] the judgment and remand[ed] for proceedings by the circuit court on this single issue." *Id*. at 23. The Court of Appeals, after considering the *James* decision, again denied the Commonwealth's motion to dismiss. *Id*., 7-10. Discretionary review of that opinion and order was denied by the Kentucky Supreme Court on August 15, 2012.

The evidentiary hearing was held on May 6, 2013. Assistant Commonwealth's Attorney Michael Van Meter testified that prior to Petitioner's September 2003 jury trial he orally communicated to Petitioner's defense counsel, Richard Flaherty, a plea offer. Van Meter informed Flaherty orally that in return for a guilty plea to unspecified charges the Commonwealth would be willing to agree to a maximum sentence of ten (10) years imprisonment with parole eligibility after service of five (5) years of confinement, *i.e.*, after serving fifty percent (50%) of the ten (10) year sentence. [05/06/13; 11:44:03-46:30.][4] Van Meter explained that nothing in his file memorialized this plea offer and he was relying on his memory in reconstructing the plea offer he made to

---

[4] As all the cites to the DVD recordings are to the May 6, 2013 evidentiary hearing, the cites to the record of that hearing hereafter will not include the date 05/06/13.

Flaherty. [11:46:19-47:54.] Van Meter surmised that the plea offer he orally communicated to Flaherty "was probably just a simple, serve fifty percent (50%)." [11:47:54-48:55.][5]

Although he "assumed" he received an oral response from Flaherty, Van Meter had no "recollection of receiving a response," either oral or written, to his plea offer. [11:48:55-50:08.] Van Meter did not recall placing any time limits on the plea offer he made to Flaherty. [*Id.*] Van Meter testified that he would not have communicated to Flaherty this plea offer that would require Petitioner to serve at least five (5) years before being eligible for release unless he "believed" this plea offer "was an appropriate resolution of this case for the Commonwealth." [11:51:53-53:31.] Van Meter's "main concern" in offering this plea agreement "was what was in the best interest of the children and having victim approval." [11:51:00-53.] Van Meter does not "like to make children testify and if there is a way" to avoid that, he tries "to do what is in the best interest of the kids." [11:51:53-53:31.] Van Meter explained that he would not have offered the plea agreement of a ten (10) year sentence with five (5) years to serve before becoming parole eligible unless Tina Grimes, the mother of the two victims, felt this was an appropriate resolution and plea offer. [*Id.*] Van Meter acknowledged that if Petitioner had agreed to take the plea offer, he would not have reneged on the offer. [11:53:31- 54:49.]

Prior to the evidentiary hearing, Flaherty filed a document entitled "Hon. Joseph R. Flaherty's Statement of the Case," which had several exhibits attached to it. [NTR1, 125-151.] There were two

---

[5] The "ten years to serve" version of the oral plea offer is a revision of the Commonwealth's concession in its response to Petitioner's RCr 11.42 motion, where "[t]he offer was to serve five years, with the defendant serving five years before being eligible for release." [Com.'s Response to 11.42 Motion, 2; OTR3, 44.] KRE 801A, *Prior statements of witnesses and admissions*. The "five years to serve" is the conceded plea offer. However, to avoid stating both versions each time the offer is discussed, this document will use the "ten years to serve" version in most situations, without conceding that is the correct version.

(2) copies of the indictment marked Exhibit One (1).  One copy of the indictment was virtually unmarked except for the signature "Anthony T. Grimes" and the date "7-4-03." This indictment was returned on February 4, 2003.  Flaherty testified that he replaced Petitioner's prior trial attorney on March 6, 2003. [12:02:34-03:18.]  Flaherty stated he gave Petitioner a copy of the indictment on July 4, 2003 and had him sign it to show that Petitioner received a copy of the indictment on that date. [12:05:08-08:11.] Petitioner's jury trial began on September 24 and concluded on September 26, 2003.  Flaherty waited from March 6, 2003, when he began representing Petitioner, until July 4, 2003 to give Petitioner a copy of the charges against him.   Flaherty had not previously given Petitioner a copy of the indictment because he required Petitioner to sign and date the indictment to establish when he provided the indictment to Petitioner.

Also attached as Exhibit 2 was a document entitled "Kentucky Department of Corrections Certification on the Calculation of Parole Eligibility." [NTR1, 125-151.] That document bears the words "received copy" and the signature "T. Grimes" and the date "9-3-03." The document is itself a generic document that requires a person using it to identify his or her charges, determine what class of felony each charge is and the minimum and maximum range of punishment for each class of felony. This document is not a specific breakdown of the charges in the indictment against Petitioner and the range of punishment for each offense.  The application of this generic document to the eighteen count indictment returned against Petitioner would require considerable work by a non-lawyer.  Apparently  Flaherty did not present Petitioner with a specific breakdown on the sentences he faced if convicted at trial of all or some of these charges.  Additionally, Flaherty provided Petitioner with this document on September 3, 2003, some three (3) weeks before his trial was scheduled to begin.

Exhibit 3 attached to Flaherty's Statement of the Case was an annotated copy of KRS 439.3401, the violent offender statute. Exhibit 4 was comprised of copies of KRS 532.045, KRS 532.047, KRS 532.050, KRS 17.510, KRS 17.520, KRS 17.530, KRS 17.540, KRS 17.550, KRS 17.552, KRS 17.554, KRS 17.556, apparently copied from West's Criminal Law of Kentucky, with annotations appearing on the copied pages. Three of these pages contained the notation "received copy," the signature "T. Grimes," and the date "9-3-03." [NTR1, 125-151.]

Flaherty testified that he did not provide Petitioner "with any written explanations of these statutes or this Department of Corrections document certification on the calculation of parole eligibility" that "broke this down for his individual case." [12:13:02-56.] Flaherty asked "why would [he] do that" when Petitioner "had the statutes, he had the certifications, the general statements of the certification." [*Id.*]

As Flaherty explained, "[t]he reason I had him sign these documents is because these were serious charges and I wanted to do what the Bar Association recommends you do and that is document things, make sure you and your client are square on the matter and so forth and that's the reason I did these. So he would know everything about this thing. Most attorneys don't do that, but I do." [12:08:11-09:59.] By having Petitioner sign the documents, Flaherty "recorded for [his] file that Grimes was given" that specific information. Flaherty testified that "as a matter of routine that's what we would do normally, send a copy of everything to every client to keep them fully informed." [12:13:56-14:51.] Flaherty "assumed" that he sent everything to Petitioner "because that was our regular thing to do." [*Id.*] According to Flaherty, "[w]hen you have a serious case like this you want to be fully informed." [*Id.*]

Flaherty, however, could provide no documentation from his litigation file indicating that

he had informed Petitioner of the prosecution's offer of a ten year sentence with five years to serve before becoming eligible for parole. [12:26:26-28:26; 12:53:56-57:51.] When Flaherty was asked whether "the prosecution ever communicate[d] a plea offer" to him in Petitioner's case, he responded, "if you look at the court record, the Supreme Court record, the prosecutor said that," apparently referring to the record on appeal in the Kentucky Court of Appeals. [12:21:01-22:26.]

When Petitioner's counsel repeatedly tried to elicit from Flaherty whether he could recall the prosecutor ever communicating a plea offer to him in Petitioner's case, Flaherty consistently repeated that, according to the post-conviction record, the prosecutor said he communicated an offer to Flaherty, then the prosecutor must have. [12:21:01-12:26:26.] Flaherty grudgingly admitted he had no independent recollection of the plea offer and that Van Meter's recounting of the plea offer in the Commonwealth's 2006 response was neither made by Flaherty or adopted by him while the matter was fresh in his memory. The circuit court acknowledged from the bench, "I think he [ Flaherty] is saying that he can't remember." [12:25:03-40.]

Although Flaherty testified that he communicated the plea offer to Grimes, he could not "remember exactly what [he] did say" to Grimes as to the terms of the plea offer, but he claimed that he knew Grimes "rejected it." [01:03:16-04:13.] When asked if he remembered how he explained to Grimes "how this plea offer ... was going to work," Flaherty answered 'no.'" [12:37:00-38:08.]

Petitioner testified that in a casual conversation Flaherty told him that Petitioner's wife, Tina Grimes, wanted him "to serve five years," but Flaherty said that Petitioner "was not eligible to serve five years." According to Petitioner, Flaherty "laughed it off," saying Tina "doesn't know the law." Flaherty did not explain to Petitioner why five years to serve was not a sentence he could receive. Additionally, Flaherty did not tell Petitioner that he was going to talk to the prosecutor to see if he

"would agree in a plea bargain" to what Petitioner's wife, the mother of the two alleged victims, "was proposing as" a sentence for Petitioner to serve.  [02:41:51-43:58.]  Petitioner testified that the only time that  Flaherty mentioned a plea offer from the prosecution to him "was after trial" when Petitioner was confined in the Daviess County Detention Center.  [02:43:12-47:00.]

According to Petitioner,  Flaherty "never told [him] a maximum sentence," and "never had a conversation about" his "parole eligibility if [he] were convicted of all these offenses."  Petitioner did not know before he went to trial what a "violent offender" was.  Petitioner could not say whether Flaherty told him to read the statutes and other papers he had Petitioner sign, date and acknowledge receipt. [02:48:05-49:00.] Petitioner did know the sentencing ranges for Class B and C felonies. When he added up all the charges, he thought his maximum sentence would be "over 200 years" and Flaherty never told him that was "wrong." [02:48:05-51:48.]

Petitioner did not recall reading the various statutes and other documents  Flaherty gave him. Petitioner explained that he did not read those documents because he had hired  Flaherty, who had forty years experience as a lawyer to be his attorney – to have his back. [03:33:34-34:51.]

Petitioner acknowledged that "before trial" he maintained that he was not guilty of these charges and that at trial he testified that he did not commit these offenses.  Despite maintaining his innocence, Petitioner explained that he would have taken the plea offer of a ten year sentence, with five years to serve before being eligible for parole, if it had been communicated to him by Flaherty. Petitioner acknowledged that he "was scared to death to go to trial and scared to get up and testify." Flaherty repeatedly would ask him "how we going to get around your wife saying that you allegedly confessed to her."  Petitioner knew that "the Commonwealth was flying Tina and Jordy and Ashley back from California to testify against" him and he "knew what they were going to say through their

discovery." And, he added he "was facing over 200 years." Petitioner felt that "the only evidence on [his] side was [his] testimony saying that [he] did not do this." Petitioner explained that, "on a scale of this is against me and this is for me, it was pretty easy, me against all the other, it was five years was a whole lot better than 200." [02:50:52-54:47.]

Petitioner testified that in all the meetings he had with Flaherty they never discussed guilty pleas and Flaherty never said that he was going to talk to the prosecutor to see what the prosecution might offer for a guilty plea. Petitioner never told Flaherty not to go to the prosecutor to see what he might offer in return for a guilty plea, because he did not know that was an option. [02:58:11-03:00:24.]

Following the evidentiary hearing, the parties briefed the issues. On February 24, 2014 the circuit court entered an order denying the RCr 11.42 motion, holding that "this matter is one of fact, the resolution of which centers squarely on one issue: the credibility of the witnesses, i.e., the defendant's testimony versus the testimony of Flaherty." [NTR2, 277; A4.] After noting that "[t]he Defendant has everything to gain and nothing to lose," the circuit judge added that " Flaherty has nothing at stake in these proceedings except pride in the legal services he has rendered." [*Id.*] The circuit court found "[t]he only evidence of note proffered by the Defendant is his testimony that Mr. Flaherty received an offer and did not relay it to him," stating that "[t]here is no other evidence of substance for the Court to consider." [*Id.*]  In its credibility analysis, the circuit court emphasized that "[t]he Defendant has been found guilty of horrendous offenses yet continues to deny guilt although the evidence against him was overwhelming," immediately adding "[i]n the overall critical issue of credibility, the Court finds the Defendant lacking." [*Id.*]

On March 5, 2014, Petitioner filed a motion, pursuant to CR 52.02 and RCr 11.42(6), for

findings of fact on the following issues: (1) *By his own testimony, Mr. Flaherty denied Mr. Grimes the effective assistance of counsel in communicating the Commonwealth's plea offer to Mr. Grimes*; and (2) *Mr. Van Meter's Questioning About Mr. Grimes' Trial Testimony, His Guilt of the Charges and Whether He Would Have Entered a Non-Alford Guilty Plea Were All Outside the Scope of This Hearing and Violated Mr. Grimes' Fifth Amendment Rights*. [NTR2 302-309.] The circuit court denied this motion. [NTR2, 310.] A timely notice of appeal from both orders was filed. [NTR2, 315-17.]

The Kentucky Court of Appeals in its July 22, 2016 opinion affirmed the order of the Daviess Circuit Court on remand denying the claim in question. *Grimes*, KCA, 2016.[6] The Court of Appeals also found that "'[w]hether or not trial counsel's advice" regarding the plea offer he allegedly communicated to Grimes constituted ineffective assistance of counsel, the circuit court could not consider that claim because it was not alleged in the RCr 11.42 motion. [*Id*., 9.]

On September 26, 2016, Petitioner filed a motion for discretionary review in the Kentucky Supreme Court. That motion was denied on February 9, 2017 and the case became final that same day.

On February 17, 2017, Petitioner filed in the Daviess Circuit Court a motion, pursuant to CR 60.02, to vacate judgment and sentence and/or to provide appropriate relief. [NTR2, 319-340.] On March 9, 2017, without receiving a response from the Commonwealth's Attorney's Office, the circuit court entered an order denying Grimes' CR 60.02 motion. [NTR2, 341-340.] Upon learning that "the parties had an agreement to allow the Commonwealth until April 18, 2017 to Defendant's Motion," the circuit court ordered that the March 9, 2017 order denying the CR 60.02 motion be "set

[6] *Grimes v. Commonwealth*, 2016 WL 3962309 (July 22, 2016).

aside." [NTR2, 346.] On April 6, 2017, the Commonwealth filed its response urging denial of the CR 60.02 motion. [NTR2, 347-351.] On April 20, 2017, Petitioner filed his reply. [NTR2, 352-365.]

On May 8, 2017, the circuit court entered an order again denying Petitioner's CR 60.02 motion. [NTR2, 366-373.] The circuit court faulted Petitioner for not amending his RCr 11.42 motion, following the May 6, 2013 evidentiary hearing "to allege inadequate assistance." [Order Denying, 05/08/17, p. 4.] The circuit court "believe[d] that amending the RCr 11.42 motion to include a new claim that Mr. Flaherty provided inadequate advice regarding the plea is the correct procedure." [*Id*., p. 4 n.5.]

The circuit court found that Petitioner "has failed to show that Flaherty was ineffective in advising [him] as to the plea" as it "would not fault Flaherty for the Defendant's own failure to read information [Corrections' generic calculation of parole eligibility, the indictment, and criminal law statutes] provided him by his attorney." [*Id*., p. 7.]

On June 6, 2017 Petitioner filed his notice of appeal from the May 8, 2017 order denying his CR 60.02 motion. [NTR2, 374-375.]

In its April 26, 2019 unpublished opinion the Kentucky Court of Appeals affirmed the order of the Daviess Circuit Court denying Petitioner's CR 60.02 motion. *Grimes,* KCA, 2019); *Grimes v. Com*., unpublished, 2019 WL 1868919 (April 26, 2019).

On appeal the Court of Appeals rejected the circuit court's determination that Petitioner's CR 60.02 motion was procedurally barred, but held that Petitioner had not established Flaherty provided ineffective assistance of counsel with regard to the plea negotiations.  Petitioner filed a timely rehearing petition alleging, *inter alia*, that, with the procedural bar set aside, he was entitled to an evidentiary hearing on his claim.  The Court of Appeals denied the rehearing petition.

Petitioner's timely motion for discretionary review was denied by the Kentucky Supreme Court on February 12, 2020.

**FEDERAL HABEAS CORPUS**

The Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) states that a federal court may not grant relief on one of the Petitioner's claims unless the state court's consideration of the claim either "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States ... or ... (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

"[A] state-court decision is contrary to [the Supreme] Court's precedent if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). "A state-court decision will certainly be contrary to [a Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Id*. at 406.

"First, a state-court decision involves an unreasonable application of [the Supreme] Court's precedent if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, *supra* at 407.

"Second, a state-court decision also involves an unreasonable application of [the Supreme] Court's precedent if the state court ... unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, *supra* at 407.

"The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite

in character or nature,' or 'mutually opposed.'" *Williams v. Taylor*, 529 US 362, 405 (2000), quoting Webster's Third New International Dictionary 495 (1976). "The text of § 2254(d)(1) therefore suggests that the state court's decision must be *substantially different* from the relevant precedent of this Court." *Id*.; (emphasis added).

"A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Id*.

"A state-court decision will also be contrary to th[e] [Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*, 529 US 362, 406 (2000).

"[T]he lack of a Supreme Court decision on nearly identical facts does not by itself mean that there is no clearly established federal law, since 'a general standard' from [the Supreme Court's] cases can supply such law." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1449 (2013), quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

However, if the federal constitutional claim was not "adjudicated on the merits by the state court," then the limitations of the AEDPA do not apply and this Court reviews the claim *de novo*. *Johnson v. Williams*, 133 S.Ct. 1088, 1091 (2013).

**INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD**

A claim of ineffective assistance of counsel is a mixed question of law and fact[7] reviewed under the two-part *Strickland* test: 1) was counsel's representation deficient in that it "fell below an

---

7

objective standard of reasonableness;" and, 2) was the defendant "prejudiced" by his attorney's substandard performance? *Ramonez v. Berghuis*, 490 F.3d 482, 487 (6th Cir. 2007); *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000); *Strickland v.Washington*, 466 U.S. 668, 687-88, 692 (1984); *see Dickerson v. Bagley*, 453 F.3d 690, 693 (6th Cir. 2006); *Harries v. Bell*, 417 F.3d 631, 636 (6th Cir. 2005). This test applies to pretrial proceedings, jury selection, the guilt – or – innocence phase, the sentencing phase, and even the direct appeal proceedings. In applying this test, courts must recognize that "[i]neffective assistance of counsel claims based on trial counsel's failure to investigate and present [] evidence can never be proven based solely on evidence in the record because the record necessarily does not contain evidence of prejudice," and while an ineffective assistance of counsel analysis will necessarily require courts to speculate as to the effect of the deficient performance, the state cannot defeat an ineffective assistance of counsel claim merely by presenting speculation about why trial counsel did not do something or what would have happened if counsel took a different approach. *Williams v. Anderson*, 460 F.3d 789, 800 (6th Cir. 2006); *Sears v. Upton*, 561 U.S. 945, 953-55 (2010). And, an ineffective assistance of counsel claim cannot be rejected because trial counsel's actions appeared reasonable or were seemingly part of a trial strategy. As the United States Supreme Court has held, "that a theory might be reasonable, in the abstract does not obviate the need to analyze whether counsel's failure to conduct an adequate [investigation] before arriving at this particular theory [was] prejudicial." *Id.* Thus, courts must determine whether counsel actually made a strategic decision, and if so, whether that decision was based on a reasonable investigation or was objectively unreasonable. If the decision was not based on a reasonable investigation or was otherwise objectively unreasonable on its face, courts must find counsel's performance deficient and must then address whether prejudice ensued.

*Deficient performance*

An attorney's performance can be deficient at any stage of the proceedings. Deficiency occurs whenever counsel acts in a way that is objectively unreasonable, or is objectively unreasonable in failing to act. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003). In assessing whether counsel's conduct was deficient, a court must determine what happened and why it happened. If the answer to the question why is counsel's conduct, then counsel's performance may have been deficient. To determine this, a court "must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Id*.

The deficient performance prong requires this Court to determine 1) whether trial counsel made a strategic decision; 2) what is reasonable under the prevailing professional guidelines; and, 3) whether trial counsel's performance was reasonable under those guidelines. The failure to make a strategic decision is deficient performance per se. And, a strategic decision constitutes deficient performance when either 1) the investigation underlying the decision was unreasonable; or, 2) the decision itself contradicts prevailing professional norms.

*Prejudice*

Prejudice under *Strickland* requires a petitioner to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 694. In jurisdictions, like Kentucky, where a unanimous verdict is required, a different result means a "reasonable probability that at least one juror would have struck a different balance." *Id.*; *Wiggins*, 523. This standard applies to both the guilt – or – innocence phase and sentencing

phase of a trial, and is established at the guilt – or – innocence phase merely by showing that one juror might have struck a difference balance - a standard that is satisfied even if all that can be shown is that one juror might have held out, resulting in a hung jury. *See*, *e.g.*, *Ramonez*, 490 F.3d 482, 491(6th Cir. 2007).

"Reasonable probability" is defined as a "probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 693. This is not an outcome determinative inquiry. Rather, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id*., 694. Thus, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id*., 693; *Porter v. McCollum*, 558 U.S. 30, 39-40 (2009). Instead, the "touchstone" of the prejudice test is whether the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v.Whitley*, 514 U.S. 419, 434 (1995).

Likewise, the prejudice test "is not a sufficiency of evidence test." *Id*. The question is not whether if counsel had performed adequately the jury would have acquitted the defendant or given him a lesser sentence, or even if there is a possibility that the jury would have convicted or imposed the same sentence if counsel performed adequately. *Rompilla v. Beard*, 545 U.S. 374, 393 (2005). The appropriate question is whether counsel's conduct so undermined the proper functioning of the adversarial process that the court cannot be confident that the outcome of the trial or sentencing would have been the same. *Strickland*, 687. Confidence of the outcome is undermined when the difference between counsel's performance at trial and adequate performance at trial "might well have influenced the jury's appraisal [of guilt] or moral culpability." *Williams*, 529 U.S. at 398; *accord*,

*Rompilla*, 545 U.S. at 393; *Wiggins*, 539 U.S. at 538; *Dickerson*, 453 F.3d at 699; *Harries*, 417 F.3d at 640. "Might well have influenced" is "established so long as the chances of acquittal [of the charged offense] are better than negligible." *United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 246 (7th Cir. 2003).

In determining whether confidence in the outcome is undermined because one juror may have decided an issue differently, the resulting prejudice from counsel's errors must be "considered collectively, not item-by-item." *Kyles v. Whitley*, 436.

**PALPABLE ERROR REVIEW AND INEFFECTIVE ASSISTANCE OF COUNSEL REVIEW**

Although on Petitioner's direct appeal the Kentucky Supreme Court held that a number of claimed errors were found to be inadequately preserved and not palpable errors, those rulings did not preclude relief for ineffective assistance of counsel premised on one or more of those claimed errors. *Martin v. Commonwealth*, 207 S.W.3d 1, 2-5 (Ky. 2006).

The circuit court's conclusion in ruling on Petitioner's RCr 11.42 motion that "[n]early all of [Grimes'] arguments and allegations ... could have been presented on direct appeal of the judgment in this case" is fallacious. The failure of Petitioner to raise the basis for a claim of ineffective assistance of counsel as a palpable error on his direct appeal does not preclude relief in an RCr 11.42 action for ineffective assistance of counsel despite a version of the ineffectiveness claim being premised on the same conduct as the direct appeal claim. The theory that the claim could have been raised on direct appeal as a palpable error is not dispositive of the ineffective assistance of counsel claim.

"[T]here are distinctions between palpable error under RCr 10.26 and the prejudice requirement of *Strickland*," which "prevent[] a palpable error from being dispositive of an ineffective

assistance of counsel claim." *Martin*, *supra* at 4-5. "As a general rule, a claim of ineffective assistance of counsel will not be reviewed on direct appeal from a trial court's judgment, because there is usually no record or trial court ruling on which such a claim can be properly considered." *Humphrey v. Commonwealth*, 962 S.W.2d 870, 872 (Ky. 1998). As a result, a claim of palpable error and a claim of ineffective assistance of counsel, although arising out of the same conduct or inaction at trial, are not the same error and are not interchangeable.

## ARGUMENT

### I. PETITIONER WAS DENIED HIS FEDERAL CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS DURING THE PRETRIAL AND JURY TRIAL STAGES OF HIS STATE COURT CONVICTION AND SENTENCING.

*Trial Defense Counsel's Failure to Communicate the Prosecutor's Plea Agreement to Petitioner Prior to the Conclusion of Petitioner's Trial, Sentencing and Final Judgment.*

This claim was raised in Petitioner's timely filed RCr 11.42 motion and appealed to both the Kentucky Court of Appeals and the Kentucky Supreme Court to no avail, although an evidentiary hearing was conducted on remand from the Court of Appeals.

*The Claim*. On August 17, 2006, Petitioner filed in the Daviess Circuit Court an RCr 11.42 motion, alleging some fifteen (15) specific claims of ineffective assistance of counsel, including the follow claim:

> Movant's trial counsel failed to render effective assistance of counsel by failing to communicate to movant prior to trial that the prosecutor had offered to settle the case on a five-year plea agreement. Prior to trial, defense counsel had told movant that movant's wife wanted him to serve five (5) years. However, defense counsel explained to movant that the charges in the indictment did not carry a sentence of five (5) years, noting that movant's wife knew nothing about the law. After final sentencing, trial counsel came to the county jail to advise movant about post-conviction remedies. At that time trial counsel claimed that movant had been offered a five-year plea by the prosecution and movant had rejected it. This was the first time that movant had ever heard of this offer. At no time prior to that post-judgment

> meeting did trial counsel inform movant of any such plea agreement. It is the ethical and legal duty of any attorney to advise the client of any settlement agreements, whether in a civil or criminal case. "A lawyer should keep a client reasonably informed about the status of a matter" and "should explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Kentucky Rules of Professional Conduct (KRPC), Rule 1.4 (a) & (b), Communication, SCR 3.130. "A lawyer who receives from opposing counsel an offer of settlement in a civil controversy or a proffered plea bargain in a criminal case should promptly inform the client of its substance unless prior discussions with the client have left it clear that the proposal will be unacceptable." KRPC, Rule 1.4, Commentary [1], SCR 3.130. This was deficient performance.

[OTR3, 14-32.]

The Commonwealth in its response explained that it "never offered a five-year plea agreement to defense counsel," but *conceded* that it did communicate to defense counsel a pretrial offer on the charges, noting that "[t]he offer was to serve five years before being eligible for release." [Com.'s Response, 2; OTR3, 44.] Petitioner's RCr 11.42 motion was denied, without an evidentiary hearing, on November 20, 2006. [OTR3, 85-87.]

In its December 9, 2011 opinion in this case, the Kentucky Court of Appeals noted that "Grimes contends that his trial counsel failed to inform him of a plea offer from the Commonwealth." *Grimes*, KCA, 2011, 22. "According to Grimes, but for trial counsel's failure to communicate this alleged offer, he would have entered a guilty plea and received a significantly lighter sentence." *Id*., 22. The Court of Appeals held "that Grimes is entitled to a hearing on this aspect of his RCr 11.42 motion" and "vacate[d] the judgment and remand[ed] for proceedings by the circuit court on this single issue." *Id*. at 23.

*The Evidentiary Hearing*. The Court of Appeals remanded Grimes' 11.42 "for proceedings on this single issue" of "the alleged failure [of defense counsel] to communicate a plea offer." At the May 6, 2013 evidentiary hearing Assistant Commonwealth's Attorney Michael Van Meter, Mr.

Flaherty (trial defense counsel), and Petitioner testified.

*Defense Counsel's Deviation from His Acknowledged Standard Operating Procedure Was Evidence of His Failure to Communicate the Offer*. Trial defense counsel submitted to the Daviess Circuit Court copies of the indictment, a generic form for calculating parole eligibility, the violent offender statute, and a variety of other criminal law statutes, many of which were signed and dated by Petitioner indicating he had received them. [NTR1, 125-151.]  Flaherty testified that he believed it was extremely important to record for his file that he had given these various documents to Petitioner and the dates upon which Petitioner received them.  It was his professional  practice. [12:08:11-09:59.]  Flaherty recorded for his file that Petitioner  was given specific information and that "as a matter of routine that's what we would do normally, send a copy of everything to every client to keep them fully informed." [12:13:56-14:51.]  Flaherty "assumed" that he sent everything to Petitioner "because that was our regular thing to do" and "[w]hen you have a serious case like this, you want to be fully informed." [*Id*.]

Flaherty's testimony establishes his standard operating procedure was to have his clients sign for information given them to "make sure" he and his clients are "square" on these various matters. This acknowledged standard operating procedure would indicate that when he passed on important information to a client, such as Petitioner, he would have the client document in writing his receipt of that information including the date the information was provided.  Yet  Flaherty could provide no document from his litigation file indicating that he had informed Petitioner of the prosecution's pretrial plea offer, let alone that Petitioner rejected the offer.  [12:26:26-28:26; 12:53:56-57:51.]

Flaherty's failure to produce a document signed and dated by Petitioner that conveyed the plea offer, when contrasted with  Flaherty's admitted routine procedure of obtaining such client

documentation not only in Petitioner's case, but in all his cases, is strong evidence that Flaherty did not communicate the plea offer to Petitioner.  Kentucky Rules of Evidence (KRE), Rule 401, *Definition of "Relevant Evidence."*[8]  Yet the Daviess Circuit Court obviously disregarded this evidence.

*Defense Counsel Had No Independent Memory of Either the Prosecutor Communicating the Plea Offer to Him, Including the Terms of the Plea Offer, or of How He Explained the Plea Offer to Petitioner*.  When asked whether "the prosecution ever communicate[d] a plea offer" to him in Petitioner's case, Flaherty repeatedly answered that the record showed that the prosecution said he communicated the offer to him. [12:21:01-22-26.]  Importantly, Flaherty's reference to the prosecutor's assertion in the Commonwealth's response to the RCr 11.42 motion that he communicated a plea offer to Flaherty does not qualify as either present memory refreshed (KRE 612)[9] or past memory recorded (KRE 803(5)).[10]  Flaherty grudgingly admitted he had no independent recollection of the plea offer and the prosecutor's recounting of the plea offer in the Commonwealth's 2006 response was neither made by Flaherty or adopted by him while the matter was fresh in his memory.  Thus, Flaherty's testimony that the prosecutor's statement in the record about communicating the plea offer must be correct was inadmissible opinion evidence under KRE

---

[8]  "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  KRE 401.

[9]  KRE 612, *Writing used to refresh memory*.

[10]  KRE 803(5), *Hearsay exceptions; availability of declarant immaterial; Recorded recollection*.

701[11] as Flaherty has no independent recollection of Van Meter communicating an oral plea offer to him. Even the circuit court acknowledged from the bench, "I think he [ Flaherty] is saying that he can't remember." [12:25:03-40.] Flaherty's lack of any recollection of either the plea offer having been communicated him or the terms of the plea bargain is consistent with Flaherty forgetting the plea offer and failing to pass it on to Petitioner. This too was disregarded by the circuit court.

Flaherty testified that he communicated the plea offer to Petitioner, but he could not "remember exactly what [he] did say" to Petitioner as to the terms of the plea offer. However, he claimed that knew Petitioner "rejected it." [01:03:16-04:13.] When asked if he remembered the way he explained to Petitioner "how this plea offer ... was going to work," Flaherty answered 'no." [12:37:00-38:08.] Here again Flaherty's inability to recall how he communicated a plea offer of "five years to serve before being eligible for release" to a client who was facing multiple felony offenses is additional evidence that Flaherty never communicated the plea offer to Petitioner.

Flaherty's testimony is inherently incredible. He has no memory of the prosecutor communicating to him a plea offer, whether of "ten years, with five to serve before becoming parole eligible" or simply "five years to serve before being eligible for release," and no memory of how he explained the terms of the plea offer to Petitioner, but Flaherty clearly remembers that he communicated the offer he could not remember receiving to Petitioner who rejected it. Additionally, despite his acknowledged standard operating procedure for documenting important information provided to his clients, Flaherty has no documents in his litigation file for this case that corroborate in any way his testimony that he conveyed the plea offer to Petitioner, who then rejected the offer. In view of all these deficiencies, Flaherty's self-serving testimony cannot constitute "substantial

---

[11] KRE 701, *Opinion testimony by lay witnesses.*

evidence" that he communicated the plea offer to Petitioner.

*Defense Counsel's Admitted Belief That the Court Would Not Accept the Prosecution's Plea Offer is Evidence That Counsel Did Not Convey the Offer to Petitioner*. Initially, when the prosecutor told Flaherty that the Commonwealth was offering Petitioner either "just a simple ten years, serve fifty percent (50%)" or "five years to serve before being eligible for release," Flaherty apparently did not ask the prosecutor how this would work in view of the eighteen counts of the indictment. [11:47:54-48:55.] Flaherty testified that "when Mr. Van Meter communicated this plea offer to [him] orally," Flaherty did not "ask" Van Meter "how this plea offer would be carried out so [h]e could pass that on to [his] client." [01:00:00-02:15.] Yet Flaherty testified that he could "not see how the attorney, the Commonwealth Attorney, could get the judge to approve that kind of punishment," *e.g.*, "five years to serve." That was the feeling Flaherty had. [12:18:52-21:21:01.] Flaherty also testified that he "had a question of how a judge would approve five years based on the number of charges, based on the number of people and based on the duration that this thing went on." [12:45:05-46:00.]

If, as he testified, Flaherty communicated the prosecutor's plea offer to Petitioner, what could Flaherty have told Petitioner as to what charges would be dismissed and what sentences would be recommended, except that the recommended sentence would be ten (10) years with five (5) years to serve before becoming parole eligible or five years to serve before being eligible for release. By his own admission, Flaherty had never told Petitioner what the maximum sentence would be should Petitioner be convicted at trial of all the charges, receive the maximum sentence on each, and have all sentences run consecutively to each other.

Apparently, from his testimony, Flaherty did not figure out that the offer of a ten year

sentence with five years to serve before being eligible for parole would necessarily require the Commonwealth to dismiss all of the eight (8) counts of Class B felonies, first degree rape and sodomy, and have Petitioner at best plead guilty to the lesser offenses contained in those charges. And, even assuming *arguendo* that Flaherty had calculated that Petitioner would not have to plead guilty to any Class B felonies, but only Class C or D felonies, he did not, by his own admission, explain that to Petitioner.

An important aspect of the plea agreement could have been that Petitioner would not have to plead guilty to any counts of first degree rape or sodomy. However, it is clear from Flaherty's testimony that he never explained that to Petitioner when he allegedly communicated the plea offer to him.

Flaherty admitted that he could not see how the prosecutor could get the court to approve an offer that would allow Petitioner to be released after serving only five years of confinement in view of the number of charges, the number of victims and the duration of these criminal offenses. It may very well be that Flaherty declined to explain this plea offer to Petitioner because Flaherty did not think a court would accept it. Although the Daviess Circuit Court could find "absolutely no reason" why Flaherty would have "withheld" the offer from Petitioner, this reason was apparent from the testimony and the briefing below. [NTR2, 277.]

*Defense Counsel Had a Motive or Bias to Testify Falsely as to Whether He Communicated the Plea Offer to Petitioner*. The circuit court, in comparing and contrasting the credibility of Flaherty and Petitioner, observed "[o]n the other hand, Flaherty has nothing at stake in these proceedings except pride in the legal services he has rendered." [NTR2, 277.] But, Flaherty had a motive or bias to testify falsely that he communicated to Petitioner the prosecutor's plea offer and

Petitioner rejected it. In Kentucky a criminal defendant is precluded from filing a civil legal malpractice against his or her defense attorney unless and until the defendant has obtained exoneration from his underlying criminal conviction and sentence by direct appeal or a collateral proceeding. *Ray v. Stone*, 952 S.W.2d 220 (Ky. App. 1997); *Stephens v. Denison*, 150 S.W.3d 80 (Ky. App. 2004). At the time of the evidentiary hearing, the Kentucky Supreme Court had "yet to rule explicitly on the 'innocence' requirement adopted in *Stone*." *U.S., ex rel U.S. Attorneys ex rel. Eastern, Western Districts of Kentucky v. KBA*, 439 S.W.3d 136, 156 n. 90 (2014).[12]

Had Petitioner been granted relief due to Flaherty's failure to communicate the prosecution's plea to him or to adequately advise him concerning the plea offer, Petitioner would be allowed to plead to the prosecution's offer with at the most a maximum sentence of ten (10) years of imprisonment. Petitioner has been confined since September 26, 2003, not counting twenty-one (21) days of pretrial confinement, and was scheduled to serve out a ten (10) year sentence by early September 2013. Without addressing whether Petitioner would have been paroled after serving five (5) years, Flaherty could have been liable in a civil legal malpractice for every day Petitioner spends in confinement beyond the maximum ten (10) year sentence in the plea offer should Flaherty be found in a legal malpractice case not to have communicated the offer.

But perhaps more importantly, Flaherty could face disciplinary action by the Kentucky Bar Association for violating Kentucky Rule of Professional Conduct (KRPC) 1.4, *Communication*, SCR

[12] However, in December 2018, the Kentucky Supreme Court in *Lawrence v. Bingham, Greenbaum, Doll*, 567 SW 3d 133, 141 (Ky. 2018), "adopt[ed] the following articulation of the Exoneration Rule: to survive a motion to dismiss for failure to state a claim in a professional malpractice case against a criminal defense attorney, the convicted client must plead in his complaint that he has been exonerated of the underlying criminal conviction."

3.130 (1.4). "[A] lawyer who receives from opposing counsel ... a proffered plea bargain in a criminal case must promptly inform the client of its substance unless the client has previously communicated to the lawyer that the proposal will be acceptable or unacceptable or has authorized the lawyer to accept or to reject the offer." *Id*., *Commentary* (2). See KRPC 8.4(a), *Misconduct*, SCR 3.130(8.4).

Flaherty "had a natural motive to attempt to exculpate himself as much as possible." *Lilly v. Virginia*, 527 U.S. 116, 139 (1999). "[A]ny evidence of a witness' bias, hostility, or interest is germane to the question of the credibility" of that witness. *Barrett v. Commonwealth*, 608 SW 2d 374, 376 (Ky. 1980). "[A] showing of bias can be important because, 'unlike evidence of prior inconsistent statements – which might indicate that the witness is lying – evidence of bias suggests *why* the witness might be lying.'" *Star v. Commonwealth*, 313 SW 3d 30, 38 (Ky. 2010), quoting *Stephens v. Hall,* 294 F.3d 210, 224 (1st Cir.2002) (emphasis in original).

The credibility of Flaherty's uncorroborated testimony that he did communicate the prosecutor's plea offer to Petitioner, who then rejected it, is suspect due to his motive and bias to testify falsely. Yet the circuit court explicitly disregarded this basis for undermining Flaherty's credibility by saying Flaherty has "nothing at stake in these proceedings except pride." [NTR2, 277.] This was again a clearly erroneous finding of fact.

*The Sentence Disparity Test*. "To establish prejudice in this instance, it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." *Missouri v. Frye*, 132 S. Ct. 1399, 1409 (2012), citing cf. *Glover v. United States*, 531 U.S. 198, 203, (2001) ('[A]ny amount of [additional] jail time has Sixth Amendment significance').

"'[A] *substantial disparity* between the penalty offered by the prosecution and the punishment called for by the indictment is sufficient to establish a reasonable probability that a properly informed and advised defendant would have accepted the prosecution's offer.'" *Griffin v. United States*, 330 F.3d 733, 737 (6th Cir. 2003); (emphasis added). When "there was a substantial disparity between the penalty offered by the government and the penalty called for by the indictment, the defendant showed a reasonable probability that he would have pleaded guilty had he received proper advice." *Id.* at 738.

"[A] substantial disparity between the plea offer and the post-trial sentence provides evidence that the defendant would have accepted the plea." *Titlow v. Burt*, 680 F.3d 577, 588 (6th Cir. 2012), reversed on other grounds[13] by *Burt v. Titlow*, 134 S.Ct. 10 (2013), citing, *e.g.*, *Smith v. United States*, 348 F.3d 545, 552 (6th Cir. 2003) (recognizing this evidentiary principle in a case involving a 60-month plea offer versus a 156-month sentence); and *Magana v. Hofbauer*, 263 F.3d 542, 551-52 (6th Cir. 2001) (involving a 10-year plea offer versus a sentence of two consecutive 10-to-20 year terms). A number of federal courts "have pointed to the disparity between the plea offer and the potential sentence exposure as strong evidence of a reasonable probability that a properly advised defendant would have accepted a guilty plea offer, despite earlier protestations of innocence." *Smith v. United States*, 348 F.3d at 552.

In Petitioner's case, upon conviction of the all the charged offenses, the maximum sentence of imprisonment, if all the sentences were run consecutively, would have been limited by law to seventy (70) years. KRS 532.110(1)© ("In no event shall the aggregate of consecutive indeterminate

---

[13] *Titlow v. Burt*, 680 F.3d 577 (6th Cir. 2012), was reversed by the United States Supreme Court in *Burt v. Titlow*, 134 S.Ct. 10 (2013), on grounds only applicable to federal habeas corpus proceedings and not relevant in Grimes' case.

sentences exceed seventy (70) years").  Because eight (8) of the offenses in the indictment were either first degree rape or first degree sodomy, upon conviction of those offenses, Petitioner would have been a violent offender sentenced to a term of years who would be eligible for parole consideration after serving eighty-five percent (85%) of the sentence imposed for those offenses, or twenty (20) years, whichever is less.  KRS 439.3401(1)© & (3); *Hughes v. Commonwealth*, 87 S.W.3d 850, 856 (Ky. 2002); *Hampton v. Commonwealth*, 133 S.W.3d 438 (Ky. 2004).

If Petitioner received at trial any sentence in excess of  twenty-three (23) years and six (6) months, as he did, he would not have been eligible for parole for twenty (20) years. Petitioner was sentenced to fifty-nine (59) years of imprisonment on four (4) Class B felonies, first degree rape and first degree sodomy, for which he must serve twenty (20) years before being eligible for parole. There is a *substantial disparity* between serving twenty (20) years before being eligible for parole and serving five (5) years before being eligible for release under the conceded plea offer.  The gap between Petitioner's potential maximum sentence and eligibility for parole date (1) if tried and convicted and (2) if sentenced under the plea offer is *a substantial disparity* that creates a reasonable probability that Petitioner, had the offer been communicated to him and properly explained, would have accepted it.  Petitioner's actually sentence of fifty-nine (59) years of imprisonment resulted in a *substantial disparity* between that sentence and the plea offer of ten (10) years to serve.

The sentencing disparity between the plea offer and the maximum sentence for the charged offenses is compelling evidence that Petitioner would have accepted the plea offer had it been communicated to him by Flaherty as well as demonstrating the prejudice Petitioner suffered.  The circuit court implicitly disregarded this substantial evidence that Petitioner was never told of the plea agreement until after his jury trial concluded.

*Petitioner's Guilt or Innocence of These Charges is Irrelevant to This Claim*.  The circuit court in its findings emphasized that "[t]he Defendant has been found guilty of horrendous offenses yet continues to deny guilt although the evidence against him was overwhelming."[14] [NTR2, 277.] However, Petitioner's guilt or innocence of the charged offenses is not a relevant factor in the resolution of this federal constitutional claim.  "The fact that [a defendant] is guilty does not mean he was not entitled by the Sixth Amendment to effective assistance [of counsel] or that he suffered no prejudice from his attorney's deficient performance during plea bargaining."  *Lafler v. Cooper*, 132 S.Ct. 1376, 1388 (2012).  Not only was it clearly erroneous for the circuit court to use the jury's verdict of guilty to deny this claim, it was also unconstitutional and in clear violation of established federal law.

The prosecutor had no knowledge of whether Flaherty communicated the oral plea offer to Petitioner and no recollection or documentation that Flaherty ever told him that Petitioner had rejected the plea offer, but assumed Flaherty must have at some point.  Flaherty has no memory of: (1) the prosecutor telling him of the oral plea offer; (2) what the plea offer was; (3) how the plea offer would work; and (4) how he explained the plea offer to Petitioner.  Petitioner's testimony that Flaherty never communicated the plea offer is consistent with the prosecutor's testimony that he orally communicated the pretrial offer to Flaherty and Flaherty's total lack of memory about the plea offer itself.

The Kentucky Court of Appeals upheld the circuit court's denial of this claim on the basis

---

[14]  The circuit judge below did not preside over Petitioner's jury trial and the evidence against Petitioner was the testimony of the two victims (Petitioner's stepdaughters) and their mother.  No medical evidence of sexual abuse of any kind was presented as to either of the victims.

that substantial evidence supported the circuit court's finding and did not address the circuit court's reliance on the jury's verdict and Petitioner's denial of guilt to support its denial of this claim. This decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

*The Commonwealth Would Not Have Cancelled the Plea Offer and No Basis Exists to Indicate Judicial Rejection of the Plea Bargain*.  "Defendants must also demonstrate a reasonable probability the plea offer would have been entered without the prosecution cancelling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law." *Missouri v. Frye*, 132 S.Ct. 1399, 1409 (2012).  The testimony of the prosecutor, Van Meter, established that had the plea offer been accepted by Petitioner, the Commonwealth would not have cancelled the offer or otherwise reneged on the offer.

Van Meter testified that he would not have communicated to Flaherty this plea offer that would require Petitioner to serve at least five (5) years before being eligible for release unless he "believed" this plea offer "was an appropriate resolution of this case for the Commonwealth." [11:51:53-53:31.]  Van Meter's "main concern" in offering this plea agreement "was what was in the best interest of the children and having victim approval."  [11:51:00-53.]  Van Meter does not "like to make children testify and if there is a way" to avoid that, he tries "to do what is in the best interest of the kids." [11:51:53-53:31.] Van Meter explained that he would not have offered the plea agreement of a ten (10) year sentence with five (5) years to serve before becoming parole eligible unless Tina Grimes, the mother of the two alleged victims, felt this was an appropriate resolution and

plea offer.[15] [*Id.*]  Van Meter acknowledged that if Petitioner had agreed to take the plea offer, he would not have reneged on the offer. [11:53:31- 54:49.]

Van Meter's testimony at the evidentiary hearing also established the reasonable probability that the trial court would have accepted the plea agreement.  First, the Commonwealth believed this plea offer "was an appropriate resolution of this case for the Commonwealth."  Second, Tina Grimes, the mother of the victims, approved this plea offer.  Third, the plea offer would spare the victims from having to testify in court as to these numerous charges of sexual offenses committed against them, which would have been "in the best interest of the children."  Under these circumstances, it would be very difficult for a trial judge to reject this plea offer, despite the approval of the victims' mother, and run the risk of forcing a trial at which these two young girls would have to testify about the alleged sexual abuse they suffered and be subject to cross-examination.

This is particularly true because in this case "no particular fact or intervening circumstance" has been established that would have caused either the prosecutor to withdraw the offer or for a trial judge to reject the plea bargain.  "So in most instances it should be not be difficult to make an objective assessment as to whether or not a particular fact or intervening circumstance would suffice, in the normal course, to cause prosecutorial withdrawal or judicial nonapproval of a plea bargain." *Frye* at 1410.

There is no evidence of record that would establish that had Petitioner accepted the plea offer, the prosecutor would have cancelled the plea offer or the judge would have reject the plea bargain.

---

[15]  According to KRS 421.500(6), "[t]he victim shall be consulted by the attorney for the Commonwealth on the disposition of the case including dismissal, release of the defendant pending judicial proceedings, any conditions of release, *a negotiated plea*, and entry into a pretrial diversion program" (emphasis added).

However, there is strong evidence that the Commonwealth would not have reneged on the plea offer and that a judge would have approved this plea bargain under the specific circumstances of this case.

*The Federal Constitutional Right to Effective Assistance of Counsel in the Context of Guilty Plea Negotiations*.  "Before deciding whether to plead guilty, a defendant is entitled to 'the effective assistance of competent counsel.'"  *Padilla v. Kentucky*, 130 S.Ct. 1473, 1480-81 (2010), quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970).  "Defendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process."  *Lafler v. Cooper*, 132 S.Ct. 1376, 1384 (2012).  "'[T]he negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to the effective assistance of counsel.'"  *Missouri v. Frye*, 132 S.Ct. 1399, 1406 (2012), quoting *Padilla*, *supra* at 1486.   "[A]s a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may result in a lesser sentence, a conviction on lesser charges, or both."  *Frye*, 132 S.Ct. at 1408.

"Though the standard for counsel's performance is not determined solely by reference to codified standards of professional practice, these standards can be important guides."  *Frye* at 1408.  "The American Bar Association recommends defense counsel 'promptly communicate and explain to the defendant all plea offers made by the prosecuting attorney,' ABA Standards for Criminal Justice, Pleas of Guilty 14-3.2(a) (3d ed. 1999), and this standard has been adopted by numerous state and federal courts over the last 30 years."  *Frye* at 1408, citing a variety of state and federal court opinions, including *Griffin v. United States,* 330 F.3d 733, 737 (C.A.6 2003). "The standard for prompt communication and consultation is also set out in state bar professional standards for attorneys."  *Frye* at 1408, citing a number of state ethical code provisions, including Ky. Sup.Ct. Rule 3.130, Rule Prof. Conduct 1.4 (2011).

The Kentucky Court of Appeals' ruling that Flaherty communicated the prosecutor's plea agreement to Petitioner resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, such as *Missouri v. Frye*, *supra*.  28 U.S.C. § 2254(d)(1).  Even assuming *arguendo* that Flaherty told Petitioner that the prosecutor is offering a deal of either "just a simple ten years, serve fifty percent (50%)" or "five years to serve before being eligible for release," without any additional information or explanation, which Flaherty admittedly did not know, Flaherty's statement did not constitute communicating to Petitioner the "terms and conditions of an offer that may result in a lesser sentence, a conviction on lesser charges, or both."  Flaherty did not know anything about the prosecution's plea offer except that simple statement and made no effort to learn the terms and conditions, such as what offenses would Petitioner have to plead to and therefore what he would have to admit to in court or acknowledge the prosecution could prove against him.  This was not communicating a plea offer to a client under the effective assistance of counsel standards.

Additionally, that Court of Appeals ruling, under the facts and circumstances of this case, also "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(2).

Habeas corpus relief is mandated.

*Assuming as Found by the Kentucky Courts That Trial Defense Counsel Communicated the Prosecutor's Plea Agreement to Petitioner Prior to Trial, Defense Denied Petitioner his Federal Constitutional Right to the Effective Assistance of Counsel By Failing to Adequately Explain the Plea Offer and Advise Petitioner of the Risks and Advantages of Accepting the Plea Offer Compared to Going to Trial.*

This claim was raised in Petitioner's timely filed CR 60.02 motion and appealed to both the Kentucky Court of Appeals and the Kentucky Supreme Court to no avail.

*The Claim*. On February 17, 2017, Petitioner filed in the Daviess Circuit Court a motion, pursuant to CR 60.02, claiming:

> ASSUMING, AS THIS COURT FOUND, THAT DEFENSE COUNSEL COMMUNICATED THE PLEA OFFER TO MOVANT, DEFENSE COUNSEL, BY HIS OWN TESTIMONY AT THE EVIDENTIARY HEARING, DENIED MOVANT THE EFFECTIVE ASSISTANCE OF COUNSEL WITH REGARD TO HIS DEFICIENT ADVICE WITH REGARD TO THE PLEA BARGAIN IN VIOLATION OF MOVANT'S FEDERAL CONSTITUTIONAL RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS AND SECTION ELEVEN OF THE KENTUCKY CONSTITUTION, AN ISSUE THAT WAS NOT BEFORE THIS COURT AT THAT TIME.

[NTR2, 319-340.]

*By His Own Testimony, Flaherty Denied Petitioner the Effective Assistance of Counsel in Communicating the Commonwealth's Plea Offer to Petitioner*. Assuming, as the state courts found, that Flaherty did communicate to Petitioner the prosecution's plea offer, Flaherty's testimony of how he communicated this plea agreement to Petitioner establishes ineffective assistance of counsel on Flaherty's part.

The claim is that trial counsel's explanation of the offer and its risks and advantages compared to going to trial constituted deficient performance. "The American Bar Association recommends defense counsel 'promptly communicate *and explain to the defendant all plea offers made by the prosecuting attorney*,' ABA Standards for Criminal Justice, Pleas of Guilty 14-3.2(a) (3d ed. 1999), and this standard has been adopted by numerous state and federal courts over the last 30 years." *Missouri v. Frye*, 132 S.Ct. 1399, 1408 (2012); (emphasis added). "Prevailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable ...." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). See also *Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Padilla v. Kentucky*, 130 S. Ct. 1473, 1482 (2010).

"The failure of defense counsel to 'provide professional guidance to a defendant regarding his sentence exposure prior to a plea may constitute deficient performance.'" *Smith v. United States*, 348 F.3d 545, 553 (6th Cir. 2003), quoting *Moss v. United States*, 323 F.3d 445, 474 (6th Cir. 2003). "'A criminal defendant has a right to expect at least that his attorney will review the charges with him by explaining the elements necessary for the government to secure a conviction, discuss the evidence as it bears on those elements, and explain the sentencing exposure the defendant will face as a consequence of exercising each of the options available.'" *Titlow v. Burt*, 680 F.3d 577, 587 (6th Cir. 2012), quoting *Smith*, *supra* at 553, reversed on other grounds[16] by *Burt v. Titlow*, 134 S.Ct. 10 (2013).

Communicating a plea offer without explaining its terms and conditions to the accused does not constitute effective assistance of counsel in plea negotiations. Flaherty admitted he had no idea how the plea offer would work, did not inquire of the prosecutor how the plea offer would work, and made no attempt to explain the plea offer to Petitioner.

Initially, when the prosecutor, Van Meter, told Flaherty that the Commonwealth was offering Petitioner "just a simple ten years, serve fifty percent (50%)," Flaherty did not ask Van Meter how this would work in view of the eighteen (18) counts of the indictment. [11:47:54-48:55.] Flaherty testified that "when Mr. Van Meter communicated this plea offer to [him] orally," Flaherty did not ask" Van Meter "how this plea offer would be carried out so [h]e could pass that on to [his] client." [01:00:00-02:15.] Yet Flaherty testified that he could "not see how the attorney, the Commonwealth Attorney, could get the judge to approve that kind of punishment," *e.g.*, "five years to serve." That

---

16 *Titlow v. Burt*, 680 F.3d 577 (6th Cir. 2012), was reversed by the United States Supreme Court in *Burt v. Titlow*, 134 S.Ct. 10 (2013), on AEDPA grounds only.

was the feeling Flaherty had. [12:18:52-21:21:01.] Flaherty also testified that he "had a question of how a judge would approve five years based on the number of charges, based on the number of people and based on the duration that this thing went on." [12:45:05-46:00.]

If, as he testified, Flaherty communicated the prosecutor's plea offer to Petitioner, what could Flaherty have told Grimes as to what charges would be dismissed and what sentences would be recommended, except at best that the recommended sentence would be ten (10) years with five (5) years to serve before becoming parole eligible. This was not explaining the terms and conditions of the plea offer to Petitioner.

By his own admission, Flaherty had never told Petitioner what the maximum sentence would be should Petitioner be convicted at trial of all the charges, receive the maximum sentence on each, and have all sentences run consecutively to each other. Although Flaherty gave Grimes a copy of KRS 439.3401, the violent offender statute, he failed to explain to Grimes the controlling case law, *Hughes v. Commonwealth*, 87 S.W.3d 850, 854-856 (Ky. 2002), that clearly limited the maximum amount of time Grimes would have to serve if convicted to one or more of the Class B felonies, first degree rape and sodomy, to either eight-five percent (85%) of the sentence imposed for those offenses or twenty (20) years, whichever is less.[17]

The circuit court found it effective assistance of counsel and adequate advice to Petitioner that the Corrections' generic Certification on the Calculation of Parole Eligibility had on its fourth and final page an explanation with regard to *Hughes v. Commonwealth*, *supra*. [Order Denying,

---

[17] *Hughes v. Commonwealth*, 87 S.W.3d 850, 854-856 (Ky. 2002), became final on November 21, 2002, some ten (10) months before Petitioner's jury trial commenced on September 24, 2003. See *Troy DeWayne Hughes v. Commonwealth*, Kentucky Supreme Court, Case No. 2000-SC-0156-MR.

05/08/17, p. 6 n.10.] It is inconceivable that giving generic documents and statutes to a criminal defendant to read and figure out for himself can constitute effective assistance of counsel under the federal constitutions.

Flaherty, when discussing the documents he had Petitioner sign, stated, "I'm not saying he has privy to all these documents but the thing itself gives you various situations and we wanted him to be, to have that information that's the reason we gave him a copy and have him sign it so he could go home and look at it." [12:11:35.] When asked if he told Petitioner the total maximum sentence he faced, Flaherty responded, "I didn't tell him what a total was." [12:41:57.] When asked if he ever provided Petitioner with information on concurrent and consecutive sentences, Flaherty answered, "We provide all the information for him to look at probation and parole what they wanted they classified these documents according to the crimes and so forth and they can add it up. To answer your question directly, no, I didn't, but he knew that it was a ton." [12:43:15.] When he talked with Petitioner about the plea offer, Flaherty "didn't discuss" sex offender registration with him. [12:59:12.]

Flaherty testified that he did not provide Petitioner "with any written explanations of these statutes or this Department of Corrections' Certification on the Calculation of Parole Eligibility" that "broke this down for his individual case." [12:13:02-56.] Flaherty asked "why would [he] do that" when Petitioner "had the statutes, he had the certifications, the general statements of the certification." [*Id*.]

Petitioner was not a lawyer. The circuit court emphasized that Flaherty "testified that [Petitioner] was very smart and attentive" and concluded that, "[f]rom the indictment, statutes, and parole eligibility, [Petitioner] would be aware of the nature of the charges against him, and the

penalties." [Order Denying, 05/08/17, p. 6.]  "'Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence.'" *Faretta v. California*, 422 US 806, 833 n. 43 (1975), quoting *Powell v. Alabama*, 287 U. S. 45, 69 (1932).  Flaherty did not provide Petitioner with the effective assistance of counsel by giving him various legal documents and statutes to read and try to comprehend.

Apparently, from his testimony, Flaherty did not figure out that the offer of a ten year sentence with five years to serve before being eligible for parole would necessarily require the Commonwealth to dismiss all of the eight (8) counts of Class B felonies, first degree rape and sodomy, and have Petitioner at best plead guilty to the lesser offenses contained in those charges. And, even assuming *arguendo* that Flaherty had calculated that Petitioner would not have to plead guilty to any Class B felonies, but only Class C or D felonies, he did not, by his own admission, explain that to Petitioner.  An important aspect of the plea agreement could have been that Petitioner would not have to plead guilty to any counts of first degree rape or sodomy.  It is clear from Flaherty's testimony that he never explained that to Petitioner when he allegedly communicated the plea offer to Petitioner.

For example, under the plea offer, Petitioner could have been required to plead guilty to all nine counts of first degree sexual abuse, each with a maximum sentence of five  years, running five counts concurrent with each other and the other four counts concurrent with each other, with both sets of five year sentences to run consecutively for a total of ten (10) years.

Flaherty admitted that he could not see how the prosecutor could get the court to approve an offer that would allow Petitioner to be released after serving only five years of confinement in view

of the number of charges, the number of victims and the duration of these criminal offenses.  This is further evidence that Flaherty had no idea of how the plea offer would work and, as a result, could not have explained it to Grimes.  Despite these doubts, Flaherty admittedly never went back to the prosecutor to ask how would this plea offer work with regards to the charges to be dismissed or amended, the charges Petitioner would have to plead guilty to, and the sentences Petitioner would receive.  By his own admission, Flaherty knew none of this information when he allegedly informed Petitioner of the plea offer.  Flaherty provided no advice to Petitioner concerning the offer, either orally or in writing.

Flaherty's own testimony at the evidentiary hearing, previously accepted by the state courts as credible, established deficient performance in explaining to Petitioner the plea offer of the prosecution and the exposure Petitioner faced depending on the option he chose, going to trial or accepting the plea agreement.  Without explaining the prosecution's plea offer and comparing it to the risks of going to trial, Flaherty, assuming he actually communicated the bare bones plea offer, denied Petitioner his right to the effective assistance of counsel in the context of plea negotiations.

*The Constitutional Claim*.  The United States Supreme Court has "long recognized that the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel." *Padilla v. Kentucky*, 130 S.Ct. 1473, 1486 (2012).  In *Lafler v. Cooper*, 132 S. Ct. 1376, 1386 (2012), the defendant "went to trial rather than accept a plea deal," and "this was the result of ineffective assistance during the plea negotiation process."  In *Hill v. Lockhart*, 474 U.S. 52 (1985), and *Padilla v. Kentucky*, 130 S.Ct. 1473 (2010), "the claim was that the prisoner's plea of guilty was invalid because counsel had provided incorrect advice pertinent to the plea." *Missouri v. Frye*, 132 S. Ct. 1399, 1406 (2012).

Alleging deficient advice in plea negotiations is a completely different constitutional claim from alleging "defense counsel allowed the offer to expire without advising the defendant or allowing him to consider it," which also denies an accused the effective assistance the United States Constitution requires. *Frye*, 1408. The Kentucky Court of Appeals specifically found that Petitioner could not have raised the deficient advice in plea negotiations claim in his initial RCr 11.42 motion in which he alleged the failure of Flaherty to communicate the prosecution's plea offer to Petitioner.

"It is [the Supreme Court's] responsibility under the Constitution to ensure that no criminal defendant — whether a citizen or not — is left to the 'mercies of incompetent counsel.'" *Padilla v. Kentucky*, 130 S.Ct. at1486, quoting *McMann v. Richardson*, 397 US 759, 771 (1970). "If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it. If that right is denied, prejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence." *Lafler v. Cooper*, 132 S. Ct. at 1387.

Yet the Kentucky Court of Appeals, when addressing "deficient performance," noted that not only did "Flaherty provided Grimes with copies of many relevant documents, such an official parole eligibility calculation sheet, the violent offender statute, the sex offender registry requirement statute and the indictment," but emphasized that Flaherty "testified that he orally 'went through' them with Grimes." *Grimes*, KCA, 2019. But to what extent could Flaherty have "gone through" those documents with Petitioner? Flaherty admittedly did not discuss with Petitioner: the maximum sentence Petitioner could receive, as Flaherty admitted not knowing it; concurrent and consecutive sentences in an 18 count indictment; and sexual offender registration. And if Flaherty had competently and thoroughly gone through those documents with Petitioner, why did Flaherty expect

Petitioner to read those documents and figure out how they applied to Petitioner's case? If Flaherty went over those documents with Petitioner, why did Flaherty and the state courts fault Petitioner for not reading the statutes, the indictment and the generic form provided by Corrections?

The Court of Appeals noted that "Flaherty also testified that he told Grimes there were 'big problems' in the case, such as the damning testimony his children and wife would give." It is unlikely that Petitioner or any non-lawyer, for that matter, would need a lawyer to provide them with that information. Flaherty did not testify that he explained any strategy he would pursue to challenge that "damning testimony."

The Court of Appeals stated, "[a]rguably, Flaherty should have explained the seventy-year cap to Grimes," but added, "[h]owever, Flaherty did provide written documentation about possible sentences to Grimes." The Court of Appeals endorsed the principle that a criminal defense attorney provides effective assistance of counsel by providing a client with an 18-count indictment, a number of statutes, and a generic sentencing calculation form for the client to read and figure out the charges and potential sentences he or she faces. This was contrary to an unreasonable application of clearly established Federal law.

The Court of Appeals acknowledged that "[p]erhaps Flaherty should have asked the Commonwealth to flesh out the offer, such as by requesting a detailed explanation of which charges would be amended or dismissed," but diminished that deficiency of performance by contending that "Grimes has not shown how acquiring that information would have impacted his decision."

Under the circumstances at bar, the court below's finding that Petitioner repeatedly stated he would accept no plea offer is without any weight when his defense attorney admittedly never explained the plea offer or Petitioner's exposure from going to trial or taking the plea offer.

"A defendant possesses '"the ultimate authority"' to determine her plea." *Burt v. Titlow*, 134 S. Ct. 10, 19 (2013), J. Sotomayor, concurring, quoting *Florida v. Nixon*, 543 U.S. 175, 187 (2004). "But a lawyer must abide by his client's decision in this respect only after having provided the client with competent and fully informed advice, including an analysis of the risks that the client would face in proceeding to trial. Given our recognition that 'a defendant's proclamation of innocence does not relieve counsel of his normal responsibilities,' *ante*, at 17, our further observation that such a proclamation 'may affect the advice counsel gives,' *ibid*., states only the obvious: that a lawyer's advice will always reflect the objectives of the representation, as determined by the adequately informed client." *Burt v. Titlow*, 19, J. Sotomayor, concurring.

Defense counsel's "silence" in this situation is "fundamentally at odds with the critical obligation of counsel to advise the client of 'the advantages and disadvantages of a plea agreement.'" *Padilla v. Kentucky*, *supra*, 1484 (2010), quoting *Libretti v. United States*, 516 U.S. 29, 50-51(1995).

"A defendant without any viable defense will be highly likely to lose at trial." *Lee v. United States*, 137 S. Ct. 1958, 1966 (2017). The circuit court seemed to suggest that Petitioner had no viable defense due to "big problems" in his case. "Where a defendant has no plausible chance of an acquittal at trial, it is highly likely that he will accept a plea if the Government offers one" "because defendants obviously weigh their prospects at trial in deciding whether to accept a plea." *Id*. Petitioner did not have the opportunity to *weigh his prospects* at trial due to the deficient advice his counsel gave him about plea negotiations, the plea offer and any defense strategy for trial.

For a criminal defendant, "there is more to consider than simply the likelihood of success at trial." *Lee*, 1966. "The decision whether to plead guilty also involves assessing the respective consequences of a conviction after trial and by plea." *Id*. Petitioner needed to be advised as to the

aftermath of being convicted both by going to trial and by taking the prosecution's plea offer . "When those consequences are, from the defendant's perspective, similarly dire, even the smallest chance of success at trial may look attractive." *Id*. "For example, a defendant with no realistic defense to a charge carrying a 20-year sentence may nevertheless choose trial, if the prosecution's plea offer is 18 years." *Id*., 1966-67. But in Petitioner's case, if convicted, he faced an actual maximum sentence of seventy (70) years of confinement, should his sentences run consecutively. KRS 532.110(1)( c). The plea offer apparently was at the most a maximum sentence of ten (10) years. Petitioner's consequences of conviction by trial or by taking the plea offer were dramatically different.

     *Prejudice*. In *Lafler v. Cooper*, 132 S.Ct. 1378, 1386 (2012), the defendant "went to trial rather than accept a plea deal, and it [was] conceded this was the result of ineffective assistance during the plea negotiation process." The defendant "received a more severe sentence at trial, one 3 ½ times more severe than he would have likely received by pleading guilty." *Id*. As the *Lafler* court explained, "[f]ar from curing the error, the trial caused the injury from the error." *Id*. "[E]ven if the trial itself is free from constitutional flaw, the defendant who goes to trial instead of taking a more favorable plea may be prejudiced from either a conviction on more serious counts or the imposition of a more severe sentence." *Id*. "If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it." *Id.* at 1387. "If that right is denied, prejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence." *Id*. On the basis of the sentencing disparity alone between the plea offer and the actual jury sentence, Petitioner demonstrated a reasonable probability of prejudice.

Petitioner was sentenced to confinement in the penitentiary for fifty-nine (59) years. [TR 84-100.] That sentence was virtually six times greater than the plea offer of ten (10) years to serve. Petitioner suffered prejudice as a result of the defective representation in that the maximum sentence he could possibly receive under the plea offer was significantly less than that imposed through trial. Prejudice is manifest and undeniable.

However, the Kentucky Court of Appeals deviated significantly from the *Lefler* prejudice standard by creating an impossible standard for Petitioner to meet. The Court of Appeals held that Petitioner "has not shown prejudice because he has not shown how Flaherty's performance (*i.e.*, failure to obtain from the Commonwealth, and then relate to Grimes, the precise details about the plea, as well as not orally discussing Grimes's maximum sentence and parole eligibility, etc.) impacted Grimes's decision to reject the plea offer." *Grimes*, KCA, 2019. This version of the *Lafler* prejudice standard would be impossible to meet. The Court of Appeals unwittingly demonstrated that impossibility. According to the Court of Appeals, "other than his own self-serving allegations, Grimes's contention that he would have accepted the plea if he had been fully informed of its terms is unsupported by—indeed is contrary to—the record." On that basis, the Court of Appeals found "Grimes has not met his burden to show prejudice." As explained above, the sentencing disparity between the plea offer's maximum sentence and the maximum sentence imposed at trial established the prejudice prong of the ineffective assistance of counsel claim. *Lafler*, 132 S.Ct. at 1386.

Under AEDPA, a federal court may not grant a petition for a writ of habeas corpus unless the state court's adjudication on the merits was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28

U.S.C. § 2254(d)(1). "A decision is contrary to clearly established law if the state court 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases.'" *Lafler*, 132 S.Ct. at 1390.

*The Commonwealth Would Not Have Cancelled the Plea Offer and No Basis Exists to Indicate Judicial Rejection of the Plea Bargain.* "Defendants must also demonstrate a reasonable probability the plea offer would have been entered without the prosecution cancelling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law." *Missouri v. Frye*, 132 S.Ct. 1399, 1409 (2012). The testimony of the prosecutor, Van Meter, as set forth in the previous claim, established that had the plea offer been accepted by Petitioner the Commonwealth would not have cancelled the offer or otherwise reneged on the offer and that the trial judge would have accepted the prosecutor's recommended sentence.

*Remedy***.** The remedy for this constitutional violation is muddied by the reality that the ambiguous verbal plea offer was either "to serve five years, with the defendant serving five years before being eligible for release"[18] or "probably just a simple ten years, serve fifty percent (50%)."[19] Flaherty had no idea how this plea agreement would work and had no interest in inquiring of the prosecutor what charges, if any, would be dismissed or amended, what sentences would be recommended, etc. Van Meter, the prosecutor, had nothing in his trial file to refresh his memory as to how he intended to execute the plea offer.

As explained above, by the very nature of the plea offer that Van Meter communicated to Flaherty, the Commonwealth would apparently have had either to dismiss the eight (8) counts of the

---

[18] Commonwealth's Response to 11.42 Motion, 2; OTR3, 44.

[19] Prosecutor VanMeter's testimony at the evidentiary hearing. [11:47:54-48:55.]

Class B felonies of first degree rape and sodomy, or to amend those counts to Class C or Class D felonies, which would have removed those offenses from the eighty-five percent (85%) rule for parole eligibility to enable Grimes to be eligible for parole after serving five (5) years of imprisonment.

"The specific injury suffered by defendants who decline a plea offer as a result of ineffective assistance of counsel and then receive a greater sentence as a result of trial can come in at least one of two forms." *Lafler v. Cooper*, 132 S.Ct. at 1389. "In some cases, the sole advantage a defendant would have received under the plea is a lesser sentence. This is typically the case when the charges that would have been admitted as part of the plea bargain are the same as the charges the defendant was convicted of after trial." *Id*. As explained, under the plea offer made by Van Meter, Petitioner could not plead to any of the Class B felony counts of first degree rape or sodomy and receive a maximum sentence of ten years, let alone five years.

"In some situations it may be that resentencing alone will not be full redress for the constitutional injury." *Lafler* at 1389. "If, for example, an offer was for a guilty plea to a count or counts less serious than the ones for which a defendant was convicted after trial, or if a mandatory sentence confines a judge's sentencing discretion after trial, a resentencing based on the conviction at trial may not suffice." *Id*. "In these circumstances, the proper exercise of discretion to remedy the constitutional injury may be to require the prosecution to reoffer the plea proposal." *Id*. "The correct remedy in these circumstances, however, is to order the State to reoffer the plea agreement." *Id*. at 1391. "Presuming [the defendant] accepts the offer, the state trial court can then exercise its discretion in determining whether to vacate the convictions and resentence [the defendant] pursuant to the plea agreement, to vacate only some of the convictions and resentence [the defendant]

accordingly, or to leave the convictions and sentence from trial undisturbed." *Id*.

Kentucky has long held that the prosecution's withdrawal of a plea offer, following relief obtained "either through a direct or collateral attack to the conviction," may not be the result of prosecutorial vindictiveness or retaliation. *Osborne v. Commonwealth*, 992 S.W. 2d 860, 866 (Ky. App. 1998), citing, *inter alia*, *Blackledge v. Perry*, 417 U.S. 21 (1974), and *Turner v. Tennessee*, 858 F.2d 1201, 1208 (6th Cir. 1988). Should this Court find Petitioner received ineffective assistance of counsel by Flaherty's failure to review the charges with him by explaining the elements necessary for the prosecution to secure a conviction, to discuss the evidence as it bears on those elements, and explain the sentencing exposure Grimes would face as a consequence of exercising each of the options available prior to trial, "the means by which to repair the constitutional deprivation" in Kentucky "is to restore [Petitioner] to the position in which he would have been had the denial not occurred, namely, serving a sentence harmonious to that offered by the Commonwealth." *Osborne v. Commonwealth*, 992 S.W.2d 860, 866 (Ky. App.1998), citing *Lewandowski v. Makel,* 949 F.2d 884, 889 (6th Cir.1991). "The Commonwealth may withdraw its prior offer only if it can rebut the presumption that the withdrawal is the product of prosecutorial vindictiveness." *Osborne* at 866.

In Petitioner's case, assuming the prosecution is required to re-offer the plea agreement and Petitioner accepts, should the Commonwealth under the plea agreement require Petitioner to plead guilty to all nine (9) of the first degree sexual abuse counts of which he was convicted at trial, the court below would not have to vacate those convictions, but could re-sentence Petitioner on those nine (9) charges as long as the sentence for those offenses did not exceed a maximum sentence of imprisonment for ten (10) years as mandated by the plea agreement. However, under the terms of the plea agreement, the jury convictions for first degree rape and sodomy would apparently have to

be vacated under the terms of the plea agreement and Petitioner may be required by the Commonwealth to plead guilty to lesser offenses included in those charges.

The Kentucky Court of Appeals' ruling that Flaherty provided effective assistance of counsel with regard to his explaining the terms and conditions of the plea offer and advising Petitioner of the risks and advantages of accepting the plea offer compared to going to trial resulted in a decision that was contrary to, and/or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, such as *Lafler v. Cooper*, 132 S.Ct. 1376, 1388 (2012). 28 U.S.C. § 2254(d)(1).

As explained above, the Kentucky Court of Appeals ruling, under the facts and circumstances of this case, also "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2).

Habeas corpus relief is mandated.

*Trial Defense Denied Petitioner his Federal Constitutional Right to the Effective Assistance of Counsel By Failing to Object During the Prosecutor's Guilt Phase Closing Argument When the Prosecutor Argued Facts Neither in Evidence Nor Reasonably Inferable From the Evidence, by Telling the Jury that Petitioner had Admitted to His Wife that His Stepdaughter, Ashley, "is Like You, She Said No, She Told Me No, I'd Leave Her Alone."*

Petitioner's trial counsel denied him effective assistance of counsel by failing to object when, during the prosecution's guilt phase closing argument, while discussing Tina Grimes' account of Petitioner's alleged telephone confession to her on December 11, 2002, the prosecutor, speaking as if he were Tony Grimes talking to his wife on the phone, said, "Ashley is like you, she said no, she told me no, I'd leave her alone."   [TAPE 2; 9/26/03; 02:10:26-31.]

However, in a motion for new trial filed October 3, 2003, trial defense counsel raised the claim that "[i]n its closing argument, the Commonwealth argued facts that were not in evidence or

reasonably inferable therefrom." [TR 112.] The motion provides no further elaboration of this error. The record contains no ruling on that motion.

This argument by the prosecutor, although unobjected to by the defense, was prosecutorial misconduct because no evidence of this statement by Tina Grimes was introduced into evidence by either the Commonwealth or the defense.  The prosecutor's reference to facts not in evidence was calculated to bolster the credibility of his witness, Tina Grimes, and the veracity of her account of Petitioner's phone confession, to achieve an unfair litigation advantage and deprive Petitioner of a fundamentally fair trial.  It must be remembered that Petitioner had not confessed to the police but instead steadfastly maintained his innocence. [TAPE 2; 09/25/03; 01:09:36-45.] Yet Flaherty never objected to the prosecutor arguing facts not in evidence and not inferable from the evidence.

During his guilt phase closing argument, the prosecutor told the jury that Petitioner had told Tina Grimes during their December 11, 2002 phone call, "Ashley is like you.  She said no, she told me no, I'd leave her alone."  [TAPE 2; 9/26/03; 02:10:26-31.] A review of the videotapes of the entire trial reveals that no testimony of this nature was presented.  Specifically, Tina Grimes, Petitioner and Officer Duvall never testified that Petitioner made such a statement to Tina Grimes at any time.  Attorneys may not argue facts without some evidentiary support.

Petitioner's alleged statement argued by the prosecutor can only be read as an admission that Petitioner had sexual contact with his stepdaughter, Ashley, but only when she agreed. There is no evidence of record, testimonial or otherwise, that would support the prosecutor's reciting of Petitioner's supposed admission on this point.

As the prosecutor's arguing facts neither in evidence or reasonably inferable from the evidence was not objected to by defense counsel, on direct appeal it was raised as an unpreserved

error creating a manifest injustice.  That specific claim will be addressed within.  For the purpose of evaluating Flaherty's ineffective assistance in this instance and its prejudicial impact, a review of the nature of this constitutional error is important.

A prosecutor's statement in closing argument is improper if the statements argue facts which are not in evidence and are prejudicial.  *United States v. Wiedyk*, 71 F.3d 602, 610 (6th Cir. 1995).  "Although a prosecutor is allowed 'to argue reasonable inferences from the evidence,' *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000), he or she is not allowed to misstate the evidence."  *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002), citing *United States v. Carter*, 236 F.3d 777, 784 (6th Cir. 2001).  Yet Flaherty failed to object to the prosecutor arguing facts not in the record.

The prosecutor use of extra-record evidence to bolster the credibility of Tina Grimes' account of Petitioner's alleged phone confession was fundamentally unfair.  After reciting this non-record evidence to the jury, the prosecutor asserted to the jury, "I mean these are not things that are made up."[20] [TAPE 2; 09/26/03; 02:10:55.]  Immediately thereafter, addressing these remarks and others, the prosecutor told the jury: "And again, the point is, if Tina was lying she could have done a better job, but she's telling the truth."[21] [02:11:03.]

The prosecutor misstated the evidence to gain an unfair tactical advantage by inculpating Petitioner while bolstering the credibility of his own witness, Tina Grimes.  "[I]t is improper to argue facts not in evidence."  *Perry v. Commonwealth*, 390 SW 3d 122, 134 (Ky. 2012).

*This Error Violated Petitioner's Federal Constitutional Right to Due Process*.  The prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a

---

[20] This was also improper bolstering/vouching by the prosecutor.

[21] This was also improper bolstering/vouching by the prosecutor.

denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). This argument by the prosecutor was prosecutorial misconduct because no evidence of this statement was introduced into evidence by either the Commonwealth or the defense.

Unlike in *Darden v. Wainwright*, 477 U.S. 168, 181-182 (1986), the prosecutor's argument did "manipulate or misstate the evidence" and it did "implicate other specific rights of the accused." This particular argument violated the Petitioner's right to confront the witness against him as no witness testified that Petitioner made the confession/admission the prosecutor referenced in his closing, depriving Petitioner of the right to cross-examine the alleged proponent of the statement in question.

"The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" *Crawford v. Washington*, 541 US 36, 42 (2004). The Supreme Court has "held that this bedrock procedural guarantee applies to both federal and state prosecutions." *Id.*, citing *Pointer v. Texas*, 380 U. S. 400, 406 (1965). "'The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.'" *Lilly v. Virginia*, 527 U.S. 116, 123-124 (1999), quoting *Maryland v. Craig*, 497 U. S. 836, 845 (1990).

Although the prosecutor's description of Petitioner's supposed confession to his wife was only argument, it was presented to the jury as if it was evidence the jury had heard during the trial. Without an objection to the prosecutor arguing facts not in evidence, there could be no striking of that portion of the prosecution's closing argument, no admonition to the jury to disregard that argument that misstates the evidence, and no potential mistrial. As a result, this confession by Petitioner, not

contained in the evidence of record, remained unconfronted.

The objectionable content was not "invited by or was responsive to" the defense closing argument. *Id*., 182. No instruction was given by the trial court that "their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence." *Id*.

Trial defense counsel's failure to object to the prosecutor's reference to facts not in evidence, under these circumstances, was clearly deficient performance under the *Strickland* standard. There was no viable strategic reason not to object; the prosecution was arguing facts not in evidence. Was Flaherty unaware that this evidence had not been admitted? An obvious deficiency in performance. Was Flaherty not listening to the prosecutor's closing argument? An obvious deficiency. Did Flaherty think that the prosecutor injecting into his argument a confession never introduced into evidence was not worth making an objection? An obvious deficiency.[22] Trial defense counsel's failure to timely object to the prosecutor arguing to the jury a portion of Petitioner's alleged confession that had never been put into evidence constituted deficient performance that allowed the jury to believe that either that this confession of Petitioner had been introduced or that the prosecutor had knowledge of other portions of Petitioner's confession that had not been introduced into evidence. Prejudice is apparent.

On appeal, the Court of Appeals noted that "[i]t is well established that attorneys, including prosecutors, are afforded great latitude in making their closing arguments." *Grimes*, KCA, 2011, 17. The *Grimes* court held that, [o]n direct appeal, the [Kentucky] Supreme Court found that this 'isolated misstatement by the prosecutor did not prejudice Grimes in any manner,' and, thus, "the prosecutor's

---

[22] Both the circuit court and the appellate court denied Petitioner an evidentiary hearing on this ineffective assistance of counsel claim.

statement could not have invalidated Grimes's conviction, and we hold the circuit court did not err

in summarily dismissing this claim without an evidentiary hearing." *Grimes*, KCA, 2011, 18.

Petitioner, having established both Flaherty's deficient performance and prejudice, has

demonstrated ineffective assistance of counsel, even without an evidentiary hearing.

As explained above, the Kentucky Court of Appeals' ruling resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly established Federal law, as determined

by the Supreme Court of the United States, such as *Strickland, supra*.  28 U.S.C. § 2254(d)(1).

Additionally, that Court of Appeals ruling, under the facts and circumstances of this case, also

"resulted in a decision that was based on an unreasonable determination of the facts in light of the

evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(2).

Habeas relief is mandated.

*Trial Defense Denied Petitioner his Federal Constitutional Right to the Effective Assistance of Counsel By Failing Both to Investigate Potential Mitigation Witnesses and Evidence and to Present Available Mitigation Witnesses and Evidence to the Jury During the Sentencing Phase of the Trial.*

In his RCr 11.42 motion, Petitioner claimed that his "trial counsel failed to render effective

assistance of counsel at the penalty phase of the trial by failing to investigate potential mitigation

witnesses and evidence and by failing to present available mitigation witnesses and evidence." [11.42

Motion, p. 3; TR2, 14-32.]  This claim of ineffective assistance was denied without an evidentiary

hearing.

As explained *supra*, in Petitioner's case, upon conviction of the all the charged offenses, the

maximum sentence of imprisonment, if all the sentences were run consecutively, would have been

limited by law to seventy (70) years.  KRS 532.110(1)©.  The jury did not know this.  However,

despite the jury having a range of eight-eight (88) years to two hundred (200) years on the sixteen (16)

felony charges, without regard to concurrent or consecutive sentences, Flaherty did not call any witnesses at the sentencing hearing or introduce any defense exhibits.  No mitigation witnesses were called even though Petitioner's father, Barry L. Grimes, his brother, Kevin L. Grimes, and his sister, Pamela May, all resided in Owensboro, the site of the trial.  Petitioner's mother, Doris Green, resided with her husband, Jim Green, in nearby Evansville, Indiana.  All of these family members were available to testify at the sentencing hearing and virtually all were in the courtroom throughout the trial.  None were called by defense counsel at the sentencing hearing.

Petitioner had a well established work record in the community.  Prior to his conviction, Petitioner had worked at the same job for ten (10) years, as a sales representative for K & W Equipment Company, Inc., in Owensboro, Kentucky.  He covered nine (9) counties in Kentucky and three and one-half (3 ½) counties in Indiana selling John Deere construction utility equipment. Nevertheless, trial counsel did not call anyone from Petitioner's place of employment to testify at the sentencing hearing.  Father Michael E. Williams, Pastor, St. Edwards Church, Fulton, Kentucky, has known Petitioner since 1992.  From the time Petitioner was charged with these offenses up to the sentencing hearing Father Williams served as Petitioner's spiritual advisor who spoke regularly with Petitioner over the phone and in person.  Trial counsel did not call Father Williams to testify at the sentencing hearing.

The language of the three preceding paragraphs was used in the RCr 11.42 motion to describe this claim of ineffective assistance of counsel.  [11.42 Motion, pp. 3-4; TR2, 14-32.]

**The Legal Basis.**  At the sentencing hearing before the jury, "[t]he defendant may introduce evidence in mitigation or in support of leniency."  KRS 532.055(2)(b).  "[T]he purpose of KRS 532.055 is to insure having a jury well informed about all pertinent information relating to the person

on trial." *Cornelison v. Commonwealth*, 990 S.W.2d 609, 610 (Ky. 1999). There is a striking difference between the no-witness mitigation defense presented by Petitioner's defense attorney and the witnesses who could have testified in mitigation. The evidence described above had the potential to persuade the jury to give Petitioner a lesser sentence on many of the counts in question, particularly since the jury, when provided with no mitigation witnesses, had opted to impose a mid-range sentence rather than the maximum sentence on twelve of the sixteen felony convictions.

"This [potential mitigation] evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose it is possible that a jury could have heard it all and still have decided on" the same exact sentences imposed, "that is not the test." *Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 2469 (2005). "It goes without saying that the undiscovered 'mitigating evidence, taken as a whole,' "'might well have influenced the jury's appraisal'" of [the defendant's] culpability,'" *Wiggins* [*v. Smith*], 539 U. S. [510], 538 (quoting *Williams v. Taylor*, 529 U. S. [362], at 398 [2000]), and the likelihood of a different result if the evidence had gone in is 'sufficient to undermine confidence in the outcome' actually reached at sentencing, *Strickland* [*v. Washington*], 466 U. S. [668 (1984)], at 694." *Rompilla v. Beard*, 125 S.Ct. at 2469. "[I]f an increased prison term did flow from an error [a defendant] has established *Strickland* prejudice." *Glover v. United States*, 531 U.S. 198, 200 (2001).

As a result of Petitioner's conviction of eight (8) counts of first degree rape or first degree sodomy, trial counsel should have known prior to jury sentencing that Petitioner would be designated a violent offender and be required to serve eighty-five percent (85%) of the sentence imposed or twenty (20) years, whichever was less. KRS 439.3401(1)© & (3); *Hampton v. Commonwealth*, 133 S.W.3d 438 (Ky. 2004); *Hughes v. Commonwealth*, 87 S.W.3d 850, 856 (Ky. 2002). As a result, trial

counsel needed to provide the jury with multiple mitigation evidence to convince the jury that a relatively low term of years was adequate punishment for Petitioner, whether the result of minimum sentences, concurrent sentences or both.

Trial counsel was obviously aware of the need for the jury to recommend lower sentences and to recommend that the sentences run concurrently as he made this request of the jury during his extremely brief closing sentencing argument, yet counsel presented no mitigation evidence or witnesses.  [TAPE 3: 09/26/03; 05:13:52.] This was ineffective assistance of counsel, on both the deficient performance and the prejudice prongs.

If run concurrently, the minimum sentence for all the offenses was ten (10) years, with parole eligibility at eight and one-half (8½)  years, and the maximum sentence was twenty (20) years, with parole eligibility at seventeen (17) years.  The jury recommended that Petitioner be sentenced to confinement in the penitentiary for fifty-nine (59) years and the judge sentenced him accordingly. Petitioner will not be eligible for parole until he serves twenty (20) years in prison.  For purposes of parole eligibility, Petitioner received the maximum sentence.  For purposes of serving out his sentence, Petitioner's sentence of fifty-nine years is a life sentence.  Petitioner, age twenty-nine (29) at sentencing, will be eighty-eight (88) years old when his sentence is served out.

There was no danger to the defendant in calling the mitigation witnesses discussed above because Petitioner had no prior convictions of any kind and no history of significant abuse of alcohol or drugs.    "Counsel's strategy choice," even at sentencing, must be "within the range of professionally reasonable judgments."  *Strickland v. Washington*, 466 U. S.668, 699 (1984).

In its order denying 11.42 relief, the circuit court found "that the decision of the Defendant, through his attorney, after the guilt phase not to present witnesses at the penalty phase is an issue of

*trial strategy* for which the Court does not infer ineffective assistance." [TR2, 86; (emphasis added).] "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000). "'[T]he mere incantation of "strategy" does not insulate attorney behavior from review.'" *Fisher v. Gibson*, 282 F.3d 1283, 1296 (10th Cir. 2002), quoting *Brecheen v. Reynolds*, 41 F.3d 1343, 1369 (10th Cir.1994) (internal quotation omitted). The circuit court could not make a determination that counsel's failure to present mitigation witnesses was *trial strategy* without conducting an evidentiary hearing. "An evidentiary hearing must be held in this case to determine whether the failure to introduce mitigating evidence was trial strategy, or 'an abdication of advocacy.'" *Hodge v. Commonwealth*, 68 S.W.3d 338, 345 (Ky.2002). "And, if defense counsel's advocacy was deficient, then a finding must be made of what mitigating evidence was available to counsel." *Id*.

According to the circuit court, "[t]he jury had heard the evidence, considered the Defendant's denials and reached obvious conclusions about his character." "Under the circumstances," the circuit court reasoned, "there was not much more to say in mitigation of the offense." This conclusion is based on neither the face of the record nor an evidentiary hearing and is therefore clearly erroneous.

"If there was no [mitigation] investigation, then [counsel's] performance was deficient." *Hodge v. Commonwealth*, 68 SW 3d 338, 344 (Ky. 2001). "An evidentiary hearing must be held in this case to determine whether the failure to introduce mitigating evidence was trial strategy, or 'an abdication of advocacy.'" *Id*., 345. " And, if defense counsel's advocacy was deficient, then a finding must be made of what mitigating evidence was available to counsel." *Id*. "The circuit court was required to conduct an evidentiary hearing." *Id*.

The circuit court was required to conduct an evidentiary hearing "'to identify precisely what

mitigating evidence was available to defense counsel, the reasonableness of any investigation into mitigating evidence counsel conducted, and the rationale for counsel's failure to present additional mitigation evidence.'" *Gambrel v. Commonwealth*, unpublished opinion, 2006 WL 1789156 (Ky. App. 2004), p. 2. Only after such an inquiry could the circuit court "'determine whether defense counsel's performance with respect to the penalty phase and [counsel's] failure to introduce mitigating evidence was constitutionally deficient.'" *Id*.

The circuit court gratuitously added that "[t]he Defendant did not express remorse for sexually abusing his step-daughters." Because trial counsel called *no witnesses* in the sentencing hearing, including Petitioner, and did not request on the record that Petitioner be permitted to allocute to the jury, Petitioner made no sentencing statement to the jury. However, without an evidentiary hearing, the circuit court could give no significance to this fact.

The Kentucky Court of Appeals erroneously dismissed this claim of ineffective assistance of counsel stating Petitioner "only offered conclusory assertions that his trial counsel should have investigated potential ... mitigation witnesses." claiming Petitioner "did not state with specificity what evidence" such an "investigation would have revealed." *Grimes*, KCA, 2011, 12. On this basis, the Court of Appeals ruled "the circuit court did not err in dismissing" this claim "without an evidentiary hearing." *Id*. This ruling was contrary to Kentucky decisional law.

Petitioner had "provided sufficient information on available mitigating evidence to justify an evidentiary hearing to more fully explore the specifics of potential evidence that a reasonable investigation by defense counsel would have developed." *Gambrel v. Commonwealth*, unpublished opinion, NO. 2001-CA-002415-MR2006, December 13, 2002, p. 17.

As the RCr 11.42 motion makes clear, virtually all of the uncalled potential mitigation

witnesses were listed by name and relationship to Petitioner, were available to testify and were at the court proceedings. Petitioner was entitled to an evidentiary hearing on the basis of the specificity of this claim, contrary to the state court rulings. Father, mother, brother, sister, his mother's husband, his spiritual advisor and his employer, none were called for mitigation testimony and Petitioner received a sentence of 59 years imprisonment. Flaherty presented no mitigation testimony or evidence.

Although the mitigation presented at the jury sentencing phase is initially presented to assist the jury, it may be used by the judge to modify downward a jury's sentence. A judge in Kentucky may not increase a jury's felony sentence, but may only reduce it in certain circumstances. KRS 532.070(1), *Court modification of felony sentence*.[23] The circuit judge heard no mitigation evidence to support a reduction of sentence.

The Kentucky courts assumed, without a basis in the record, that the presentation of no mitigation evidence was a strategic decision by defense counsel or because none of the named potential mitigation witnesses' testimony would be mitigating.

As explained above, the Kentucky Court of Appeals' ruling resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, such as *Strickland, supra*. 28 U.S.C. § 2254(d)(1). Additionally, that Court of Appeals ruling, under the facts and circumstances of this case, also "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2).

---

[23] KRS 532.070(1) specifically authorizes the trial judge to consider "the history and character of the defendant."

Federal habeas corpus relief is mandated.

*Trial Defense Denied Petitioner his Federal Constitutional Right to the Effective Assistance of Counsel By Failing to Object During the Prosecutor's Guilt Phase Closing Argument When the Prosecutor Used Petitioner's Reputable Occupation as a Professional Salesman to Advise the Jury that it was Petitioner's "Job as a Salesman to Try to Sell to You that he is Not Guilty," an Impermissible and Unreasonable Inference from the Evidence.*

Petitioner's trial counsel failed to render effective assistance of counsel by failing to object when the prosecutor during his guilt phase closing argument used Petitioner's occupation as a professional salesman, that had been introduced by the defense only as legitimate background evidence [TAPE 2; 09/25/03; 03:14:29-46], to advise the jury that it was Petitioner's "job as a salesman to try to sell to you that he is not guilty," an impermissible and unreasonable inference from the evidence.

During the guilt phase closing argument, the prosecutor told the jury: "No, he looked well, he dressed well, *he testified professionally*.  His chosen profession is *a salesman*.  I'm not knocking salesmen, but *it's his job as a salesman to try to sell to you that he is not guilty*, but the evidence, the proof and the details show otherwise." [TAPE 2; 9/26/03; 02:13:05-25; (emphases added).]   Such prosecutorial misconduct, specifically used to challenge an accused's credibility on the basis of a neutral background factor, his occupation as a legitimate salesman, was calculated to achieve an unfair litigation advantage and deprive Petitioner of a fundamentally fair trial.  "It is true that [Tony Grimes'] means of subsistence had no direct bearing on his guilt or innocence of the charge[s] on which he was being tried."  *Bolin v. Commonwealth*, 407 S.W.2d 431, 433 (Ky. 1966).   Trial counsel's performance was deficient when he failed to object to this line of argument.

Some five minutes earlier in his closing guilt phase argument, the prosecutor discussed the occupation of Tina Grimes, the mother of the two alleged victims, in glowing terms: "Tina's a nurse,

*a respected profession. She's a professional*. She believes her kids, they have a right to be believed." [TAPE 2; 9/26/03; 02:08; (emphases added).] Thus, the prosecutor sought to attack Tony's credibility on the basis of his occupation as a salesman, a reputable occupation, while enhancing Tina's credibility because of her job as a nurse. This tactic was used to help sway the jury to believe Tina's account of Petitioner's confession rather than Petitioner's denial that he ever made those statements to his wife. Prejudice is apparent.

As this prosecution argument was not objected to by defense counsel, on direct appeal it was raised as an unpreserved error creating a manifest injustice. That specific claim will be addressed within. For the purpose of evaluating Flaherty's ineffective assistance in this instance and its prejudicial impact, a review of the nature of this constitutional error is important.

This prosecution argument violated Petitioner's federal constitutional right to federal due process. The prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). This argument constituted prosecutorial misconduct because it manipulated Petitioner's background testimony as to his honest, legitimate occupation as a salesman into an attack on Petitioner's credibility and adversely implicated his federal constitutional right to testify.

Unlike in *Darden v. Wainwright*, 477 US 168, 181-182(1986), the prosecutor's argument did "manipulate ... the evidence." The objectionable content was not "invited by or was responsive to" the defense closing argument. *Id*., 182.

Unlike in *Darden*, this objectionable argument did "implicate other specific [constitutional] rights of the accused." *Id*. This prosecution argument implicated Petitioner's federal constitutional right to testify. "At this point in the development of our adversary system, it cannot be doubted that

a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." *Rock v. Arkansas*, 483 US 44, 49 (1987). "The right to testify on one's own behalf at a criminal trial has sources in several provisions of the Constitution." *Id*., 51.

"It is one of the rights that 'are essential to due process of law in a fair adversary process.'" *Id*., citing *Faretta v. California*, 422 U. S. 806, 819, n. 15 (1975). "The necessary ingredients of the Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process of law include a right to be heard and to offer testimony." *Rock*, 51.

"The right to testify is also found in the Compulsory Process Clause of the Sixth Amendment, which grants a defendant the right to call 'witnesses in his favor,' a right that is guaranteed in the criminal courts of the States by the Fourteenth Amendment." *Rock*, 52, quoting *Washington v. Texas*, 388 U. S. 14, 17-19 (1967). "Logically included in the accused's right to call witnesses whose testimony is 'material and favorable to his defense,' *United States v. Valenzuela-Bernal*, 458 U. S. 858, 867 (1982), is a right to testify himself, should he decide it is in his favor to do so. In fact, the most important witness for the defense in many criminal cases is the defendant himself." *Rock*, 52. "Even more fundamental to a personal defense than the right of self-representation ... is an accused's right to present his own version of events in his own words." *Id*.

"The opportunity to testify is also a necessary corollary to the Fifth Amendment's guarantee against compelled testimony." *Id*. "'Every criminal defendant is privileged to testify in his own defense, or to refuse to do so.'" Id., 53, quoting *Harris v. New York*, 401 U. S. 222, 225 (1971).

In *Rock*, the Supreme Court ruled that "[t]here is no justification today for a rule that denies an accused the opportunity to offer his own testimony." *Rock*, 52. Likewise, there is no justification for a prosecutor's closing argument that takes an innocuous yet inherent aspect of an accused's

background testimony, such as his respectable occupation, and manipulates that factor into an attack on the accused's credibility, adversely implicating the accused's right to testify.

"Like the truthfulness of other witnesses, the defendant's veracity ... can be tested adequately by cross-examination." *Rock*, 52. But an accused's reputable and honest occupation, unrelated to the charged offenses, is not a legitimate mode of impeachment or credibility challenge. This prosecution argument, based solely on Petitioner's legitimate employment history, undermined his federal constitutional right to testify.

*This Prosecutorial Misconduct Violated Petitioner's Presumption of Innocence As Guaranteed by the Federal Constitution*. This prosecutor's tactic of using a citizen accused's legitimate, neutral profession as a sales representative for a farm equipment manufacturer as a means of attacking the defendant's credibility is the type of procedure or practice that undermines "the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." *Estelle v. Williams*, 425 U.S. 501, 503 (1976). A citizen accused's occupation, when it is unrelated to the charges, should not be used by the prosecution as a means of manipulating the jury against the defendant and his testimony. "To implement the presumption [of innocence], courts must be alert to factors that may undermine the fairness of the fact-finding process." *Id.* Trial defense counsel's failure to object to the prosecutor's argument that Petitioner's testimony regarding his honest occupation undermined the veracity of his testimony, under these circumstances, was clearly deficient performance under the *Strickland* standard. There was no viable strategic reason not to object; the prosecution was "manipulating" facts in evidence and perverting them into an indictment of Petitioner's credibility.

Taking its cue from the ruling on direct appeal, the Court of Appeals noted that the Kentucky

Supreme Court had "cited to references to criminal defendants as 'a bit of evil,' a 'beast,' and 'worse than all the convicts and traitors in hell' as acceptable," and ruled that the circuit court did not err in dismissing this claim without an evidentiary hearing.  *Grimes*, KCA, 2011, 19.

Of course, the cited examples of these "descriptive names" found acceptable in other cases may have been legitimate inferences from facts in evidence that apparently neither manipulated or misstated the evidence and certainly did not implicate any specific federal constitutional rights.

As explained above, the Kentucky Court of Appeals' ruling resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, such as *Strickland, supra*.  28 U.S.C. § 2254(d)(1). Additionally, that Court of Appeals ruling, under the facts and circumstances of this case, also "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(2).

Federal habeas corpus relief is required.

*Trial Defense Denied Petitioner his Federal Constitutional Right to the Effective Assistance of Counsel By Failing to Object When Petitioner's Wife on Cross-examination Volunteered an Unresponsive, Inadmissible Lay Opinion that Falsely Informed the Jury That "Early" Breast Development in Girls is a Physical Indicator That Her Daughters Were Sexually Abused and That her Younger Daughter had Developed Breasts "Early."*

Flaherty, Petitioner's trial counsel, denied Petitioner effective assistance of counsel by failing to object when Tina Grimes, Petitioner's wife, on cross-examination volunteered an unresponsive, inadmissible lay opinion that falsely informed the jury that "early" breast development in girls is a physical indicator that the girls were sexually abused and that her daughter Jordan had developed breasts "early."  [TAPE 1; 9/24/03; 04:35:55.]  Defense counsel's question asked only whether there were any "emotional indications of any kind" that either one of Tina's daughters were being sexually

molested as they have alleged.  Ms. Grimes unresponsively volunteered her opinion about her daughters' physical indicators of sexual abuse.  Instead of responding to the question asked, Tina Grimes volunteered her opinion that both daughters' "breasts were developing early," specifically observing that Jordan at 10 years of age was "already getting breasts" and giving her opinion that breast development at age 10 "is early for a little girl."  "The answers volunteered by the witness," Tina Graves, "were not responsive to the questions" and defense counsel "can hardly be accused of" eliciting the answers "when a witness makes unresponsive answers of a voluntary nature." *Meadows v. Commonwealth*, 551 S.W.2d 253, 254 (Ky.App. 1977).  Tina Grimes, as the girls' mother, undoubtably had opinions as to what ages her daughters began developing based on her observations of her daughters' breasts.  However, Ms. Grimes did not have as a lay witness opinions rationally based on her own perceptions of the age at which the development of breasts in girls is medically regarded as "early."  KRE 602; KRE 702.  What Ms. Grimes also did not have as a lay witness were opinions rationally based on her own perceptions that the early development of breasts in girls is a physical indicator that a child has been sexually active.

As a result of Ms. Grimes' unresponsive, inadmissible lay opinion testimony, the jury was told that the fact that both daughters developed breasts early was undeniable physical evidence that corroborated their accounts of being sexually abused by their stepfather, Petitioner.  This type of unresponsive, inadmissible lay opinion evidence was particularly damaging in Petitioner Grimes' case because no medical evidence concerning the physical condition of the girls' sexual organs was introduced to corroborate the testimony of either victim.

The language of the two preceding paragraphs was used in the RCr 11.42 motion to describe this claim of ineffective assistance of counsel.  [11.42 Motion, 15-17; TR2, 14-32.]

*The Unresponsive, Inadmissible Opinion Was Volunteered By The Mother Of The Alleged Victims*. During defense counsel's cross-examination of Tina Grimes, the mother of Ashley and Jordan, this exchange occurred:

> Mr. Flaherty: Let's cooperate, um, can you, I assume that the children were regular happy, happy family and there were *no other emotional indications of any kind* that either one of these girls were being molested as they claim they have been.
>
> Tina Grimes: Um, actually I had noticed that they were developing early, that *their breasts were developing early, Jordan was 10 and she was already getting breasts, which that is early for a little girl* and I can name numerous things that I can look back on now and see there were indications that I overlooked. [TAPE 1; 9/24/03; 04:35:55; (emphases added).]

Rather than objecting to the unresponsive, prejudicial testimony, Flaherty, as both the Kentucky appellate courts noted, Flaherty "did not object to the response and even commented that he thought the youngest victim looked more mature than she did a year ago." *Grimes*, KSC, 2005, 9. See also *Grimes*, KCA, 2011, 20-21. In other words, Flaherty not only failed to object, but by his comment appeared to affirm to the jury the wife's unresponsive observation. This amplified Flaherty's deficient performance in this instance.

*The Answer Was Blatantly Unresponsive*. Defense counsel's question asked only whether there were any "emotional indications of any kind" that either one of Tina's daughters were being sexually molested as they have alleged. Ms. Grimes unresponsively volunteered her opinion about her daughters' physical indicators of sexual abuse. Instead of responding to the question asked, Tina Grimes volunteered her opinion that both daughters' "breasts were developing early," specifically observing that Jordan at 10 years of age was "already getting breasts" and giving her opinion that breast development at age 10 "is early for a little girl."

"The answers volunteered by the witness," Tina Graves, "were not responsive to the

questions" and defense counsel "can hardly be accused of" eliciting the answers "when a witness makes unresponsive answers of a voluntary nature." *Meadows v. Commonwealth*, Ky.App., 551 S.W.2d 253, 254 (1977).

*The Witness' Lay Opinion Was Inadmissible*.  Ms. Grimes, as the girls' mother, undoubtably had opinions as to what ages her daughters began developing based on her observations of her daughters' breasts.  However, Ms. Grimes did not have as a lay witness opinions rationally based on her own perceptions of the age at which the development of breasts in girls is medically regarded as "early."  What Ms. Grimes also did not have as a lay witness were opinions rationally based on her own perceptions that the early development of breasts in girls is a physical indicator that a child has been sexually active.

"While an expert's opinion may be based on facts or data otherwise inadmissible as evidence, e.g., hearsay, KRE 703(a), a lay witness's opinion must be based on his/her own personal knowledge or perceptions." *Young v. Commonwealth*, 50 S.W.3d 148, 170 (Ky. 2001), citing KRE 602[24] and *Mills v. Commonwealth*, 996 S.W.2d 473, 478 (Ky. 1999).  Because Tina Grimes was not "basing this opinion on [her] own factual observations," this was error under KRE 701.[25]  *See Tamme v. Commonwealth*, 973 S.W.2d 13, 35 (Ky. 1998), citing KRE 701.

*The Witness's Opinion About Her Daughters' "Early Development" Was Incorrect*. Although Ms. Grimes did not state the age Ashley began developing breasts, she did volunteer that "Jordan was

---

[24]  "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  KRE 602.

[25]  "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are: (1) [r]ationally based on the perception of the witness; and (b) [h]elpful to a clear understanding of the witness' testimony or the determination of a fact in issue."  KRE 701.

10 and she was already getting breasts, which that is early for a little girl." This unresponsive, volunteered, inadmissible lay opinion concerning the early development of breasts in girls was also incorrect.

The mean age of onset of breast development for white[26] girls is 9.96 years. *Secondary Sexual Characteristics and Menses in Young Girls Seen in Office Practice: A Study from the Pediatric Research in Office Settings Network*, Marcia E. Herman-Giddens et. al, Pediatrics, Vol. 99, No. 4, April 1997, pp. 505-512.[27] Thus, the statistical norm for Caucasian girls to develop breasts is in the latter months of their ninth year.

If Jordan began developing breasts at age 10, she was not experiencing early development, but was developing normally. Yet her mother used the apparent physical reality of Jordan's development coupled with disinformation to tell the jury this was biological evidence, an "indication," that Jordan (and, by implication, Ashley) had been sexually abused by their stepfather. Left unsaid was how else could this "early" breast development of these two girls be explained.

*The Unresponsive Lay Opinion Was Extremely Prejudicial*. As a result of Ms. Grimes' unresponsive, inadmissible lay opinion testimony, the jury was told that the fact that both daughters developed breasts early was undeniable physical evidence that corroborated their accounts of being sexually abused by their stepfather, Petitioner.

This type of unresponsive, inadmissible lay opinion evidence was particularly damaging in

---

[26] The videotape record indicates that both of the alleged victims were Caucasian. But even if that conclusion is incorrect, non-Caucasian girls on average develop breasts earlier than Caucasian girls.

[27] The Kentucky appellate court was required to take judicial notice of this information, pursuant to KRE 201(b)(2) and (f).

Petitioner's case because no medical evidence concerning the physical condition of the girls' sexual organs was introduced to corroborate the testimony of either victim. Such evidence would have been admissible. *See*, *e.g.*, *Turner v. Commonwealth*, 767 S.W.2d 557, 559 (Ky. 1988).

Additionally, the jury had learned that Tina Grimes was an emergency room nurse for Owensboro Emergency Health Systems. [TAPE 1; 09/24/03; 04:00:25-39; 04:36:45.] Consequently, the jury would be more likely to trust her "medical" opinions on early development of breasts and the correlation between early breast development and sexual abuse, despite the misinformation she stated.

"Where" inadmissible "evidence is introduced through the non-responsive answer of a witness, this court must look at all of the evidence and determine whether the defendant has been unduly prejudiced by that isolated statement." *Phillips v. Commonwealth*, 679 S.W.2d 235, 237-238 (Ky. 1984).

*Tina Grimes Launched An "Evidentiary Harpoon."* Some jurisdictions recognize the improper tactic of a witness volunteering unresponsive, inadmissible, and prejudicial evidence as an "evidentiary harpoon" and condemn the tactic. Usually, "[e]videntiary harpoons are voluntary statements, made by experienced police officers or other lay witnesses that are willfully jabbed to inject information about other crimes calculated to prejudice the defendant and do in fact prejudice the defendant." *Pickens v. State*, 19 P.3d 866, 877 (Okl. Crim. App. 2001). Tina Grimes' unresponsive answer volunteering that her daughters' "early" breast development was the result of being sexually abused by their stepfather meets this definition of an "evidentiary harpoon," except that the injected information is not "about other crimes," but is inadmissible, prejudicial evidence none the less. "An evidentiary harpoon is the placing of inadmissible evidence before the jury with the deliberate purpose of prejudicing the jurors against the defendant." *Kirby v. State*, 774 N.E.2d

523, 535 (Ind. Ct. App. 2002).

Although the Kentucky Supreme Court dismissed this unpreserved error on the basis that Petitioner "cannot reasonably claim any palpable error," the Court of Appeals dismissed this ineffectiveness claim on the basis that "[i]n light of all the other evidence, there is no likelihood that the exclusion of this testimony would have resulted in a different outcome." *Grimes*, KC, 2011, 21.[28]

Yet this was a prosecution's case where there was no physical evidence that any type of sexual abuse of these two girls had ever occurred, no fresh complaints to anyone by either daughter against Petitioner during the alleged lengthy period of time these offenses occurred, Petitioner's confessions allegedly made only to the girls' mother, a temporary recantation of one daughter's accusations against Petitioner, and Petitioner's repeated denials to the police that he committed any of these charged crimes. This is the context in which Tina Grimes' unresponsive, erroneous testimony that her daughters' alleged early breast development indicated they had been sexual molested was launched.

There was no strategic basis to object to Tina Grimes' unresponsive answer. If an objection had been granted, the jury would have been told to disregard that portion of her testimony, which could raise in the jury's minds questions about other portions of Tina Grimes' testimony, such as Petitioner's uncorroborated confessions to her. "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481

[28] As Tina Grimes' unresponsive prejudicial testimony was not objected to by defense counsel, on direct appeal it was raised as an unpreserved error creating a manifest injustice. That specific claim will be addressed within. For the purpose of evaluating Flaherty's ineffective assistance in this instance and its prejudicial impact, this review of the nature of this constitutional error is important.

(2000). As Petitioner was denied an evidentiary hearing on this claim, Petitioner never had an opportunity to question Flaherty about his basis for not objecting.

As explained above, the Kentucky Court of Appeals' ruling resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, such as *Strickland, supra*. 28 U.S.C. § 2254(d)(1). Additionally, that Court of Appeals ruling, under the facts and circumstances of this case, also "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2).

Petitioner is entitled to federal habeas corpus relief.

*Petitioner's Trial Counsel Denied Petitioner the Effective Assistance of Counsel by Failing to Object on Numerous Occasions to the Prosecutor's Leading Questions During his Direct Examination of Ashley, the Alleged Victim Who was Eighteen (18) Years Old at the Time of the Trial.*

Flaherty did not object to the prosecutor repeatedly asking leading questions of this witness, Ashley. on direct examination. Examples of the prosecutor's leading questions to this witness: "Later on that day did you get a pair of jeans?" [TAPE 1: 09/24/03; 02:07:24-29.] "Were you scared?" [02:08:58-09:04.] "Did he put his mouth on your vagina?" [02:17:40-48.] "Was it ever a time at the house on Circle Drive where you were forced to perform oral sex upon him?" [02:17:52-58.] "Did you speak with, do you remember this fellow [Sergeant Duvall] here?" [02:22:33-42.] "Now the next day, did you tell somebody it didn't happen?" [02:24:42-47.] "Did you tell him [Sergeant Duvall] you lied to him?" [02:25:10-16.]

*Petitioner's Trial Counsel Denied Petitioner the Effective Assistance of Counsel by Failing to Object on Numerous Occasions to the Prosecutor's Leading Questions During his Direct Examination of Jordan, the Alleged Victim who was Twelve (12) Years Old at the Time of the Trial.*

Trial defense counsel did not object to the prosecutor repeatedly asking leading questions of

this witness, Jordan, on direct examination.  For example, when discussing an incident that occurred

when she was in the fourth grade and living at the Brookhill house, Jordan on direct exam repeatedly

told the prosecutor Petitioner only rubbed her butt.  At that point the prosecutor asked her, "Did you

tell them [Sergeant Powell and Steve White] he rubbed your vagina?" [TAPE 1; 9/24/03; 3:19:13.]

When Jordan responded, "Um, I might have said that, yeah," the prosecutor asked, "Well, okay, that

would have been true?"  To which, Jordan replied, "yeah."  Trial counsel did not object to the

prosecutor's blatant leading of Jordan from a confident answer to a totally different answer that

contradicted her testimony moments earlier.

In describing an incident of oral sodomy, Jordan was asked by the prosecutor if Petitioner

touched her at that time.  When Jordan answered "no" twice to that question, the prosecutor asked,

"Do you remember telling [Steve White] that he [Petitioner] put his mouth on your breast?"  That

leading question evoked a different answer from Jordan, "Oh, yes, yes, he did." [TAPE 1; 9/24/03;

03:34:48.] Trial counsel did not object to this leading question either.

All of the information in the five preceding paragraphs was included in Petitioner's RCr 11.42

motion. [RCr 11.42 Motion, 10-11.]   Despite that reality, the Kentucky Court of Appeals rejected

this claim because Petitioner "failed to point to specific examples of the prosecutor's leading

questions." *Grimes*, KCA, 2011, 17.  That was obviously an incorrect finding by the appellate court

as Petitioner had cited numerous examples of leading questions by the prosecutor in his examination

of both the alleged victims in the RCr 11.42 motion.  In addition, the Court of Appeals emphasized

it had "reviewed the record of the trial" in connection with this claim.  *Id*.

The Court of Appeals ruled that "the circuit court did not err in summarily dismissing this claim

without an evidentiary hearing." *Id*.

As a result, Flaherty was never required to provide a reasonable explanation for not objecting to the prosecutor's leading questions to the alleged victims as they recounted their account of the charges.  "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000).

On direct examination, the prosecutor's "questioning clearly partook of cross-examination as a matter of form." *Ohio v. Roberts*, 448 U.S. 56, 70 (1980).  "His presentation was replete with leading questions, the principal tool and hallmark of cross-examination." *Id.*, 70-71.  The Supreme Court has recognized, even in the context of a civil case, the inherent unreliability of testimony "when such testimony is prompted by leading questions..." *Guzman v. Pichirilo*, 369 US 698, 703 (1962).

These two alleged victims supposedly provided the only eyewitness accounts of the myriad crimes charged against Petitioner in a case where there was no corroborating physical evidence of any sexual offenses and the numerous charges were alleged to have occurred over a many year period. Nevertheless, Flaherty, by not objecting, allowed the prosecutor free reign to put words in both of the girls' mouths via leading questions.  These were not leading questions on insignificant matters or on background information; these leading questions were on the elements of the charged offenses.  Yet Flaherty objected to none of them.

*The Jury's Interest in Jordan's Testimony Demonstrates the Prejudicial Impact of Defense Counsel's Failure to Object to the Prosecutor's Leading Questions During The Direct Examination of Jordan.*  The testimony of Jordan M. was obviously extremely important to the jury as they requested the playback of her entire testimony during guilt phase deliberations, complete with all the prosecutor's leading questions.  [TAPE 3; 9/26/03; 03:21:24-55:00.]

The Kentucky Court of Appeals' ruling resulted in a decision that was contrary to, or involved

an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, such as *Strickland, supra*.  28 U.S.C. § 2254(d)(1).  Additionally, that Court of Appeals ruling, under the facts and circumstances of this case, also "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(2).

*Petitioner's Trial Counsel Denied Petitioner Effective Assistance of Counsel by Failing to Move the Court to Order a Physical Examination of the Genitalia of Both the Alleged Victims, Pursuant to Turner v. Commonwealth, 767 S.W.2d 557, 559 (Ky. 1988).*

"In some cases the physical condition of an alleged victim may, in itself, negate the fact that a particular crime has been committed."  *Turner*, 559.  "In a case such as this, the critical question is whether the evidence sought by the [defendant] is of such importance to his defense that it outweighs the potential for harm caused by the invasion of the alleged victim's privacy and the probability that the prospect of undergoing a physical examination might be used for harassment of a prosecuting witness."  *Id*.

"In this case, a physical examination of the" two alleged victims, who were eighteen and twelve at the time of trial, "might have disclosed evidence to completely refute the charge[s], and at the very least, would have been of enormous benefit to the [defendant] in the conduct of the trial."  *Id*.

No evidence was introduced to indicate that the older alleged victim, who was eighteen at the time of trial, was sexually active with boys her own age or with older men, other than the allegations made against Petitioner.  Because the alleged sexual assaults on both of these sisters occurred over a lengthy period of time, a physical examination of the genital area of these two alleged victims by an independent gynecologist would have been valuable to the defense in preparation for trial and,

depending on the results, at trial.  The prosecution disclosed in discovery no evidence of an independent genital examination of either alleged victim.  At trial the prosecution presented no evidence indicating that a medical examination had been made of either of the two alleged victims.

*Turner* allows, "as a matter of due process and fairness," a defendant may be "entitled at least to have the alleged victim[s] examined by an independent gynecologist in preparation for trial." *Turner*, *supra*.  Trial defense counsel's failure to move for such an independent medical examination of the two victims' genital areas constituted ineffective assistance of counsel.

The language of the six preceding paragraphs was used in the RCr 11.42 motion to describe this claim of ineffective assistance of counsel.  [11.42 Motion, pp. 5-6; TR2, 14-32.]

*The Circuit Court's Ruling*.  The circuit court ruled that "[t]he Defendant's claim that his defense counsel was ineffective for failing to request physical examination of the victims' genitalia is unsupported by adequate legal grounds for such a procedure." [TR2, 86.]   "In light of the sexual contacts alleged by the Commonwealth," the circuit court reasoned, "physical and medical evidence of injury or proof of sexual activity was not an issue in the case." [*Id*.]  "Positive or negative results of such examination would not support the Defendant's defense." [*Id*.] The trial record does not support the circuit court's conclusion, rather the record refutes it.

Petitioner was convicted of two counts of first degree rape of the older victim.  She testified that on October 6, 2003 Petitioner put his penis in her vagina. [TAPE 1; 09/24/03; 10:04:00-07:00.] She also testified that when she was fifteen years old and in the tenth grade Petitioner put his penis in her vagina. [*Id*.; 02:13:00-14:00.]  She also recounted that Petitioner placed his finger in her vagina on a number of occasions. [*Id*.: 10:04:00- 07:00, 02:08:00- 10:00, 02:10:00- 12:00, 02:16:00-17:00.]

Because of the two incidents of penile penetration and four instances of digital penetration, a physical examination of the older victim's genital area would have produced valuable evidence for the defense regardless of the findings.  The circuit court's ruling to the contrary is clearly erroneous. Certainly a medical finding that revealed no evidence of penetration would have been extremely useful to the defense at trial.

The younger victim did not testify that she was vaginally penetrated by Petitioner, either by penis or finger.  If a physical examination of the younger girl's vagina was consistent with penetration, this would have raised serious doubts about her accounts of these incidents, raising the possibility that she was sexually violated by someone other than Petitioner and was trying to protect her actual assailant by falsely blaming Petitioner for what had happened to her. [11.42 Reply, 12; TR2, 74.]

The circuit court added that "[a]ny evidence obtained by subjecting the girls to medical examination would likely be inadmissible under the Rape Shield Evidence Law."  [TR2, 86.]  That ruling was clearly erroneous.  The Kentucky Rules of Evidence (KRE) 412(b)(1)(C) contains the specific exception in criminal cases that "any other evidence directly pertaining to the offense charged" is admissible under the Rape Shield Act, if otherwise admissible under the rules of evidence.   In *Turner*, *supra*, "[t]he purpose of the requested examination was to gather physical evidence which the accused hoped would be exculpatory."  *Bart v. Commonwealth*, 951 S.W.2d 576, 578 (Ky. 1997).

The circuit court added that it "believe[d] that requiring the victims to submit to examination of genitalia would serve only to harass and/or intimidate the victims." [TR2, 86.] The alleged victims were eighteen and twelve at the time of trial, not children of tender years.    The Court of Appeals held, "because there was no medical evidence being offered by the Commonwealth to rebut, Grimes failed to show any probability that the outcome of the trial would have been different had a medical

examination been sought." *Grimes*, KCA, 2011, 21. By this distorted reasoning, the appellate court turned Kentucky law upside down by limiting the use of the *Turner* motion for a genital examination of the alleged victim of a sexual offense to only when the prosecution has presented its own genital examination evidence, citing no supporting statutory or case law. Under this erroneous version of this procedure, the decision of the prosecution not to seek a genital examination bars the defense from seeking such an examination of the victim or victims.

The Court of Appeals' ruling was unconstitutional. "[R]estrictions on a criminal defendant's right ... to present evidence may not be arbitrary or disproportionate to the purposes they are designed to serve." *Rock v. Arkansas*, 483 U.S. 44, 55-56 (1987). This is a violation of "the Compulsory Process Clause of the Sixth Amendment, which grants a defendant the right to call 'witnesses in his favor,' a right that is guaranteed in the criminal courts of the States by the Fourteenth Amendment." *Rock v. Arkansas*, 52, quoting *Washington v. Texas*, 388 U. S. 14, 17-19 (1967).

The Court of Appeals added that "there existed great potential for harm." Yet, Petitioner was denied an evidentiary hearing on this ineffective assistance of counsel claim resulting in no record evidence to support the appellate court's pure speculation. At the time of trial, as noted above, the alleged victims were eighteen and twelve at the time of trial, not children of tender years. Without an evidentiary hearing, it is impossible to know whether either or both of these alleged victims may have already had prior to trial a gynecological examination of any type, which would reduce even the potential harm of any defense examination. As the mother of the alleged victims was a nurse, it is highly likely that she had both her daughters undergo some form of gynecological examination after they alleged Petitioner had sexually assaulted them. Only an evidentiary hearing could have produced this information. The Kentucky courts were not free to speculate on the potential harm such an

examination would cause the alleged victims on a silent record.

The Kentucky Court of Appeals' ruling resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, such as *Strickland, supra*.  28 U.S.C. § 2254(d)(1).  Additionally, that Court of Appeals ruling, under the facts and circumstances of this case, also "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(2).

Federal habeas corpus relief is warranted.

*Petitioner's Trial Counsel Denied Him Effective Assistance of Counsel by Failing to Request Lesser Included Offense Instructions on Those Charges Involving the Older Stepdaughter that Allegedly Occurred When She Was at Least Twelve Years Old But Not Yet Sixteen Years Old on the Basis that the Victim's Own Testimony Raised a Factual Issue of Whether There was Forcible Compulsion or She Consented to Obtain Favors from Petitioner.*

The testimony of Ashley, the alleged victim, indicated that during the time she was over twelve years of age and was sexual intimate with Petitioner, her stepfather, that he offered to agree to her requests for favors, such as new clothes or her friends coming over to the house, if she would be sexually intimate with him.  Ashley testified that she told Petitioner that she did want him to do the favors she requested and the sexual activity continued.  Although trial defense counsel requested lesser included offenses for these charges, he did not request those instructions on this ground, according to the Kentucky Supreme Court.  Instead, trial counsel contended the defense was entitled to those lesser instructions because Petitioner's denial that he had any sexual activity with Ashley constituted evidence that the sexual conduct, such as intercourse, had not occurred and created a question of fact to be resolved by a lesser included offense instruction.  The Kentucky Supreme Court on direct appeal found that in making this argument trial counsel "had misinterpreted the commentary from [1] Cooper,

[Kentucky Instructions to Juries (Criminal)] § 4.23[, at 201 (4th ed. Anderson 1999).]" *Grimes*, KSC, 2005, 2-5.  That "misinterpretation" was undeniably deficient performance as to the guilt phase instructions.

Lesser included offenses were necessary to enable the jury to determine whether Ashley was forced to submit to these activities or whether she consented to obtain the favors she had requested from Petitioner.

The language of the three preceding paragraphs was used in the RCr 11.42 motion to describe this claim of ineffective assistance of counsel.  [11.42 Motion, pp. 8-9; TR2,   1.]

*Absent Forcible Compulsion, the Age of the Victim Generates Lesser Included Sexual Offenses*. In the absence of "forcible compulsion," the sexual crimes of first degree rape, sodomy and sexual abuse all have lesser included offenses that apply when the victim is at least twelve (12) years old, *i.e.*, incapable of consent, but less than sixteen (16) years old, *i.e.*, capable of consent.

For example, "[a] person is guilty of rape in the second degree when ... [b]eing eighteen (18) years old or more, he engages in sexual intercourse with another person less than fourteen (14) years old." KRS 510.050(1)(a).  Similarly, "[a] person is guilty of rape in the third degree when ... [b]eing twenty-one (21) years old or more, he engages in sexual intercourse with another person less than sixteen (16) years old."  KRS 510.060(1)(b).

This same bevy of lesser included offenses apply in sodomy cases.  "A person is guilty of sodomy in the second degree when ... [b]eing eighteen (18) years old or more, he engages in sexual intercourse with another person less than fourteen (14) years old."  KRS 510.080(1)(a).  On the other hand, "[a] person is guilty of sodomy in the third degree when ... [b]eing twenty-one (21) years old or more, he engages in sexual intercourse with another person less than sixteen (16) years old."  KRS

510.090(1)(b).

The same approach applies to the offense of sexual abuse.  "A person is guilty of sexual abuse in the second degree when ... [h]e subjects another person who is less than fourteen (14) years old to sexual contact."  KRS 510.120(1)(b).  However, "[a] person is guilty of sexual abuse in the third degree when ... [h]e subjects another person to sexual contact without the latter's consent."  KRS 510.130(1)(a).

*Ashley's Age At the Times of the Offenses*.  Ashley M. was born June 6, 1985. [TAPE 1; 9/24/03; 01:58:12.] Ashley turned twelve on June 6, 1997; thirteen on June 6, 1998; fourteen on June 6, 1999; fifteen on June 6, 2000; and sixteen (16) on June 6, 2001.

*Counts Four Through Eleven Required Lesser Included Offense Instructions*.  Count four alleged that Petitioner had committed first degree sodomy on Ashley between September 1, 2000 and December 31, 2001 "in the bathroom at the Brookhill address when [she] wanted a friend to come over." [TR 45.]  During that time frame Ashley was fifteen and sixteen years old.  Ashley did not testify to her age at the time of this alleged incident.  [TAPE 1; 9/24/03; 02:08:09-10:18.] To determine whether, in view of the conflicting evidence, Tony Grimes used forcible compulsion on Ashley in this incident, the jury had to be instructed on the lesser included offense of third degree sodomy, which also would require the jury to decide whether Ashley was fifteen or sixteen years of age when she consented.

Count five alleged that Petitioner had committed first degree sexual abuse on Ashley between September 1, 2000 and December 31, 2001 "in the bathroom at the Brookhill address when [she] wanted a friend to come over." [TR 46.]  This is the same incident as count four.  During the period in the charge Ashley was fifteen and sixteen years old.  Ashley did not testify to her age at the time of

this alleged offense.  [TAPE 1; 9/24/03; 02:08:09-10:18.] Again, to resolve the factual question of whether forcible compulsion had taken place, the jury had to be instructed on the lesser offense of third degree sexual abuse. Under the lesser offense instruction, the jury could find the absence of forcible compulsion and that Ashley at the time of the offense was not yet sixteen years old and therefore incapable of consent.  KRS 510.130(1)(a).

Count six alleged that Petitioner had committed first degree sodomy on Ashley between September 1, 2000 and December 31, 2001 "in her bedroom at the Brookhill address." [TR 47.] During that time frame Ashley was fifteen and sixteen years old.  Ashley testified that she was "about 15" at the time of this incident.  [TAPE 1; 9/24/03; 02:11:52.]  Here again Petitioner, in view of the conflicting evidence on consent, was entitled to have the jury instructed on the lesser offense of third degree sodomy.

Count seven alleged that Petitioner had committed first degree sexual abuse on Ashley between September 1, 2000 and December 31, 2001 "in her bedroom at the Brookhill address."  [TR 48.] Within the time period alleged in the count Ashley was fifteen and sixteen years old.  Ashley testified that she was "about 15" at the time of this incident.  [TAPE 1; 9/24/03; 02:11:52.] Here again the lesser included instruction on third degree sexual abuse was required to allow the jury to resolve the issue of whether forcible compulsion was used or whether Ashley, at less than sixteen (16) years of age, voluntarily participated, although incapable of legal consent.

Count eight alleged that  had committed first degree rape on Ashley between September 1, 2000 and December 31, 2001 "in the master bedroom at the Brookhill address." [TR 49.]  During that time frame Ashley was fifteen to sixteen years old.  Ashley testified that she was "in 10th grade, [she] was 15" at the time of this incident.  [TAPE 1; 9/24/03; 02:13:43.] To resolve the conflict between the

evidence of forcible compulsion and consent, Petitioner was entitled to an instruction on third degree rape.

Count nine alleged that had committed first degree sodomy on Ashley between September 1, 2000 and October 31, 2002 "in the master bedroom at the Brookhill address." [TR 50.]  During that time frame Ashley was fifteen to seventeen years old.  Ashley did not testify as to her age at the time of this incident.  [TAPE 1; 9/24/03; 02:14:43-16:30.] Because the jury could find from the evidence that Ashley consented to the sexual activity and was less than sixteen (16) years old at the time, the jury had to be instructed on third degree sodomy.

Count ten alleged that  had committed first degree sodomy on Ashley between June 6, 1998 and September 30, 2000 "in the living room at the Circle Drive address." [TR 51.]  During that time frame Ashley was twelve to fifteen years old.  Ashley did not testify as to her age at the time of this incident.  [TAPE 1; 9/24/03; 02:16:32-18:50.] To determine whether Ashley consented, the jury had to be instructed on both second degree sodomy where the alleged victim is less than fourteen years old and third degree sodomy where the alleged victim is at least fourteen but less than sixteen years old.

Count eleven alleged that  had committed first degree sodomy on Ashley between June 6, 1997 and September 30, 2000 "at the Circle Drive address." [TR 52.]  During that time frame Ashley was eleven to fifteen years old.  Ashley did not testify as to her age at the time of this incident.  [TAPE 1; 9/24/03; 02:16:32-18:50.] For the reasons explained above, Petitioner was entitled to lesser included offense instructions on second and third degree sodomy.

*Prejudice Is Apparent*.  Both first degree rape and first degree sodomy are Class B felonies requiring a sentence to a term of imprisonment for at least ten (10) but not more than twenty (20) years. KRS 510.040(2); KRS 510.070(2); KRS 532.020(1)©.  By contrast, second degree sodomy is a Class

C felony with a term of imprisonment of at least five (5) years but not more than ten (10) years.  KRS 510.080(2); KRS 532.020(1)(b).  Lastly, both third degree rape and third degree sodomy are Class D felonies carrying a term of imprisonment of at least one (1) year but not more than five (5) years.  KRS 510.060(2); KRS 510.090(2).  KRS 532.020(1)(a).

On counts four and six, first degree sodomy charges,  the jury sentenced Petition to ten (10) years imprisonment on each count to be served consecutively for a total of twenty (20) years.  TR 87, 89.  On count eight, first degree rape, the jury recommended a sentence of fifteen (15) years to run consecutively. [TR 91.]

On these counts the trial judge sentenced in accordance with the jury's recommendations.  [TR 132-133.]  Thus, thirty-five years of Petitioner's total fifty-nine year sentence of imprisonment were generated by these two convictions of first degree sodomy and one conviction of first degree rape.

On counts nine and ten, both first degree sodomy charges, the jury sentenced  on each to fifteen (15) years to run concurrent with the other sentences in this case. [TR 92, 93.]  On count eleven, a first degree sodomy charge, the jury sentenced  to twenty (20) years to run concurrent with the other sentences. [TR 94.]

First degree sexual abuse is  a Class D felony requiring a sentence to a term of imprisonment for at least one (1) but not more than five (5) years.  KRS 510.110(2); KRS 510.070(2); KRS 532.020(1)(a).  By contrast, third degree sexual abuse is a Class B misdemeanor with a jail term of not more than ninety (90) days. KRS 510.130(2); KRS 532.090(2).

On counts five and seven, first degree sexual abuse charges,  the jury sentenced  to three (3) years imprisonment on each count to be served concurrently. [TR 88, 90.]  The judge's sentence on these two counts was identical to the jury's recommendation. [TR 132.]

*Trial Defense Counsel's Failure to Argue the Correct Grounds for These Lesser Included Offenses.* In its opinion on Petitioner's direct appeal, the Kentucky Supreme Court stated that, "[a]t the instruction conference, defense counsel claimed that there was evidence that forcible compulsion did not occur because Grimes denied the allegations" and "asserted that the victim's age could be a factor that would support the lesser crimes." *Grimes*, KSC, 2005, 4. The Kentucky Supreme Court noted that trial "[d]efense counsel cited the commentary to 1 Cooper, Kentucky Instructions to Juries (Criminal) §4.23, at 201 (4th ed. Anderson 1999), particularly, this sentence: 'If there is evidence that sexual intercourse did not occur, an instruction on First-Degree Sexual Abuse should be given as a lesser included offense.'" *Grimes*, *supra* at 3. The Kentucky Supreme Court concluded that "[t]rial defense counsel misinterpreted the commentary from Cooper, *supra*, 4.23." *Grimes*, *supra* at 4.

Ashley M.'s own testimony provided the basis for these requested lesser included instructions on the basis of her age and lack of forcible compulsion. For example, during the prosecution's examination of Ashley, discussing the offenses on October 6, 2002, that she had asked Petitioner "if we could go get jeans the day before and he told me to ask on Sunday cause he might let us." [TAPE 1; 9/24/03; 02:04:23.] In describing the sexual contact that occurred on October 6, 2002, she describes Petitioner shutting and locking the door to the room, telling her "to lay down and take off [her] pants," her refusal, him trying to pull her pants down while she tried to keep them up, and him finally getting her pants off and him sexually assaulting her.

However, she also stated: "I kept pushing his head away from me and I kept telling him to stop but he wouldn't listen to me. He's like *do you want those jeans or not and I was like yea and he kept going*." [TAPE 1; 9/24/03; 02:05:55; emphasis added.]

By her own testimony, Ashley was seventeen (17) years and four months old on October 6,

2002. [TAPE 1; 9/24/03; 02:27:01-28:00.] There was no crime if she consented to this sexual contact rather than submitted to forcible compulsion.  There was no need for an instruction on a lesser included offense on this charge due to the lack of forcible compulsion because Ashley's age was not an element of the offense. Nevertheless, this incident was indicative of factual question of consent that pervaded Ashley's testimony on all of the counts in which she is alleged to be the victim.

　　　*This Factual Predicate Entitled Petitioner To The Lesser Included Offense Instruction On Both Rape Charges*.  Kentucky "law requires the court to give instructions 'applicable to every state of case covered by the indictment and *deducible from or supported to any extent by the testimony*.'" *Reed v. Commonwealth*, 738 S.W.2d 818, 822 (Ky. 1987), quoting *Lee v. Commonwealth*, 329 S.W.2d 57, 60 (Ky. 1959); (emphasis added).  "It is irrelevant that the evidence from the parties does not indicate the need for a particular instruction." *Reed* at 822.  "The determination of what issues to submit to the jury should be made upon the totality of the evidence."  *Reed* at 822, citing *Rice v. Commonwealth*, Ky., 472 S.W.2d 512 (1971).

　　　The language of the twenty-three preceding paragraphs was used in the Memorandum in Support of Petitioner's RCr 11.42 Motion, filed August 17, 2006 in the circuit court to describe this claim of ineffective assistance of counsel. [RCr 11.42 Supporting Memo, 08/17/2006, 1-8.]

　　　*The Trial Court's Ruling on Lesser Included Offenses Based on Ashley's Age and Consent*. In the course of the guilt phase instruction conference, the trial judge ruled that "no lesser included offenses will be given to the jury in regard to any of the offenses due to the fact that the defendant, defense in the case is a denial of the contact which is prosecuted in the case."  "Therefore," the trial judge saw "no factual basis in the record for a finding by the jury of any lesser offense than those charged in the indictment." [TAPE 2; 9-26-03; 11:33:29-34:20.] After observing that counts one

through twelve involve forcible compulsion, the trial judge reasoned that "those counts in the court's mind do not have an age factor in them in which there would be an issue for the jury on age." [11:35:44-36:15.]

Even after these rulings defense counsel specifically requested lesser included offense instructions on counts four through eleven. [TAPE 2; 09/26/03; 11:46:00-11:57:47.] The trial judge denied those requests.

On his direct appeal to the Kentucky Supreme Court, Petitioner raised this basis for lesser included instructions of the first degree rape and sodomy charges where Ashley was the alleged victim in assignment of error II. Despite presenting all of the above information, the Kentucky Supreme Court apparently found the error unpreserved despite the judge's ruling on the instructions. However, in discussing this claimed error the Kentucky Supreme Court held it was unpreserved and apparently declined to address the factual evidence, specifically Ashley's testimony about the alleged assaults and the dates of these alleged offenses. *Grimes*, KSC, 2005, 2-5.

The Court of Appeals declined to address the testimony of Ashley about the circumstances of her alleged encounters with Petitioner and her actual age at the time of each charged encounter. Grimes, KCA, 2011, 14-15. The Court of Appeals relied on the Kentucky Supreme Court's finding on direct appeal that "there was no factual basis to support an instruction on lesser- included offenses to first degree rape," despite the evidence Petitioner presented to the trial court and the Court of Appeals. The Court of Appeals concluded on that basis that "any request for a lesser-included offense instruction would have been futile." *Id.*, 15.

*Petitioner's Counsel, the Prosecutor and the Trial Judge All Acknowledged During Trial that the Jury May Have Difficulty From the Evidence Determining the Dates and Specific Crimes of the*

*Incidents Charged in the Indictment*.  Prior to the inception of the defense case, defense counsel at a bench conference told the court that he and the prosecutor were both concerned that the jury may not know from the testimony "the incidents" charged in the indictment. [TAPE 2; 9-25-03; 02:34:20-26.] At that point the trial judge expressed his agreement. [02:34:30.]  Defense counsel stated, "We [the prosecutor and defense counsel] have difficulties" with the proof  lining up with the charges, "so I know that they [the jury] do." [02:34:34.] To which the judge responded, "I don't see how they can do it to tell you the truth ... especially, even if you have detailed notes, I don't know if you can do it." [02:34:40.] This exchange following the close of the prosecution's case-in-chief highlights the acknowledged confusion generated by the Commonwealth's evidence as to the dates and specific crimes committed in the separate incidents, including Ashley's age at the time of each alleged incident.

   *The Supreme Court has Recognized the Duty of Counsel to Seek Lesser Included Offense Instructions When Warranted Even in Noncapital Cases*.  In *Beck v. Alabama*, 447 U.S. 625 (1980), the United States Supreme Court held that the due process requires a trial court to submit jury instructions on lesser included offenses in capital cases if the evidence warrants such a charge.  The *Beck* court expressly reserved the question of whether due process requires a lesser included offense instruction in the noncapital context.  *Beck* at 638 n. 14.

   However, the *Beck* court did discuss the importance of giving lesser included offense instructions in noncapital cases when warranted by the evidence.  "While we have never held that a defendant is entitled to a lesser included offense instruction as a matter of due process, the nearly universal acceptance of the rule in both state and federal courts establishes the value to the defendant of this procedural safeguard."  *Beck* at 637.  "[T]he failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted

conviction." *Id*. Whether the failure to give a lesser included offense instruction is in and of itself a denial of a federal constitutional right may be less than clear at this time, for purposes of determining ineffective assistance of counsel. the *Beck* court has recognized that seeking a lesser included offense when warranted by the evidence is a recognized duty of defense counsel even in a noncapital case.

"A defendant is entitled to an instruction on a lesser included offense when 'a reasonable juror could entertain a reasonable doubt of the defendant's guilt on the greater charge, but believe beyond a reasonable doubt that the defendant is guilty of the lesser offense.'" *Commonwealth v. Black*, 907 S.W.2d 762, 763 (Ky. 1995), quoting *Skinner v. Commonwealth*, Ky., 864 S.W.2d 290, 298 (1993).

*The Trial Court's Failure to Give These Lesser Included Offenses on These Grounds Was Initially Raised on Direct Appeal to the Supreme Court and Rejected as Unpreserved*. The Kentucky Supreme Court found the "issue was not fairly and adequately presented to the trial judge" because Flaherty sought these lesser included instructions on the grounds "based on" Petitioner's "testimony that he did not have sexual intercourse with the victims." *Grimes*, KSC, 2005, 3. According to the Kentucky Supreme Court, "[a]t the instruction conference, defense counsel claimed that there was evidence that forcible compulsion did not occur because Grimes denied the allegations" and "[t]hus, *he asserted that the victim's age could be a factor that would support the lesser crimes*." *Id*., 4; (emphasis added).

The Kentucky Court of Appeals' ruling resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, such as *Strickland, supra*. 28 U.S.C. § 2254(d)(1). Additionally, that Court of Appeals ruling, under the facts and circumstances of this case, also "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court

proceeding." 28 U.S.C. § 2254(d)(2).

Federal habeas relief is mandated.

*Petitioner's Trial Counsel Denied Him Effective Assistance of Counsel by Failing to Request as to Counts One (First Degree Rape), Two (First Degree Sodomy) and Three (First Degree Sexual Abuse) an Instruction, Pursuant to KRS 510.020,*[29] *That Informed the Jury that a Person is Deemed Capable of Consenting to Any Sexual Act, Including Sexual Intercourse, When Sixteen Years of Age or Older.*

Ashley testified that she was seventeen (17) years and four months old on October 6, 2002, when counts one, two and three allegedly occurred. [TAPE 1; 9/24/03; 02:27:01-28:00.] There was no crime if she consented to these sexual acts rather than submitted to forcible compulsion. The jury should have been instructed as to these three charges that if Ashley consented to these sexual acts there was no forcible compulsion. In describing what happened on October 6, 2002, Ashley stated, *inter alia*: "I kept pushing his head away from me and I kept telling him to stop but he wouldn't listen to me. He's like *do you want those jeans or not and I was like yeah and he kept going*." [TAPE 1; 9/24/03; 02:05:55; emphasis added.] The factual basis for an instruction may come from any portion of the testimony. Failure to request this instruction was deficient performance and the absence of the instruction led to jury confusion on those three charges.

The language of the two preceding paragraphs was used in the RCr 11.42 motion to describe this claim of ineffective assistance of counsel. [11.42 Motion, pp. 8-9; TR2, 14-31.]

Importantly, the definition of "forcible compulsion," KRS 510.010(2) contains no references

[29] KRS 510.020 reads in pertinent parts:

"(1) Whether or not specifically stated, it is an element of every offense defined in this chapter [KRS Chapter 510] that the sexual act was committed without consent of the victim."

"(3) A person is deemed incapable of consent when he is:
(a) Less than sixteen (16) years old; ....

to age and does not discuss the age of consent.  The instruction defining "forcible compulsion" was inadequate, under the facts and circumstances of this case, to negate the need for an age of consent instruction.

Under the facts of this case, it was a constitutionally deficient performance by Flaherty to fail to request an age of consent instruction as to these three counts.  That omission undoubtedly prejudiced Petitioner by allowing the jury to convict him of those counts without making a determination as to whether Ashley, who at the time of those charged offenses was capable of consenting to the alleged sexual activity, consented to that sexual activity.  If Flaherty had a reasonable basis for declining to request such an instruction, which is unlikely, it was unknown to the state courts as the requested evidentiary hearing on this claim was denied.

*Prejudice Is Apparent*.  Both the first degree rape and first degree sodomy counts are Class B felonies requiring a sentence to a term of imprisonment for at least ten (10) but not more than twenty (20) years.  KRS 510.040(2); KRS 510.070(2); KRS 532.020(1)( c).  The first degree sexual abuse count is a Class D felony requiring a sentence to a term of imprisonment for at least one (1) but not more than five (5) years.  KRS 510.110(2); KRS 510.070(2); KRS 532.020(1)(a).  Acquittal of those three counts would have significantly reduced Petitioner's sentence.

On appeal, the Kentucky Court of Appeals rejected this claim on the basis that "there was no factual basis to give an instruction on consent based on the prosecutor's statement" made in closing argument. *Grimes*, KCA, 2011, 15-16.  The Court of Appeals did not address the facts in evidence presented by Petitioner to support a consent instruction described above.

The Kentucky Court of Appeals' ruling resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States, such as *Strickland, supra*.  28 U.S.C. § 2254(d)(1).  Additionally, that Court of

Appeals ruling, under the facts and circumstances of this case, also "resulted in a decision that was

based on an unreasonable determination of the facts in light of the evidence presented in the state court

proceeding."  28 U.S.C. § 2254(d)(2).

      Federal habeas relief is mandated.

*Petitioner's Trial Counsel Denied Him Effective Assistance of Counsel by Failing to Request an Instruction on the Separate Nature of Each Count of the Seventeen Count Indictment.*

      Petitioner Grimes was tried and convicted of seventeen (17) separate charges involving two

victims.  Yet, trial defense counsel did not request that the jury be instructed concerning the separate

nature of each count of the indictment and the requirement that the jury consider separately each count

and the evidence pertaining to that count.[30]  No comparable instruction was given by the trial court.

      The language of the two preceding paragraphs was used in the RCr 11.42 motion to describe

this claim of ineffective assistance of counsel.  [11.42 Motion, pp. 11-12; TR2, 14-32.]

      *The Failure of The Trial Court To Give a Separate Nature of Each Count Instruction*

---

[30]  Courts in this type of situation often given a version of the following instructions:

"A separate crime is charged in each count of the indictment.  Each count, and the evidence pertaining to it, should be considered separately.  The fact that you may find the defendant guilty or not guilty as to one of the crimes charged should not control your verdict as to any other."  Federal Jury Practice & Instructions (2001 Edition), § 1.21, Single Defendant--Multiple Counts.

"(1) The defendant has been charged with several crimes.  The number of charges is no evidence of guilt, and this should not influence your decision in any way.  It is your duty to separately consider the evidence that relates to each charge, and to return a separate verdict for each one. For each charge, you must decide whether the government has presented proof beyond a reasonable doubt that the defendant is guilty of that particular charge.

(2) Your decision on one charge, whether it is guilty or not guilty, should not influence your decision on any of the other charges."  Sixth Circuit Pattern Jury Instructions Criminal (2005 Edition), Instruction 2.01A, p. 36.

*Contaminated Petitioner's Entire Trial.*  Although Petitioner was tried and convicted of seventeen (17) separate charges involving two victims, the jury was not instructed concerning the separate nature of each count of the indictment.  Courts in this type of situation often given a version of the following instruction:

> A separate crime is charged in each count of the indictment.  Each count, and the evidence pertaining to it, should be considered separately.  The fact that you may find the defendant guilty or not guilty as to one of the crimes charged should not control your verdict as to any other."  Federal Jury Practice & Instructions (2001 Edition), § 1.21, Single Defendant--Multiple Counts.

Without such an instruction, there is a significant danger that the jury did not separately consider the evidence that related to each count, and failed to return a separate verdict for each count, which would have contaminated the jury's verdicts on all the counts.  This is undoubtably true in Petitioner's case where even the judge commented on the difficulties the jury faced in keeping track of  the evidence and determining to which charge it applied.

At the conclusion of the prosecution's case, at a bench conference defense counsel told the court that he and the prosecutor were both concerned that the jury may not know from the testimony "the incidents" charged in the indictment. [TAPE 2; 9-25-03; 02:34:20-26.] At that point the trial judge expressed his agreement. [02:34:30.] The trial judge expressed his concern that he did not see how the jury would be able lining up the evidence with the charges. [02:34:40.]  Despite this problem being acknowledged by opposing counsel and the trial court, Flaherty sought no remedy for the problem and neglected to request a separate nature of each count jury instruction.

Under these circumstances and without a specific instruction directing the jury to consider each count and the evidence pertaining to it separately, the danger of contamination from the various counts and alleged incidents bleeding over to other counts and incidents was extremely great.

On appeal, the Kentucky Court of Appeals noted that Petitioner, "[i]n his RCr 11.42 motion, Grimes did not cite to any Kentucky law in support of this contention." *Grime*, KCA, 2011, 16. The appellate court emphasized that "[a] review of William S. Cooper, *Kentucky Instructions to Juries* confirms there is no such instruction in Kentucky." *Id*. This was an erroneous conclusion. Kentucky does not have pattern instructions. "Unlike the many jurisdictions that use pattern instructions, and otherwise explain the law of the case to the jury, the practice in Kentucky abjures the abstract and requires the trial court, applying (rather than stating) the underlying legal principles, to frame the dispositive issue." *Ford Motor Co. v. Fulkerson*, 812 SW 2d 119, 122 (Ky. 1991). The Court of Appeals erroneously anointed Cooper's *Kentucky Instructions to Juries* as the repository of all legally appropriate instructions.

In Kentucky, "the works of Palmore and Cooper, or any other established authorities, [on jury instructions] while invaluable, are not holy writs." *Commonwealth v. Leinenbach*, 351 S.W. 3d 645, 646 (Ky. 2011). The absence of this instruction from Cooper's work is not a legitimate, legal basis to reject a proposed instruction. Yet the Court of Appeals held erroneously that "[b]ecause the requested instruction was not available to Grimes, he cannot allege that his conviction would be invalidated by the failure to provide such an instruction." *Grimes*, 16.

Kentucky case law recognizes that a trial judge has the discretion to give an uncommon instruction, despite the Court of Appeals holding to the contrary. "[T]rial courts are not enslaved to form books and can give unusual instructions as long as they are not erroneous." *Leinenbach*, 646. "Jury instructions should refrain from elaborating on an abundance of detail, but still strike the proper balance in providing enough information to a jury to make it fully aware of the respective legal duties of the parties." *Olfice, Inc. v. Wilkey*, 173 SW 3d 226, 229 (Ky. 2005).

The Court of Appeals added that "although there is no individual instruction on the separate nature of each count, each of the jury instructions specifically set forth the date and place of the charged offense," creating a "net effect of each jury instructions's specificity" being "the same as if an individual instruction has been provided." *Grimes*, 16. The Court of Appeals ignored the on the record agreement by both counsel and the trial judge regarding the significant difficulty for the jury in linking up the evidence to the numerous charges and incidents in the prosecution's case.

Additionally, the specificity of the individual date and place of each charged offense in each instruction emphasized by the Court of Appeals were dates such as "between September 1, 2000 and December 31, 2001," "between June 6, 1998 and September 30, 2000," "between June 6, 1997 and September 30, 2000," and "between June 6, 1997 and June 5, 1999." Just from these examples it is obvious that these charged periods of time not only cover either years or months, but often overlap. The specificity of the places in the instructions include various rooms in the Brookhill residence and no specific rooms at the Circle Drive residence in Masonville. The Court of Appeals' claim of the specificity of the dates and places of the individual instructions is not based on facts in the record and unreasonable.

The Kentucky Court of Appeals' ruling resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, such as *Strickland, supra*. 28 U.S.C. § 2254(d)(1). Additionally, that Court of Appeals ruling, under the facts and circumstances of this case, also "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2).

Federal habeas relief is required.

*Petitioner's Trial Counsel Denied Him Effective Assistance of Counsel by Conceding Petitioner's Guilt to the Offenses Where Ashley, the Older of the Two Sisters, was the Alleged Victim. During his Cross-examination of Ashley, Trial Counsel Asked for Each of the Alleged Incidents Ashley's Age at that Time and Whether She Was "in Fear of Death or Physical Injury" or "Suffered Substantial Physical Pain or Any Impairment of Her Body."* [TAPE 1; 9/24/03; 02:26:40-32:58; 02:43:42-56:43.]

Despite pursuing this line of question with Ashley, trial counsel did nothing during that cross-examination to challenge Ashley's testimony that Petitioner had performed these sexual acts with her. Counsel did little or nothing to impeach her credibility or her testimony. Despite Petitioner's plea of not guilty to all charges and his theory of defense that the sexual acts did not occur, trial defense counsel through this line of cross-examination conveyed to the jury that the alleged sexual activity between Petitioner and Ashley had taken place but at best was consensual. This impression was further amplified because trial defense counsel elected not to present an opening statement at the inception of the guilt phase of the trial or, for that matter, prior to the defense case in the guilt phase. As a result, the jury had no idea of what the theory of defense was in the case. Thus, when Petitioner took the stand and testified that none of these encounters with either of the victims took place, this seemed to the jury as inconsistent with defense counsel's conduct of the trial, particularly his cross-examination of Ashley. This was the equivalent of a concession of guilt by trial defense counsel. This was deficient performance that substantially undermined Petitioner's trial testimony. "[S]uch a concession [of guilt] in a run-of-the-mine trial [as opposed to a death penalty trial] might present a closer question." *Florida v. Nixon*, 543 U.S. 175, 177 (2004). Because trial defense counsel made no opening statement at any point in the guilt phase, Petitioner, like the jury, was given no preview of what counsel planned to do during the trial.

The language of the two preceding paragraphs was used in the RCr 11.42 motion to describe this claim of ineffective assistance of counsel. [11.42 Motion, pp. 7-8; TR2, 14-32.]

The Kentucky Court of Appeals in denying this claim of ineffective assistance of counsel cited *Wiley v. Sowders*, 647 F.2d 642, 649-650 (6th Cir. 1981), and held that "trial counsel's questioning of the victim on cross-examination was appropriate and does not remotely approach a "surrendering of the sword." *Grimes*, KCA, 2011, 13-14.  The appellate court added that "[t]rial counsel reasonably questioned the victim based on the elements of the charged crimes," noting that "[s]uch questioning does not amount to an admission of guilt." *Id*.

Notably, *Wiley v. Sowders*, *supra*, was decided in 1981, over twenty years before the Supreme Court decide *Florida v. Nixon,* cited by Petitioner.  "When a client expressly asserts that the objective of "his defense" is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." *McCoy v. Louisiana*, 138 S. Ct. 1500, 1509 (2018). According to the Supreme Court, *Florida v. Nixon*, see *supra*, at 1505-1506, is not to the contrary.

Petitioner plead not guilty and testified that he did not commit any of the charged sexual offenses against either stepdaughter.  However, as the state circuit and appellate courts denied Petitioner an evidentiary hearing on this claim the factual predicate is at this point only Flaherty's questions of Ashley on the record, Petitioner's plea of not guilty and his denial of these crimes from the witness stand.

By conceding through his cross-examination of Ashley that her alleged sexual encounters with Petitioner occurred and her age at the time of each encounter, Flaherty was not simply conceding an element of the offenses of first degree rape, sodomy and sexual abuse, he was conceding Petitioner's complete guilt of either second degree or third degree versions of each of these offenses in each

incident.[31] This is because the sexual act itself coupled with the age of Ashley at the time of each offense establishes these offenses even in the absence of forcible compulsion. Petitioner had not entered a plea of guilty to any lesser included offenses.

Although there was no evidentiary hearing held on this claim, the Kentucky Court of Appeals in reviewing the claim that Flaherty failed to communicate the plea offer to Petitioner noted testimony from that evidentiary hearing on that claim. At the hearing, Flaherty "repeatedly emphasized that throughout the process leading up to trial, Grimes was adamant that he was not going to take a plea to anything because he [Petitioner] did not want to go to jail." *Grimes*, KCA, 2016, 3. The Court of Appeals emphasized that "Flaherty testified that Grimes repeatedly told him that he [Petitioner] would not take a plea deal." *Id.*, 8. This indicates that Flaherty, according to his own testimony at that evidentiary hearing, believed that Petitioner did not want to concede guilt on any charges. Flaherty was on notice "throughout the process leading up to trial" "that the objective of [Petitioner's] 'defense' is to maintain innocence of the charged criminal acts." *McCoy, supra*, 1509. Flaherty was required to "abide by that objective" and could "not override it by conceding guilt," even of lesser included offenses. *Id.*

*This Ineffective Assistance of Counsel Claim Constitutes a Claim of a Violation of Petitioner's Client Autonomy, a Structural Error*. Should this claim be viewed as a violation of the client's autonomy rather than ineffective assistance of counsel, it would be considered a structural error. When "a client's autonomy, not counsel's competence, is in issue," a court does "not apply ... ineffective-assistance-of counsel jurisprudence, *Strickland v. Washington*, 466 U.S. 668 (1984), or

[31] Second degree rape, KRS 510.050(1)(a); third degree rape, KRS 510.060(1)(b); second degree sodomy, KRS 510.080(1)(a); third degree sodomy, KRS 510.090(1)(b); second degree sexual abuse, KRS 510.120(1)(b); and third degree sexual abuse, KRS 510.130(1)(a).

*United States v. Cronic*, 466 U.S. 648 (1984), to [the] claim." *McCoy v. Louisiana*, 1510-11. "Violation of a defendant's Sixth Amendment-secured autonomy ranks as error of the kind [Supreme Court] decisions have called "structural"; when present, such an error is not subject to harmless-error review." *Id*., 1511.

"Such an admission [of guilt] blocks the defendant's right to make the fundamental choices about his own defense. And the effects of the admission would be immeasurable, because a jury would almost certainly be swayed by a lawyer's concession of his client's guilt." *Id*. Under this structural error, Petitioner "must therefore be accorded a new trial without any need first to show prejudice." *Id*.

As Flaherty made no opening statement either before or after the presentation of the prosecution's evidence, the only way he could concede guilt on these lesser included offenses was by in his cross-examination of Ashley conceding that the charges of sexual activity did take place and her age at the time of each offense, which Flaherty did.

Federal habeas corpus relief is required.

*Petitioner's Trial Counsel Denied Him Effective Assistance of Counsel by Failing to Object to the Prosecutor's Questions that Specifically Required Petitioner to Characterize the Testimony of his Wife, Tina Grimes, as "Not True" and to State Whether There was Anything in her Testimony that She was "Telling the Truth About."* [TAPE 2; 9/25/03; 03:58:14; 03:58:53; 03: 57:10-59:10.]

During her direct examination, Tina Grimes, testified that on December 11, 2002, her husband, Tony, telephoned her on her cell phone and during the phone call made incriminating admissions that he had committed sexual offenses against his two stepdaughters, Ashley and Jordan. [TAPE 1; 9/24/03; 04:09:55-13:55.] During his direct examination of Petitioner, defense counsel addressed the alleged December 11th telephone confession to Tina Graves and Petitioner denied ever making such a confession. [TAPE 2; 9/25/03; 03:35:40-37:15.] Trial counsel's failure to object to this line of

questioning [by the prosecutor] was deficient performance. *Moss v. Commonwealth*, 949 S.W.2d 579, 583 (Ky. 1997).

The language of the two preceding paragraphs was used in the RCr 11.42 motion to describe this claim of ineffective assistance of counsel, which had been raised on direct appeal as an unpreserved palpable error and rejected.  [11.42 Motion, p. 15; TR2, 14-32.]

*Preservation*.  This issue was not preserved for appellate review.  No objection was made to the prosecutor's questions that specifically required Petitioner to characterize the testimony of his wife, Tina Grimes, as "not true" and to state whether there was anything in her testimony that she was "telling the truth about."  On direct appeal, review was sought pursuant to RCr 10.26 and KRE 103(e) on the grounds that such improper questioning, explicitly solicited by the prosecutor, under the facts and circumstances of this case, was palpable error.

*Ms. Grimes Testifies About A Telephone Confession From Her Husband*.  During her direct examination, Tina Grimes, testified that on December 11, 2002, her husband, Tony, telephoned her on her cell phone and during the phone call made incriminating admissions that he had committed sexual offenses against his two stepdaughters, Ashley and Jordan. [TAPE 1; 9/24/03; 04:09:55-13:55.]

*The Defense Questions Petitioner About The Supposed Telephone Confession*. During his direct examination of Petitioner, defense counsel addressed the alleged December 11th telephone confession to Tina Graves:

Mr. Flaherty:   Did you get a phone call from Tina on the 16th, or a 16 minute phone call on the 11th?

Tony Grimes:   I got a phone call from Tina on the 11th, yes sir.

Mr. Flaherty:   Where were you at that time?

Tony Grimes:   It was on my cell phone, I don't know.

Mr. Flaherty: *Did you confess to her that you had done these acts that they charged you with?*

Tony Grimes: *The answer to your question is no*.

Mr. Flaherty: What did you talk about?

Tony Grimes: Can I make reference to what she tells VanMeter?

Mr. Flaherty: Sure.

Tony Grimes: Excuse me, Jay Wethington? Um, my wife says Ashley said this, I wanna now what's going on. What I said was I've never put my penis on them, I've never done oral sex to them, I've never hurt them, Ashley's hymen is still intact, I've never done anything. Up until December 9th, I was confident that Ashley had never had any type of sexual relationship. Tina was always, ____ take her and give her a shot, you know, Tina got pregnant with Ashley when she was 15 years old. Tina was concerned about Ashley having a baby when she was a baby. That's Tina's telling me Ashley has said all these things, I wanna know what's going on. I said I've never done that. *Never at no time have I ever confessed to anybody, that there's nothing to confess to*. [TAPE 2; 9/25/03; 03:35:40-37:15; (emphasis added).]

*The Prosecutor Resorts To An Improper Tactic*. During the cross-examination of Petitioner, the prosecutor focused on Petitioner's alleged telephone confession to his wife:

Prosecutor: Tell us again about the conversation on December 11th, the phone call with Tina, do you admit that you all talked for 16 minutes?

Tony Grimes: Yes, sir, I do.

Prosecutor: And instead of, and basically all you testified is "I just didn't do it." There must have been, that takes 10 seconds to say, what about the other sixteen (16) minutes?

Tony Grimes: Well, I testified that, um, Tina said "this is what Ashley's saying is going on, and I wanna know what's happening," and I said that "I've never put my penis on them, I've never sexually molested them in any way."

Prosecutor: So you didn't say, "I tried oral sex on them, I tried but they're not as

clean as you are"?

Tony Grimes: No, sir, I did not make the statement.

Prosecutor: You didn't say, you put your fingernail, or your finger in them no more than your fingernail.

Tony Grimes: No, sir, I did not.

Prosecutor: And that it had not happened in a long time, you stopped yourself?

Tony Grimes: It's never happened at all.

Prosecutor: You deny everything she said.

Tony Grimes: I deny having any sexual...

Prosecutor: Are you denying what Tina testified to about that phone call? *Are you saying that's not true*? [TAPE 2; 9/25/03; 03:58:14.]

Tony Grimes: I'd have to go back and read everything she testified to.

Prosecutor: Well,

Tony Grimes: I've got it here if you don't mind.

Prosecutor: *Right it, basically from this, is there anything in there that she's telling the truth about*? [TAPE 2; 9/25/03; 03:58:53.]

Tony Grimes: Yes, sir, I believe there is some correct information in here.

Prosecutor: What would that be?

Tony Grimes: He said he never put his penis on them, never did oral sex, never hurt them, guaranteed Ashley's hymen intact. I did let Ashley have the credit card to go wherever she needed to. Ashley didn't have a job so whenever she needed to go get gas for her Jeep or purchase something...

Prosecutor: Speaking of credit cards, on October ____

Mr. Flaherty: He's not finished Judge, I don't think...

Judge: Ask a question, go ahead. [TAPE 2: 9/25/03: 03: 57:10-59:10;

(emphasis added.]

*A Tactic Long Condemned*. In *Moss v. Commonwealth*, 949 S.W.2d 579, 583 (Ky. 1997), the Kentucky Supreme Court analyzed a situation where, "[d]uring the Commonwealth's cross-examination of [the defendant], he was asked and badgered into stating that Officer Wiley, a leading witness for the Commonwealth was lying." The *Moss* court found "such a line of questioning to be improper." *Id*.

"A witness should not be required to characterize the testimony of another witness, particularly a well-respected police officer, as lying." *Moss* at 583. "Counsel should be sufficiently articulate to show the jury where the testimony of the witnesses differ without resort to blunt force." *Id*.

According to the *Moss* court, the "decision in *Howard v. Commonwealth*, 227 Ky. 142, 12 S.W.2d 324 (1928), has long been the standard for proper cross-examination." *Moss* at 583. In *Howard*, the prosecutor during cross-examination of the defendant "in several instances asked her about certain testimony, and then asked her about what other witnesses had said concerning the same thing, in this manner, for example, "I am asking you if what Maud Denton swore is a lie." *Howard*, 12 S.W.2d at 329. "[W]here the cross-examination proceeds beyond proper bounds or is being conducted in a manner which is unfair, insulting, intimidating or abusive, or is inconsistent with the decorum of the courtroom, the court should interfere with or without objection from counsel." *Id*. The *Howard* court, using that legal standard, held that "[t]he court not only should have sustained the objections to this character of examination, but should have admonished counsel against such improper interrogation." *Id*.

*The Kentucky Supreme Court's Disapproval of This Tactic*. The *Moss* court noted that the Rhode Island Supreme Court had "commented appropriately on tactics such as the prosecutor

employed" against Moss and quoted verbatim from the foreign jurisdiction's opinion in *State v. James*, 557 A.2d 471, 473 (R.I. 1989). "'*A witness's opinion about the truth of the testimony of another witness is not permitted*.'" *Moss* at 583, quoting approvingly *James* at 473; (emphasis added). "'Neither expert nor lay witnesses may testify that another witness or a defendant is lying or faking.'" *Id*. "'That determination is within the exclusive province of the jury.'" *Id*.

The Kentucky Supreme Court has reiterated that it does "not approve of this type of cross-examination, *i.e.*, *asking one witness to characterize the testimony of another*." *Tamme v. Commonwealth*, 973 S.W.2d 13, 28 (Ky. 1998), citing *Moss*, *supra*; (emphasis added).

*"Lying" Versus "Not Telling The Truth."* It is of no consequence to this error that the prosecutor substituted "not telling the truth" for words such as "liar" or "lying." "In asking whether other witnesses were mistaken, the impression communicated to the jury may be that either the witness or the defendant is lying." *Daniel v. State*, 78 P.3d 890, 904 (Nev. 2003), citing *State v. Flanagan*, 801 P.2d 675, 679 (N.M.Ct.App. 1990). "This is especially true in a criminal case where the defendant is forced to characterize numerous witnesses, including police officers, as 'incorrect' or 'mistaken' in order for his or her testimony to be credible." *Id*. "'Whether the defendant believes the other witnesses were truthful or lying is simply irrelevant." *Id*.

*Prejudice is Apparent*. "[T]he predominate, if not sole, purpose of such questioning is simply to make the defendant look bad." *State v. Graves*, 668 N.W.2d 860, 872 (Iowa 2003). "The accused's answer is unimportant because the accused is in a no-win situation." *Id*. "If the defendant says the other witness is lying, then the defendant is put in the position of calling someone a liar, a particularly unenviable state when the other witness is a law enforcement officer." *Id*. "If the defendant says a contradictory witness is not lying, then a fair inference is that the *defendant* is lying." *Id*.; (emphasis

in original).

"The use of this tactic -- asking the defendant whether another witness is lying -- is incompatible with the duties of a prosecutor." *Graves*, *supra* at 873. "Unfairly questioning the defendant simply to make the defendant look bad in front of the jury regardless of the answer given is not consistent with the prosecutor's primary obligation to seek justice, not simply a conviction." *Id*. "Nor is such questioning consistent with the prosecutor's duty to the defendant to ensure a fair trial, including a verdict that rests on the evidence and not on passion or prejudice." *Id*.; see also *State v. Casteneda-Perez*, 61 Wash.App. 354, 810 P.2d 74, 79 (1991).

*The Palpable Error Review*. On direct appeal, the Kentucky Supreme Court, in contravention of established law, held "[t]his was proper cross-examination," emphasizing "[t]he prosecutor was attempting to clarify the differences in their testimony, some of which Grimes admitted was accurate." *Grimes*, KSC, 2005, 9. The appellate court held that "Grimes was never asked whether his wife was lying and even if it could be interpreted in that manner, there was not palpable error." *Id*.

*The RCr 11.42 Appeal*. On appeal, the Kentucky Court of Appeals reiterated what the Kentucky Supreme Court had ruled under a palpable error analysis rather, despite reviewing an ineffective assistance of counsel claim, and ruled "the circuit court did not err in summarily dismissing the claim without an evidentiary hearing." *Grimes*, KCA, 2011, 20.

Kentucky case law had long established the prosecutor's tactic was error. Petitioner's trial counsel did not object to the prosecutor's improper questioning of Petitioner or seek any curative relief. Without an evidentiary hearing, no Kentucky court ever heard why trial defense counsel declined to object to the prosecutor *"asking one witness to characterize the testimony of another*."

Additionally, the Court of Appeals did not address that the Kentucky Supreme Court noted that

if the prosecutor's questions "could be interpreted" as asking Petitioner "whether his wife was lying," that would not be palpable error.  The Court of Appeals did not acknowledge this interpretation and review it for ineffective assistance of counsel.

Petitioner never made a confession to the police and extolled his innocence on the witness stand.  The only evidence of Petitioner's alleged confessions or admissions was his wife's testimony at trial.  The prejudice resulting from trial counsel's failure to object the prosecutor's improper line of questioning regarding the wife's testimony "was heightened" because the issue of whether Petitioner ever made a confession "essentially was a swearing contest" between Petitioner and his estranged wife, due to the absence of either any other corroborating witnesses or physical evidence.  *Taylor v. Kentucky*, 436 US 478, 488 (1978).  Yet Flaherty raised no objection and sought no form of curative relief.

The Kentucky Court of Appeals' ruling resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, such as *Strickland, supra*.  28 U.S.C. § 2254(d)(1).  Additionally, that Court of Appeals ruling, under the facts and circumstances of this case, also "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(2).

Federal habeas relief is mandated.

**II.  THE TRIAL COURT DENIED PETITIONER HIS FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS WHEN IT RULED, OVER DEFENSE OBJECTION, THAT NO LESSER INCLUDED OFFENSE INSTRUCTIONS WOULD BE GIVEN ON THE TWO FIRST DEGREE RAPE COUNTS BECAUSE THE DEFENSE AT TRIAL WAS A DENIAL THAT ANY SEXUAL CONTACT HAD OCCURRED, EVEN THOUGH THE PROSECUTION INTRODUCED EVIDENCE THAT ONLY SEXUAL CONTACT, NOT RAPE, HAD OCCURRED BETWEEN PETITIONER AND HIS STEPDAUGHTER.**

*Preservation*.  This issue was preserved for appellate review.  During the guilt phase instruction conference, the trial judge specifically ruled that no lesser included offenses would be given except on count eighteen (18).  The trial judge explained that he had "come to the conclusion that in instructing the jury that no lesser included offenses will be given to the jury in regard to any of the offenses due to the fact that Petitioner's defense in the case is a denial of the contact which is prosecuted in the case."  "Therefore," the court saw "no factual basis in the record for a finding by the jury of any lesser offense than those charged in the indictment." [TAPE 2; 9-26-03; 11:33:29-34:20.] The trial court noted that its "opinion is based on the interpretation of the law that the entitlement to a lesser included offense requires a factual basis and that a denial of the superior offense does not entitle him to the lesser included."  The trial court added, "Here again the court's belief on that is that there is no factual basis and that the lesser included offense would be inappropriate in this case." [11:39:09-43.]

Even after these rulings defense counsel specifically requested a lesser include offense instruction on first degree sexual abuse on both counts of first degree rape.  The trial judge denied those requests.

*The Interplay Between Rape And Sexual Abuse*.  Counts one (1) and eight (8) charged Petitioner with committing the offense of first degree rape against his stepdaughter, Ashley.  [TR, 1-2; TR 42; TR 49.]  An element of first degree rape is that the accused "engaged in sexual intercourse with" the alleged victim.  KRS 510.040(1).  "'Sexual intercourse' means sexual intercourse in its ordinary sense and includes penetration of the sexual organs of one person by a foreign object manipulated by another person."  KRS 510.010(8).  "'Foreign object' means anything used in the commission of a sexual act other than the person of the actor."  KRS 510.010(9).

An element of sexual abuse in the first degree is that a person "subjects another person to sexual contact." KRS 510.110(1). "'Sexual contact' means any touching of the sexual or other intimate parts of a person done for the purpose of gratifying the sexual desire of either party." KRS 510.010(7). "This [definition] would obviously include such acts as the manipulation of genitals, digital penetration of the vagina, and non-consensual fondling of a woman's breast." KRS 510.010, Commentary.

There is no doubt that the "digital penetration of the vagina" is not rape, but only sexual abuse.

*Petitioner's Alleged Telephone Confession Provides The Factual Predicate For The Lesser Offense Instructions*. At trial, Tina, Petitioner's wife and the mother of Ashley and Jordan, testified that she telephoned Petitioner and spoke to him on December 11, 2002. Tina explained to the jury that she was concerned that Ashley was pregnant so she decided to phone Petitioner. Tina testified that at 1:59 p.m. on December 11, 2002 she reached Petitioner by phone and that they had a sixteen minute phone call. [TAPE 1; 9/24/03: 04:09:05-10:40.] Tina told Petitioner that she wanted to know what all he had done to her two daughters.

Tina testified on direct examination that "First, I asked him [Petitioner] if Ashley could be pregnant and he [Petitioner] said he *never touched them with his penis*." [TAPE 1; 9/24/03; 04:10:47-53]; (emphasis added). "He [Petitioner] said that *the only thing he did is he used his fingers on them* and he never put them [his fingers] in them no deeper than fingernail depth." [TAPE 1; 9/24/03; 04:10:55-11:01]; (emphasis added). In this testimony by a prosecution witness, solicited by the prosecutor on direct examination, these alleged admissions/confessions were admitted into evidence as substantive evidence to support the charges against Petitioner. See KRE 801(b)(1).

However, these statements are the factual predicate for a juror or jurors to conclude, despite

Ashley's testimony that she was vaginally penetrated by Petitioner's penis, that, although Petitioner never penetrated Ashley with his penis, he did digitally penetrated her vagina. On the basis of those statements allegedly made to Tina over the telephone, Petitioner was entitled to an instruction under both counts one (1) and eight (8) on the lesser included offense of first degree sexual abuse.

*This Factual Predicate Entitled Petioner To The Lesser Included Offense Instruction On Both Rape Charges*. Because of this evidence introduced by the prosecution on direct examination of Tina, Petitioner was entitled to a lesser included instruction on first degree sexual abuse on each of the first degree rape charges (counts one and eight). "[S]exual abuse in the first degree is a lesser-included offense of ... rape in the first degree." *Johnson v. Commonwealth*, 864 S.W.2d 266, 277 (Ky. 1993).

Kentucky "law requires the court to give instructions 'applicable to every state of case covered by the indictment and *deducible from or supported to any extent by the testimony*.'" *Reed v. Commonwealth*, 738 S.W.2d 818, 822 (Ky. 1987), quoting *Lee v. Commonwealth*, 329 S.W.2d 57, 60 (Ky. 1959). "It is irrelevant that the evidence from the parties does not indicate the need for a particular instruction." *Reed*, 822. "The determination of what issues to submit to the jury should be made upon the totality of the evidence." *Id*., citing *Rice v. Commonwealth*, 472 S.W.2d 512 (Ky. 1971).

*Petitioner's Denial of His Alleged Phone Confession to His Wife Did Not Cancel Out the Factual Predicate For the Lesser Included Offense Instruction.* Petitioner emphatically denied making those inculpatory statements to his wife during the December 11, 2002 telephone call. [TAPE 2; 9/25/03:03:36:04.] However, a defendant's in-court denial of his alleged out-of-court incriminating statements does not preclude the jury from relying on those disavowed statements to support its verdict.

As the Kentucky Court of Appeals has recognized in a different albeit comparable context, "'[w]hen the prosecution adduces evidence warranting an inference of a finding of a lesser degree of the charged offense, the court should instruct on the lesser degree even though the defendant presents the defense of alibi.'" *Reed*, 822-23, quoting *Trimble v. Commonwealth*, 447 S.W.2d 348, 350 (Ky. 1969). Even though Petitioner's theory of defense was that he had committed no sexual offenses against his stepdaughters, the evidence of his alleged telephone conversation with his wife provided the evidence that he had not raped Ashley but only sexually abused her digitally. *The Prosecutor Argued The Alleged Telephone Confession To The Jury*. In his guilt phase closing argument, the prosecutor told the jury, "He [Tony Grimes] said [to Tina Grimes] he didn't have intercourse with Ashley." [TAPE 2; 9-26-03; 02:09:01-03] The prosecutor added, "He said I put my finger in them but no deeper than fingernail length." [02:09:48-50.] The prosecutor in his closing argument treated the wife's testimony as if were Petitioner's testimony in court. Not only was the evidence that required lesser included instructions on the two rape charges introduced, the prosecutor specifically brought it to the attention of the jury in his closing argument.

*The Trial Court's Failure to Give the Requested Lesser Included Offense Instructions on First Degree Sexual Abuse Was Error*. Assuming *arguendo* that "there was substantial evidence that appellant [Petitioner] committed the crime of rape, there was other evidence from which the jury could have reasonably concluded that he committed a lesser offense." *Reed*, 823. "Failure of the trial court to properly instruct the jury was prejudicial," that required reversal of the judgment and a remand for a new trial. *Id*., citing *Brown v. Commonwealth*, 555 S.W.2d 252 (Ky.1977).

"A defendant is entitled to an instruction on a lesser included offense when 'a reasonable juror could entertain a reasonable doubt of the defendant's guilt on the greater charge, but believe beyond

a reasonable doubt that the defendant is guilty of the lesser offense.'" *Commonwealth v. Black*, 907 S.W.2d 762, 763 (Ky. 1995), quoting *Skinner v. Commonwealth*, 864 S.W.2d 290, 298 (Ky. 1993).

*Prejudice Is Apparent*. First degree rape is a Class B felony requiring a sentence to a term of imprisonment for at least ten (10) but not more than twenty (20) years. KRS 510.040(2); KRS 532.020(1)©. By contrast, first degree sexual abuse is a Class D felony requiring a sentence to a term of imprisonment for at least one (1) but not more than five (5) years. KRS 510.110(2); KRS 532.020(a).

On counts one and eight, the two first degree rape charges, the jury fixed Petitioner's punishment at confinement in the penitentiary for 15 years on each count. [TR 84, 91.] Following the jury's recommendation, the trial judge ran those two sentences consecutively to each other and any other penitentiary sentence Petitioner received in this case for a total of thirty years. [TR 84, 91; TR 132-133.] Thus, thirty years of Petitioner's total fifty-nine year sentence of imprisonment were generated by these two first degree rape convictions.

*This Error Is Of Federal Constitutional Magnitude.* In *Beck v. Alabama*, 447 U.S. 625 (1980), the Supreme Court held that the due process requires a trial court to submit jury instructions on lesser included offenses in capital cases if the evidence warrants such a charge. The *Beck* court expressly reserved the question of whether due process requires a lesser included offense instruction in the noncapital context. *Id*., 638 n. 14.

However, the *Beck* court did discuss the importance of giving lesser included offense instructions when warranted by the evidence. "While we have never held that a defendant is entitled to a lesser included offense instruction as a matter of due process, the nearly universal acceptance of the rule in both state and federal courts establishes the value to the defendant of this procedural

safeguard." *Id.*, 637. "[T]he failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." *Id.*

As a result of the admission of Petitioner's alleged out-of-court statements that he did not touch his stepdaughters with his penis, but only penetrated their vaginas with his fingers, he was entitled to a lesser included offense instruction on first degree sexual abuse as to both counts of first degree rape.

On direct appeal, the Kentucky Supreme Court reviewing this assigned error stated "[d]efense counsel did seek instructions on lesser-included offenses to the two counts of first-degree rape, but not predicated on the testimony of the mother. Instead, he indicated that Grimes was entitled to the instructions based on his testimony that he did not have sexual intercourse with the victims."[32] *Grimes*, KSC, 2005, 3.

The prosecutor elicited from Petitioner's wife an alleged confession that Petitioner denied raping Ashley, but admitted digitally penetrating her. That alleged confession was presented as if Petitioner had testified to it in open court. As explained above, in his closing guilt phase argument, the prosecutor treated Tina's testimony about Petitioner's alleged confession as if Petitioner had made that alleged confession himself on the witness stand.

Trial defense counsel asserted grounds for the lesser included offense instruction on the two rape counts was sufficient to state the matter to which he objected – the lack of lesser included offenses on the rape charges – and the grounds of his objection – Petitioner's denial of the rapes of Ashley, while admitting digital penetration of her, *i.e.*, sexual abuse. Defense counsel fairly and adequately presented his objection and grounds to the trial court.

---

[32] The Kentucky Supreme Court incorrectly indicated that the rape charges involved both alleged victims. [Note "the victims."] The only two rape charges alleged the older sister, Ashley, was the victim.

Despite finding this claim unpreserved, the Kentucky Supreme Court addressed the merits of the claim stating, "[i]n any event, there was no factual basis to support an instruction on lesser-included offenses to first-degree rape." *Grimes*, KSC, 2005, 3. The Supreme Court noted that "[e]vidence was introduced that both acts of sexual misconduct [rape and sexual abuse] occurred over a number of years and once on the same date." *Id.* "Under these circumstances," the Supreme Court erroneously reasoned, Grimes' statement to his wife could only be interpreted as a complete denial that the rapes occurred, but an admission that he did sexually abuse the victims." *Id.* This was a a decision that was "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

There were only two incidents where the offense of rape was charged and in both incidents Ashley was the alleged victim. One was an incident in Ashley's brother Drew's room at their Brookhill residence between October 1-31, 2002, that involved the charged offenses of first degree rape, sodomy, and sexual abuse found in counts one through three of the indictment.[33] [TR, 1-4; TAPE 1: 9/24/03; 02:04:01-07:57.] The other was an incident between September 1, 2000 and December 31, 2001, in the master bedroom at the Brookhill residence, that involved the charged offenses of first degree rape and sodomy found in counts eight and nine. [02:13:43-16:30]. No offense of sexual abuse was charged with regard to this incident.

As a result, Petitioner's denial of rape, but admission of guilty of first degree sexual abuse by digital penetration of Ashley's vagina supported a lesser included instruction on sexual abuse in both incidents. In the between October 1-31, 2002 incident (counts 1-3), the sexual abuse charged was not

---

[33] Count 3 of the indictment alleged only that Petitioner "committed the offense of Sexual Abuse in the First Degree when he subjected a minor female to sexual contact by forcible compulsion." [TR, 2.]

digital penetration of Ashley's vagina.  Thus, the lesser included offense of sexual abuse for the rape

charge, based on Petitioner's alleged confession to only digital penetration, was a separate and distinct

act of sexual abuse from the one charged in that indictment.

In the between September 1, 2000 and December 31, 2001 incident (counts 8-9), there was no

charge of sexual abuse so the lesser included offense of sexual abuse for the rape charge, based on the

admission of digital penetration, could not have overlapped with any other sexual abuse charge.

Contrary to the Kentucky Supreme Court's reasoning, Petitioner's alleged admission to

performing digital penetration on the victims could not be construed as an admission to all counts of

sexual abuse because some of those counts were based on sexual acts different from digital penetration

of the victims' vaginas.

As explained above, the alleged admission by Petitioner to his wife introduced into evidence

by the prosecutor was not limited to only the interpretation found by the Kentucky Supreme Court.

In fact, that interpretation is less obvious than the admission was a denial of both rapes, but an

admission that the alleged rapes were sexual abuse, digital penetration.  That evidence, albeit

introduced by the prosecution, constituted a factual basis for an instruction on sexual abuse as the

lesser included offense to the two rapes.

The Kentucky Supreme Court's ruling resulted in a decision that was contrary to, or involved

an unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States, such as *Strickland, supra*.  28 U.S.C. § 2254(d)(1).  Additionally, that Kentucky

Supreme Court's ruling, under the facts and circumstances of this case, also "resulted in a decision that

was based on an unreasonable determination of the facts in light of the evidence presented in the state

court proceeding."  28 U.S.C. § 2254(d)(2).

Federal habeas relief is mandated.

**III. THE TRIAL COURT ERRED TO PETITIONER'S SUBSTANTIAL PREJUDICE AND DENIED HIM HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS WHEN DURING A BREAK IN THE STATE'S DIRECT EXAMINATION OF A CHILD WITNESS THE COURT ALLOWED THE PROSECUTOR TO COMMUNICATE WITH THE COURT *EX PARTE* AT THE BENCH AND RULED, WITHOUT DEFENSE COUNSEL OR PETITIONER PRESENT, THAT THE WITNESS'S MOTHER, ALSO A WITNESS IN THE CASE, COULD TALK WITH THE WITNESS UNTIL THE BREAK CONCLUDED.**

*Preservation for Direct Appeal*. This issue was properly before the Kentucky Supreme Court for review on direct appeal. This issue was not preserved for appellate review by the actions below of trial defense counsel because the error was unknown to him during the trial and for that matter thereafter. The error was committed outside the presence of both trial defense counsel and the Petitioner during the trial and was never brought to their attention during the trial. Direct appeal counsel discovered the error during his review of the tapes of Petitioner's trial. Under these circumstances preservation of this error at trial was rendered impossible by the actions of the prosecutor and the judge. As the Kentucky Supreme Court has long recognized, "if a party *has no opportunity to object* to a ruling or order at the time it is made, *the absence of an objection does not thereafter prejudice that party*." RCr 9.22; (emphases added).

*The Improper Communication Between The Prosecutor and The Judge Occurs On The Record.* After Jordan M., Petitioner's twelve-year-old stepdaughter, had testified on direct examination for some seven (7) minutes, she began to cry. [TAPE 1: 9/24/03; 03:21:10.] Defense counsel immediately moved the court "to take a break." [03:22:05.] The judge ordered a five-minute break. [03:22:15.]

Thirty seconds later, the prosecutor approached the judge at the bench. The videotape clearly reveals that neither the defense counsel nor the defendant are present in the courtroom. [03:22:43.] The prosecutor tells the judge, "Not to talk about the case, but I think that she [Jordan] needs her mother."

When the judge asks the prosecutor where Jordan's mother is, the prosecutor explains that she is "up here" and in the same room with Jordan. The judge says that Jordan's mother can talk to her now but she should not talk about her testimony. To which, the prosecutor responds, "Right, right." [03:23:00.] All of this discussion and the judge's ruling on the prosecutor's request are completed in the absence of both the defense counsel and Petitioner, who are clearly not present at this bench discussion and not visible on the tape as being even in the courtroom.

Parenthetically, the videotape labels this entire proceeding at the bench as a "bench conference." Although up to this point the jury had been relaxing in place in the jury box, the judge then excuses the jury. [03:23:14.] The direct examination resumes some nine minutes later. [03:32:31.] Apparently Jordan's mother, Tina Grimes, has, unbeknownst to the defense, been in a room with Jordan talking to her during the entire break. Tina Grimes testified immediately after Jordan completed her testimony. [TAPE 1: 9/24/03; 03:58:47.]

Nowhere on the videotape record does the judge and/or the prosecutor subsequently inform defense counsel that the judge in counsel's absence has heard and granted the prosecutor's motion[34] that Tina Grimes be allowed to meet with and talk to her daughter during an intermission in Jordan's direct examination.[35]

---

[34] "An application to the court for an order shall be by motion which shall be in writing unless made during a hearing or trial, shall state with particularity the grounds therefor, and shall set forth the relief or order sought." RCr 8.14. Under the circumstances, the prosecutor moved the court *ex parte* for an order that Ms. Grimes be allowed to talk with her daughter, Jordan, during the break in Jordan's direct examination.

[35] Assuming *arguendo* that an *ex parte* communication was appropriate in this instance, the trial court was nevertheless required to inform defense counsel of what had occurred in counsel's absence. "Where circumstances require, ex parte communications for ... administrative purposes or emergencies that do not deal with substantive matters or issues on the merits are authorized; provided: (I) the judge reasonably believes that no party will gain a

Following that intermission, Jordan testified on direct examination for another fourteen (14) minutes. [03:46:35.] Jordan was then cross-examined for approximately ten (10) minutes. [03:57:44.]

Prior to giving his opening statement, the prosecutor had invoked the rule, *i.e.*, RCr 9.48, that subpoenaed witnesses be kept out of courtroom. [TAPE 1; 09/24/03; 01:38:20.]

Significantly, the trial judge did not require either the witness, Jordan M., or her mother, Tina Grimes, brought before the court to be admonished not to talk about Jordan's testimony. Instead, the court relied on the prosecutor to convey the judge's restriction on talking about Jordan's testimony to both Jordan and her mother off the record.

*Requests For Orders During Trial Must Be Made In The Presence Of Opposing Counsel.* "*[A]fter* trial has commenced," "*[e]very order requested of the court* is a matter to be addressed *in the presence of opposing counsel*." *Sanborn v. Commonwealth*, 754 S.W.2d 534, 549 (Ky. 1988); (emphases in original). "It is a 'dangerous procedure' and a 'gross breach of the appearance of justice when the defendant's principal adversary is given private access to the ear of the court.'" *Id.*, quoting *Haller v. Robbins*, 409 F.2d 857, 859 (1st Cir. 1969).

The prosecutor by approaching the judge *ex parte* during a momentary break in the trial to seek judicial permission to allow the child witness to talk to her mother broke the well established rule that such orders/rulings must be sought and obtained only in the actual presence of opposing counsel. This impropriety is magnified by the reality that the jurors watched as the prosecutor and judge talked at the bench without defense counsel present.

---

procedural or tactical advantage as a result of the ex parte communication; and (ii) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication and allows an opportunity to respond." SCR 4.300, Kentucky Code of Judicial Conduct, Canon 3(B)(7)(a).

In *Sanborn v. Commonwealth*, *supra*, 549, "there was an improper communication between the prosecutor and the court," where, "[d]uring the penalty phase, the trial court granted an ex parte motion for an order compelling the attendance of Petitioner's [Sanborn's] ex-wife as a witness." The *Sanborn* court found no "excuse" for the prosecutor "obtaining an *ex parte* order from the *judge* of the court *after* trial has commenced." *Id*.; (emphases added).

*The Impact Of The Improper Ex Parte Communication*. Had trial defense counsel heard this request by the prosecutor, he might have objected either to the substance of the motion or the procedure employed. Defense counsel might have opposed allowing the mother, a yet uncalled prosecution witness, to talk with the child during a break in her testimony. Or, defense counsel might have argued that such a discussion during the child witness' direct examination should not be allowed until or unless the judge called both the mother and daughter before him and instructed them not to discuss the child's testimony during the break.

More importantly, however, had defense counsel been aware of the court's ruling prior to his cross-examination of Jordan, he could have questioned Jordan about what actually occurred during her conversation with her mother during the break in the prosecution's direct examination. Such a cross-examination topic is permissible.

"The opposing counsel in the adversary system is not without weapons to cope with 'coached' witnesses." *Geders v. United States*, 425 U.S. 80, 89 (1976). Opposing counsel "may cross-examine a" witness "as to the extent of any 'coaching' during a recess, subject, of course, to the control of the court." *Id*. "Skillful cross-examination could develop a record which [opposing counsel] in closing argument might well exploit by raising questions as to the [witness'] credibility." *Id*. at 89-90.

It is apparent from the prosecutor's cross-examination of Petitioner that the court below would

have permitted defense counsel to pursue such a topic of cross-examination.  The prosecutor opened

his cross-examination with this line of questioning:

Prosecutor:    Thank you, your Honor. Now Mr. Grimes prior to testifying here today you've
               had the opportunity to, of course, to review all the witness statement, the police
               reports and the notes, etc., is that right?

Mr. Grimes:    Yes, sir, that's right.

Prosecutor:    As a matter of fact, you have a lot of them up here with you to help you, is that
               right?

Mr. Grimes:    Correct.

Prosecutor:    Prior to testifying here today, you've had the opportunity to review your prior
               statement, is that correct?

Mr. Grimes:    My prior statement was...

Prosecutor:    Sgt. Duvall.

Mr. Grimes:    I haven't done this.

Prosecutor:    Right, you've had a chance to review the statement that you made to him?

Mr. Grimes:    There is no report of a statement.

Prosecutor:    In Detective Duvall's notes, that you've taken to the stand.

Mr. Grimes:    Yes, sir, you're right, it is there.

Prosecutor:    Okay, and you've had an opportunity prior to testifying here today to hear all
               the other witnesses testify, is that correct?

Mr. Grimes:    Yes, sir, that's correct.

Prosecutor:    Have you ever discussed with anyone the manner in which you would conduct
               yourself as a witness today?

Mr. Grimes:    No, sir, I have not.

Prosecutor:    You have not.  It would not be fair to say you spent hours preparing for this
               trial and this testimony today?

Mr. Grimes:    Um, not as far as being a witness. [TAPE 2; 9/25/03; 03:45:05-46:10.]

Through this line of questioning, the prosecutor attempted to undermine Petitioner's credibility by revealing to the jury the extent to which Petitioner had prepared his testimony both by himself and with the help of others.  A cross-examination of Jordan by defense counsel would have been permitted by the court.

*The Jury's Interest in Jordan's Testimony Demonstrates the Prejudicial Impact of This Error.* The testimony of Jordan was obviously extremely important to the jury as they requested the playback of her entire testimony during guilt phase deliberations. [TAPE 3; 9/26/03; 03:21:24-55:00.]

*Ex Parte Communications Between the Trial Court and the Prosecutor Are Impermissible for a Variety of Reasons*.  "An *ex parte* communication between a trial court and government counsel '[i]n addition to raising questions of due process ... involve[s] a breach of legal and judicial ethics.[36] Regardless of the propriety of the court's motives in such a case ... the practice should be discouraged since it undermines confidence in the impartiality of the court.'" *United States v. Early*, 746 F.2d 412, 416 (8th Cir. 1984).

*Ex Parte Communications Between the Trial Judge and the Prosecutor Denied Petitioner The Assistance of Counsel Guaranteed by the Federal Constitution*.  By proceeding during the recess without trial defense counsel being present, the trial judge and the prosecutor denied Petitioner his federal constitutional right to counsel during his trial.  "The presumption that counsel's assistance is

---

[36] "With regard to a pending or impending proceeding, a judge shall not initiate, permit, or consider ex parte communications with parties ...."  SCR 4.300, Kentucky Code of Judicial Conduct, Canon 3(B)(7).  "The proscription against communications concerning a proceeding includes communications from lawyers, ... except to the limited extent permitted."  Id., Canon 3(B)(7), Commentary.  "To the extent reasonably possible, all parties or their lawyers shall be included in communications with a judge."  Id., Commentary.

essential requires" the United States Supreme Court "to conclude that a trial is unfair if the accused is denied counsel at a critical stage of the trial." *United States v. Cronic*, 466 U.S. 648, 659 (1984). Indeed, the United States Supreme Court "has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *Id.*, 659 n. 25.

The exclusion of defense counsel from this bench conference had federal constitutional dimensions. "The right to the assistance of counsel has ... been given a meaning that ensures to the defense in a criminal trial the opportunity to participate fully and fairly in the adversary fact finding process." *Herring v. New York*, 422 U.S. 853, 858 (1975).

*This Error Also Deprived Petitioner of His Federal Constitutional Right to a Fundamentally Fair Trial*. The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment. *Drope v. Missouri*, 420 U.S. 162, 172 (1975). For the reasons delineated above, the *ex parte* communications between prosecutor and judge during the trial denied Petitioner a fundamentally fair trial.

On direct appeal, the Kentucky Supreme Court acknowledged that "[a] defendant has the right to be present at all critical stages of his prosecution," citing RCr 8.28(1). *Grimes*, KSC, 2005, 6. The Kentucky Supreme Court noted that "[t]he test with respect to whether an ex parte communication violates that right is whether the presence of counsel was necessary to insure fundamental fairness or whether the defendant was deprived of a "reasonably substantial . . . opportunity to defend against the charge." *Id.*, citing *Gabow v. Commonwealth*, 34 S.W.3d 63, 74 (Ky. 2000), quoting *United States v. Gagnon*, 470 U .S. 522 (1985) .

The *Grimes* court, after grudgingly admitting that "the better practice could have been for

defense counsel to be present at the bench during the exchange," nevertheless found "no prejudice to" Petitioner. *Grimes*, 7.

The *Grimes* court held that Petitioner had "not been denied any fundamental rights." *Grimes*, 6. To support this analysis, the *Grimes* court asserted that the "claim that the mother could have been coached was highly speculative," without addressing that the judge failed to bring both Jordan and her mother before the court to admonish them on the record not to talk about Jordan's testimony during their time together during the break. It was *highly speculative* of the *Grimes* court to assume there was no discussion of Jordan's testimony when the trial judge had not admonished either Jordan or her mother on this point and instead left that task to the prosecutor to perform off the record and outside of the presence of both Petitioner and his counsel. The United States Supreme Court has acknowledged that the examination of a witness "is more likely to elicit truthful responses if it goes forward without allowing the witness an opportunity to consult with third parties." *Perry v. Leeke*, 488 US 272, 282 (1989).

The *Grimes* court tried to demonstrate that before the recess Jordan "had already testified to a number of sexual improprieties committed by Grimes" and that "[s]he did not testify to anything more than what she had told the police initially." *Grimes*, 6. It must be remembered that during Jordan's direct examination, the prosecutor repeatedly used leading questions to revise her answers when they did not coincide with what the prosecutor claimed Jordan had told the police initially.[37]

Despite the absence of Petitioner and his counsel on the videotape record of the prosecutor

---

[37] See, *supra*, the claim that *"Petitioner's trial counsel denied Petitioner the effective assistance of counsel by failing to object on numerous occasions to the prosecutor's leading questions during his direct examination of Jordan, the alleged victim who was twelve (12) years old at the time of the trial."*

talking privately with the trial judge at the bench, the *Grimes* court, after acknowledging that on the videotape "[d]efense counsel is not present at the bench," emphasizes that "the videotape record does not show whether he or the defendant are outside the courtroom." *Grimes*, 6. The *Grimes* court speculated, with no record evidence, that perhaps Petitioner and his counsel may have been somewhere inside the parameters of the courtroom but outside the range of the video camera to suggest somehow there was no error. Had the judge required that the prosecutor not be allowed to make a request ex parte and had the judge required both Jordan and her mother to be admonished by the judge on the record that they could not talk about her testimony during the recess, no one could speculate on whether Petitioner and his counsel were still in the confines of the courtroom. Even assuming *arguendo* that Petitioner and his counsel were somewhere within the walls of the courtroom, that would not suggest that either of them were within earshot of a conversation at the bench during a recess while the jury was still in the courtroom.

The *Grimes* court tried to diminish the significance of the judge and prosecutor's ex parte request and ruling that Jordan's mother could be with Jordan during the break in her direct examination by noting "[t]he entire exchange between the prosecutor and the trial judge lasted approximately twenty seconds." What difference could the brevity of the exchange matter when the record reveals exactly what was said between the judge and the prosecutor?

In actuality, the prosecutor at the ex parte conversation at the bench was asking at best for retroactive approval from the judge for Jordan to be with her mother during the recess as they were already together in a room. When the judge asked the prosecutor during their bench conversation where Jordan's mother is, the prosecutor explains that she is "up here" and in the same room with Jordan. Obviously, Jordan and her mother had already been together during the recess with no

admonition not to talk about her testimony.

Although the *Grimes* court held that Petitioner had "not been denied any fundamental rights," this was far from correct based on the record and Petitioner's theory of the claim. *Grimes*, 6. As explained above, "a trial is unfair if the accused is denied counsel at a critical stage of the trial." *United States v. Cronic*, 659. In that circumstance, "constitutional error" occurs "without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *Id*., 659 n. 25. Similarly, "[t]he very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free," noting that "a criminal trial ... is in the end basically a fact-finding process." *Herring v. New York*, 422 U.S. at 862. As explained above, this ex parte request and ruling impacted Petitioner's federal constitutional right of confrontation of the younger alleged victim, a prosecution witness, by keeping Petitioner and his counsel in the dark about the ex parte bench conference. "'The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.'" *Lilly v. Virginia*, 527 U.S. 116, 123-124 (1999), quoting *Maryland v. Craig*, 497 U. S. 836, 845 (1990). Depriving the defense of knowledge of the ex parte bench conference and the results of that exchange conducted during the jury trial limited Petitioner's counsel of needed information for his cross-examination of Jordan. As explained above, this ex parte request and ruling deprived Petitioner of his right to a fair trial, a fundamental liberty secured by the Fourteenth Amendment. *Drope v. Missouri*, 172.

As demonstrated above, the Kentucky Supreme Court's ruling on this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal

law, as determined by the Supreme Court of the United States and  resulted in a decision that was

based on an unreasonable determination of the facts in light of the evidence presented in the state court

proceeding." 28 U.S.C. § 2254(d).

      Habeas corpus relief is mandated.

**V.  THE COURT BELOW ERRED TO PETITIONER'S SUBSTANTIAL PREJUDICE AND DENIED PETITIONER HIS FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS WHEN IT RULED, OVER DEFENSE OBJECTION, THAT NO LESSER INCLUDED OFFENSE INSTRUCTIONS WOULD BE GIVEN ON THE TWO FIRST DEGREE RAPE COUNTS BECAUSE THE DEFENSE AT TRIAL WAS A DENIAL THAT ANY SEXUAL CONTACT HAD OCCURRED, EVEN THOUGH THE PROSECUTION INTRODUCED EVIDENCE THAT ONLY SEXUAL CONTACT, NOT RAPE, HAD OCCURRED BETWEEN PETITIONER AND HIS STEPDAUGHTER.**

      This allegation of error was raised on direct appeal as a preserved error.  The gravamen of this

direct appeal claim has already been presented *supra* as this claim of ineffective assistance of counsel:

> *Petitioner's Trial Counsel Denied Him Effective Assistance of Counsel by Failing to Request Lesser Included Offense Instructions on Those Charges Involving the Older Stepdaughter that Allegedly Occurred When She Was at Least Twelve Years Old But Not Yet Sixteen Years Old on the Basis that the Victim's Own Testimony Raised a Factual Issue of Whether There was Forcible Compulsion or She Consented to Obtain Favors from Petitioner.*

      Petitioner hereby incorporates by reference all the factual and legal information presented under

that ineffective assistance of counsel claim into this review of the direct appeal claim.

      As demonstrated in the ineffective assistance of counsel claim, the Kentucky Supreme Court's

ruling on this claim resulted in a decision that was contrary to, or involved an unreasonable application

of, clearly established Federal law, as determined by the Supreme Court of the United States and

resulted in a decision that was based on an unreasonable determination of the facts in light of the

evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

      Federal habeas corpus relief is mandated.

**VI. PETITIONER SUFFERED MANIFEST INJUSTICE AND A DENIAL OF FEDERAL DUE PROCESS WHEN THE PROSECUTOR DURING HIS GUILT PHASE CLOSING ARGUMENT ARGUED FACTS NEITHER IN EVIDENCE NOR REASONABLY INFERABLE FROM THE EVIDENCE, BY TELLING THE JURY THAT PETITIONER HAD ADMITTED TO HIS WIFE OVER THE PHONE THAT HIS STEPDAUGHTER, ASHLEY, "IS LIKE YOU, SHE SAID NO, SHE TOLD ME NO, I'D LEAVE HER ALONE."**

This issue was not preserved for appellate review. Review on direct appeal was sought pursuant to RCr 10.26 and KRE 103(e) as "palpable error" creating "manifest injustice." Defense counsel failed to object when, during the prosecution's guilt phase closing argument, while discussing Tina Grimes' account of Tony Grimes' alleged telephone confession to her on December 11, 2002, the prosecutor, speaking as if he were Tony Grimes talking to his wife on the phone, said, "Ashley is like you, she said no, she told me no, I'd leave her alone."   [TAPE 2; 9/26/03; 02:10:26-31.]

The gravamen of this direct appeal claim has already been presented *supra* as this claim of ineffective assistance of counsel:

> *Trial Defense Denied Petitioner his Federal Constitutional Right to the Effective Assistance of Counsel By Failing to Object During the Prosecutor's Guilt Phase Closing Argument When the Prosecutor Argued Facts Neither in Evidence Nor Reasonably Inferable From the Evidence, by Telling the Jury that Petitioner had Admitted to His Wife that His Stepdaughter, Ashley, "is Like You, She Said No, She Told Me No, I'd Leave Her Alone."*

Petitioner hereby incorporates by reference all the factual and legal information presented under that ineffective assistance of counsel claim into this review of the direct appeal claim.

The prosecutor's comments in closing argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). This argument by the prosecutor was prosecutorial misconduct because no evidence of this statement was introduced into evidence by either the Commonwealth or the defense.  See also *Darden v. Wainwright*, 477 U.S. 168, 181-182 (1986).

As demonstrated in the ineffective assistance of counsel claim and on direct review, the Kentucky Supreme Court's ruling on this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

Federal habeas corpus relief is warranted.

**VII. PETITIONER SUFFERED MANIFEST INJUSTICE AND A DENIAL OF FEDERAL DUE PROCESS WHEN THE PROSECUTOR DURING HIS GUILT PHASE CLOSING ARGUMENT ARGUED FACTS NOT REASONABLY INFERABLE FROM THE EVIDENCE, BY TELLING THE JURY THAT, AS A PROFESSIONAL SALESMAN, IT WAS PETITIONER'S "JOB AS A SALESMAN TO TRY TO SELL TO [THE JURY] THAT HE IS NOT GUILTY."**

*Preservation*. This issue was not preserved for appellate review. Review was sought pursuant to RCr 10.26 and KRE 103(e) as "palpable error" creating "manifest injustice." Defense counsel failed to object when the prosecutor during his guilt phase closing argument used Petitioner's occupation as a professional salesman, that had been introduced by the defense only as legitimate background evidence, to advise the jury that it was Petitioner's "job as a salesman to try to sell to you that he is not guilty," an impermissible and unreasonable inference from the evidence. Review was sought on the grounds that such prosecutorial misconduct, specifically used to challenge an accused's credibility on the basis of a neutral background factor, his occupation as a legitimate salesman, was calculated to achieve an unfair litigation advantage and deprive Petitioner of a fundamentally fair trial.

The Kentucky Supreme Court apparently reviewed this unpreserved error as palpable error and rejected the claim, stating "[t]here was no error." *Grimes*, KSC, 2005, 7-8.

The gravamen of this direct appeal claim has already been presented *supra* as this claim of ineffective assistance of counsel:

*Trial Defense Denied Petitioner his Federal Constitutional Right to the Effective Assistance of Counsel By Failing to Object During the Prosecutor's Guilt Phase Closing Argument When the Prosecutor used Petitioner's reputable occupation as a professional salesman to advise the jury that it was Petitioner's "job as a salesman to try to sell to you that he is not guilty," an impermissible and unreasonable inference from the evidence.*

Petitioner hereby incorporates by reference all the factual and legal information presented under that ineffective assistance of counsel claim into this review of the direct appeal claim.

The Kentucky Supreme Court reviewed this claim on direct appeal under the palpable error rule, RCr 10.26. *Grimes*, KSC, 2005, 7-8. The *Grimes* court noted that it had been held permissible in closing argument "to refer to a defendant" as "a bit of evil," "a desperado," and "worse than all the convicts and traitors in hell," and rationalized that the prosecutor's comments regarding Petitioner's legitimate, noncriminal occupation to challenge his credibility, being "certainly less offensive than the descriptive names" in those other cases, must mean "[t]here was no error." *Id*., 8.

The *Grimes* court's analysis misconceived Petitioner's claim and its underlying federal due process basis – "the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." *Estelle v. Williams*, 425 U.S. 501, 503 (1976).

"[T]he lack of a Supreme Court decision on nearly identical facts does not by itself mean that there is no clearly established federal law, since 'a general standard' from [the Supreme Court's] cases can supply such law." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1449 (2013), quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

As demonstrated in the ineffective assistance of counsel claim and above, the Kentucky Supreme Court's ruling on this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

Federal habeas corpus relief is warranted.

**VIII.  PETITIONER SUFFERED MANIFEST INJUSTICE AND A DENIAL OF FEDERAL DUE PROCESS WHEN THE PROSECUTOR REQUIRED PETITIONER ON CROSS-EXAMINATION TO CHARACTERIZE THE TESTIMONY OF PETITIONER'S WIFE, A KEY PROSECUTION WITNESS, AS "NOT TRUE" AND TO STATE WHETHER THERE WAS ANYTHING IN HER TESTIMONY ABOUT HIS ALLEGED PHONE CONFESSION THAT SHE WAS "TELLING THE TRUTH ABOUT," A TACTIC LONG CONDEMNED IN KENTUCKY.**

*Preservation*.  This issue was not preserved for appellate review.  No defense objection was made to the prosecutor's questions that specifically required Petitioner to characterize the testimony of his wife, Tina Grimes, as "not true" and to state whether there was anything in her testimony that she was "telling the truth about."  Review was sought pursuant to RCr 10.26 and KRE 103(e) on the grounds that such improper questioning, explicitly solicited by the prosecutor, under the facts and circumstances of this case, is palpable error.

The gravamen of this direct appeal claim has already been presented *supra* as this claim of ineffective assistance of counsel:

> *Petitioner's Trial Counsel Denied Him Effective Assistance of Counsel by Failing to Object  to the Prosecutor's Questions that Specifically Required Petitioner to Characterize the Testimony of his Wife, Tina Grimes, as "Not True" and to State Whether There was Anything in her Testimony that She was "Telling the Truth About."*  [TAPE 2; 9/25/03; 03:58:14; 03:58:53; 03: 57:10-59:10.]

Petitioner hereby incorporates by reference all the factual and legal information presented under that ineffective assistance of counsel claim into this review of the direct appeal claim.

The Kentucky Supreme Court reviewed this claim on direct appeal under the palpable error rule, RCr 10.26.  *Grimes*, KSC, 2005, 8-9.  The *Grimes* court, after finding "[t]his was proper cross-examination" in spite of established Kentucky law to the contrary, specifically held that "there was no

palpable error." *Id*., 9.

The prosecutor's improper cross-examination of Petitioner "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 US 168, 181 (1986), quoting *Donnelly v. DeChristoforo*, 416 U. S. 637 (1974). The prosecutor's use of this tactic against Petitioner to make him "look bad" as he struggled to deny his alleged confession to his wife without calling her a liar or untruthful is fundamentally unfair, particularly when the Petitioner had steadfastly maintained his innocence of these charges to the police and the jury.

As demonstrated in the ineffective assistance of counsel claim and above, the Kentucky Supreme Court's ruling on this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

Federal habeas corpus relief is warranted.

**IX. PETITIONER SUFFERED MANIFEST INJUSTICE AND THE DENIAL OF HIS FEDERAL CONSTITUTIONAL RIGHTS WHEN THE MOTHER OF THE TWO ALLEGED VICTIMS ON CROSS-EXAMINATION BY DEFENSE COUNSEL, IN AN UNRESPONSIVE ANSWER, VOLUNTEERED HER OPINION, NOT RATIONALLY BASED ON HER OWN PERCEPTIONS, THAT THE "EARLY" DEVELOPMENT OF HER DAUGHTERS' BREASTS WERE PHYSICAL EVIDENCE THAT BOTH DAUGHTERS HAD BEEN SEXUALLY ABUSED BY APPELLANT.**

*Preservation*. This issue was not preserved for appellate review. Review was sought pursuant to RCr 10.26 and KRE 103(e) as "palpable error" creating "manifest injustice." Defense counsel voiced no objection when Tina Grimes on cross-examination volunteered an unresponsive, inadmissible lay opinion that falsely informed the jury that "early" breast development in girls is a physical indicator that the girls were sexually abused and that her daughter Jordan had developed

breasts "early."

The gravamen of this direct appeal claim has already been presented *supra* as this claim of ineffective assistance of counsel:

> *Trial Defense Denied Petitioner his Federal Constitutional Right to the Effective Assistance of Counsel By Failing to Object When Petitioner's Wife on Cross-examination Volunteered an Unresponsive, Inadmissible Lay Opinion that Falsely Informed the Jury That "Early" Breast Development in Girls is a Physical Indicator That Her Daughters Were Sexually Abused and That her Younger Daughter had Developed Breasts "Early."*

Petitioner hereby incorporates by reference all the factual and legal information presented under that ineffective assistance of counsel claim into this review of the direct appeal claim.

The Kentucky Supreme Court reviewed this claim on direct appeal under the palpable error rule, RCr 10.26. *Grimes*, KSC, 2005, 9. The *Grimes* court, after finding "[d]efense counsel did not object to the response and even commented that he thought the youngest victim looked more mature than she did a year ago," held "Grimes cannot reasonably claim any palpable error here." *Id*. This error violated due process under the federal Constitution because the error was so pervasive that it rendered the trial fundamentally unfair. The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment. *Drope v. Missouri*, 420 U.S. 162, 172 (1975). It was unreliable evidence volunteered as medical opinion to support the charges of sexual abuse against Petitioner. This unresponsive unreliable testimony violated "the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." *Estelle v. Williams*, 425 U.S. 501, 503 (1976).

As demonstrated in the ineffective assistance of counsel claim and above, the Kentucky Supreme Court's ruling on this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

Federal habeas corpus relief is warranted.

**CONCLUSION**

On the basis of the federal constitutional claims asserted, whether taken singly or *in toto*, this Court should grant Mr. Grimes' petition, issue a conditional writ of habeas corpus requiring that Mr. Grimes' conviction and sentence be vacated, and provide any other appropriate relief.

**PRAYER FOR RELIEF**

Petitioner, Anthony Thomas Grimes, requests that this Court:

1) issue a writ of habeas corpus to have Petitioner Grimes brought before it, to the end that he may be discharged from unconstitutional confinement and restraint;

2) permit Petitioner's counsel a period of time to amend this petition;

3) require the Warden to file an Answer to Petitioner Grimes' habeas corpus petition;

4) require the Warden to either waive any procedural defenses (should any be potentially applicable) or file a brief detailing the allegedly applicable procedural defenses and explaining how they apply to Petitioner Grimes' claims, and allow Petitioner to file a response brief;

5) allow Petitioner Grimes to file a motion to expand the record;

6) grant Petitioner Grimes the right to conduct discovery if requested in a separately filed motion;

7) order and conduct an evidentiary hearing where proof may be offered and argument advanced concerning the allegations in this petition, which Petitioner Grimes will almost certainly request in a separate motion after the Warden files an Answer or other responsive pleading;

8) should Petitioner Grimes not prevail on all his claims, allow him to file a motion explaining why a certificate of appealability (COA) should be granted on any claims this Court denies relief on before deciding whether to issue a COA on the various claims; and,

9) grant Petitioner Grimes such further relief as may be necessary and appropriate in the interests of justice.

Respectfully submitted,

/s/ J. Vincent Aprile II
J. Vincent Aprile II
Attorney At Law
Lynch, Cox, Gilman & Goodman, P.S.C.
500 West Jefferson Street, Suite 2100
Louisville, Kentucky 40202
(502) 589-4215 (Office)
(502) 589- 4994 (Fax)
vaprile@lcgandm.com

Counsel for Anthony Thomas Grimes
Petitioner

April 8, 2020

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document and the habeas corpus petition were electronically filed with this Court by using the CM/ECF system, on this 8th day of April, 2020, and this day, April 8, 2020, undersigned counsel will serve by first class mail, postage prepaid, Kevin Mazza, Warden, Green River Correctional Complex, 1200 River Road, P.O. Box, 9300, Central City, Kentucky, and the Kentucky Attorney General will be served electronically by the CM/ECF system.

/s/ J. Vincent Aprile II